No. 22-1324

IN THE

# United States Court of Appeals for the Federal Circuit

APPLE INC.,

*Appellant,*

*v.*

COREPHOTONICS, LTD.,

*Appellee.*

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board No. IPR2020-00877

## OPENING BRIEF OF
## APPELLANT APPLE INC.

James Anglin Flynn
Mark S. Davies
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC  20005
(202) 339-8400

*Counsel for Appellant*

**CLAIM LANGUAGE AT ISSUE**

**U.S. Patent No. 10,288,840, Claims 1, 3, and 4**

**1.** A mobile electronic device comprising an integrated camera, wherein the camera comprises a Wide camera unit comprising a Wide lens unit and a Telephoto camera unit comprising a Telephoto lens unit, the Telephoto lens unit and the Wide lens unit having [specific physical characteristics].

**3.** The mobile electronic device of claim **1**, wherein the Wide and Telephoto camera units are mounted on separate printed circuit boards.

**4.** The mobile electronic device of claim **3**, wherein the printed circuit boards are located in different spaced-apart substantially parallel planes.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 22-1324 |
| **Short Case Caption** | Apple Inc. v. Corephotonics, Ltd. |
| **Filing Party/Entity** | Apple Inc. |

> **Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box.** Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/14/2022

Signature: /s/ James Anglin Flynn

Name: James Anglin Flynn

ii

FORM 9. Certificate of Interest

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Apple Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

iii

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Haynes and Boone, LLP | Michael S. Parsons | Andrew S. Ehmke |
| Jordan Maucotel | Stephanie N. Sivinski | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Corephotonics, Ltd. v. Apple Inc. No. 5:19-cv-04809-EJD (N.D. Cal.) | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

CLAIM LANGUAGE AT ISSUE..................................................................i

CERTIFICATE OF INTEREST .................................................................ii

TABLE OF AUTHORITIES.......................................................................vi

STATEMENT OF RELATED CASES ....................................................viii

INTRODUCTION......................................................................................1

JURISDICTIONAL STATEMENT ..........................................................2

STATEMENT OF THE ISSUES................................................................2

STATEMENT OF THE CASE ...................................................................3

    By 2015, modular multi-camera devices are well known...............3

    Modular lens assemblies provide desirable flexibility and
        value. .....................................................................................6

    The '840 patent claims a device with two lens assemblies
        mounted on separate printed circuit boards. .........................8

    In the IPR proceeding, the Board finds claims 1-2, 5-7, 11-13,
        15-16, 18, and 20-21 unpatentable but finds that Apple
        did not show claims 3 and 4 to be obvious............................9

SUMMARY OF ARGUMENT ..................................................................13

STANDARD OF REVIEW.......................................................................15

ARGUMENT .............................................................................................16

    I.    The Board Erred In Concluding That May Does Not
        Teach Mounting Image Sensors On Separate Printed
        Circuit Boards. ....................................................................16

    II.   The Board Erred In Concluding That There Was No
        Motivation To Combine May With The Other Prior Art......27

CONCLUSION .........................................................................................37

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ............................................... 14, 29, 31

*In re Applied Materials, Inc.*,
  692 F.3d 1289 (Fed. Cir. 2012) .................................................... 15, 33

*In re Burckel*,
  592 F.2d 1175 (CCPA 1979)............................................................ 22

*Consol. Edison Co. of N.Y. v. NLRB*,
  305 U.S. 197 (1938) ........................................................................ 15

*CRFD Rsch., Inc. v. Matal*,
  876 F.3d 1330 (Fed. Cir. 2017) ........................................................ 36

*ESIP Series 2, LLC v. Puzhen Life USA, LLC*,
  958 F.3d 1378 (Fed. Cir. 2020) ........................................................ 15

*Ethicon LLC v. Intuitive Surgical, Inc.*,
  No. 2020-1528, 2021 WL 3716397 (Fed. Cir. Aug. 23, 2021) ....... 24, 26

*EWP Corp. v. Reliance Universal Inc.*,
  755 F.2d 898 (Fed. Cir. 1985) .......................................................... 33

*Google LLC v. Lee*,
  759 F. App'x 992 (Fed. Cir. 2019) ..................................................... 36

*Granite Constr. Co. v. United States*,
  962 F.2d 998 (Fed. Cir. 1992) ................................................ 14, 26, 28

*Huawei Techs. Co. v. Iancu*,
  813 F. App'x 505 (Fed. Cir. 2020) ..................................................... 29

*Intel Corp. v. Qualcomm Inc.*,
  21 F.4th 784 (Fed. Cir. 2021)................................................. 14, 26, 29

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ............................................................... 14, 28, 33

*In re Nuvasive, Inc.*,
  842 F.3d 1376 (Fed. Cir. 2016) ...................................... 14, 24

*Personal Web Techs., LLC v. Apple, Inc.*,
  848 F.3d 987 (Fed. Cir. 2017) ................................... 14, 30, 31

## Statutes

28 U.S.C. § 1295(a)(4)(A) .................................................. 2

35 U.S.C. § 142 ................................................................. 2

35 U.S.C. § 311 ................................................................. 2

35 U.S.C. § 312 ................................................................. 2

## Rules and Regulations

37 C.F.R. § 42.104 ........................................................... 2

37 C.F.R. § 90.3(a)(1) ..................................................... 2

Fed. Cir. R. 15(a)(1) ........................................................ 2

## STATEMENT OF RELATED CASES

No appeal in or from the same proceeding was previously before this Court or any other appellate court.

Counsel is aware that the following case may directly affect or be directly affected by this Court's decision in the pending appeal:

*Corephotonics, Ltd. v. Apple Inc.*, No. 3:19-cv-04809-JD (N.D. Cal.).

Pursuant to this Court's orders, the following cases have been designated as companions to this appeal:

> *Corephotonics, Ltd. v. Apple Inc.*, Nos. 22-1340, 22-1341
>
> *Apple Inc. v. Corephotonics, Ltd.*, Nos. 22-1350, 22-1351
>
> *Corephotonics, Ltd. v. Apple Inc.*, Nos. 22-1455, 22-1456

The following case is related to this appeal:

> *Apple Inc. v. Corephotonics, Ltd.*, Nos. 22-1325, 22-1327, 22-1453, 22-1457

## INTRODUCTION

This dispute concerns a familiar technology likely found in your pocket: electronic devices, like cellphones, with multiple cameras. U.S. Patent No. 10,288,840 is directed to one such "mobile electronic device comprising an integrated camera" and claims a device that combines a wide-lens camera with a telephoto-lens camera.

The Patent Trial and Appeal Board got this case mostly right, concluding that virtually all the challenged claims (including the only independent claim) of the '840 patent were obvious in light of the prior art. It erred, however, in upholding dependent claims 3 and 4, on the theory that the prior art did not teach mounting the wide and telephoto lens assemblies "on separate printed circuit boards." It then further erred by concluding that, even assuming such a teaching in the prior art, there was no rational motivation to combine it with the other cited references.

In support of its patent, Corephotonics offered no expert testimony or evidence of its own. The undisputed evidence in the record—indeed, the only evidence—is that the prior art *did* teach mounting on separate printed circuit boards and that there *was* a motivation to combine the

art.  As a result, in upholding claims 3 and 4, the Board ignored or

rejected the undisputed testimony of the only expert in the case,

substituting the Board's own views for the expert's.  The Board's

conclusions, thus untethered from the record, lacked substantial

evidence, and this Court should reverse.

## JURISDICTIONAL STATEMENT

Apple petitioned for inter partes review of the '840 patent.  *See*

Appx99-210; 35 U.S.C. §§ 311, 312; 37 C.F.R. § 42.104.  The Board

instituted proceedings.  Appx233-285.  On November 2, 2021, the Board

issued a final written decision holding claims 1-2, 5-7, 11-13, 15-16, 18,

and 20-21 unpatentable and holding claims 3 and 4 not unpatentable.

Appx1-66.  On January 4, 2022, Apple timely filed its notice of appeal.

*See* Appx526-530; 35 U.S.C. § 142; 37 C.F.R. § 90.3(a)(1); Fed. Cir.

R. 15(a)(1).  This Court has jurisdiction pursuant to 28 U.S.C.

§ 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1.  Did the Board err in rejecting the patentability challenge to

claims 3 and 4 of the '840 patent when it concluded that the May prior

art reference (U.S. Patent No. 7,561,191) did not teach mounting image sensors on separate printed circuit boards?

2.   Did the Board err in holding claims 3 and 4 of the '840 patent not unpatentable when it found no motivation to combine the May prior art reference with the Parulski, Huang, and Tang references?

## STATEMENT OF THE CASE

### *By 2015, modular multi-camera devices are well known.*

This case is about electronic devices, like cellphones, that incorporate multiple digital camera units.  By the relevant priority date, 2015, such devices were well known in the art and widespread in the market.  For instance, U.S. Patent No. 7,859,588 (Parulski), issued in 2010, teaches the "concept of multiple lenses and multiple sensors, and the use of an integrated image capture assembly, [that] may be adapted for use in a cell phone."  Appx1360 (23:4-6).  Parulski's dual lens assemblies can be viewed from the front of the device as well as in cross-section, with the lenses shaded in red:



FIG. 2A            FIG. 16B

Appx1321 (Fig. 2A) (shading added); Appx1335 (Fig. 16B) (shading added).

Image sensors, like 614 and 618 shaded blue in Figure 16B above, capture the light that passes through the lens assemblies. It was "well-known in the art" that image sensors would be "mounted on a substrate that also carries other electronic components," *i.e.*, a "printed circuit board," like 620 shaded green above. Appx1273 (¶ 74) (citing Appx1578-1590 (Ryu, U.S. Patent No. 7,556,504)); *see also* Appx1360 (23:28-32) (Parulski).[1] In Parulski's Figure 16B—and in every other instance in the record, *see infra* at 16-17—image sensors are mounted

---

[1] The parties agree that element 620, sometimes described generally as a substrate, is a printed circuit board. *See* Appx498.

flat (or "planar") on their circuit boards, like a painting mounted flat on a wall.[2]

In the Parulski example, the image sensors are positioned in the same plane and mounted on the same circuit board. But that was not always the case. Consider another invention by Parulski and his colleagues at Eastman Kodak, U.S. Patent No. 7,561,191 (May). Appx1540-1577. In May, the lens assemblies may have different focal lengths, *i.e.*, the distance between the lenses and the image sensors. For example, a device might contain one lens assembly with a short focal length and another lens assembly with a longer focal length. The two lens assemblies can have different purposes. For example, the short focal length can be used for capturing a "wide-angle view of a room," like lens 2 and image sensor 12 in May's Figure 10A below, and the longer focal length can be used for "high resolution" transmissions of detailed images like documents, like lens 3 and image sensor 14. Appx1565 (3:17-19).

---

[2] Apple uses "planar" in a manner consistent with how the Board used that term. It appears the Board used "planar" to refer to the image sensor being directly mounted to the circuit board and parallel to the circuit board, as with blue sensor 618 and green circuit board 620.



**FIG. 10A**

Appx1551 (Fig. 10A) (shading and dashed lines added); *see also* Appx1567 (7:16-35).  Because of the differences between the lens assemblies, resulting in different lens assembly lengths, the blue image sensors 12 and 14 sit at different distances from the lenses in their assemblies.  The blue image sensors are accordingly separate and sit in different parallel planes, as indicated by the dashed blue lines above.

***Modular lens assemblies provide desirable flexibility and value.***

In the IPR proceeding under review, Apple's expert, Professor José Sasián, explained the prior-art context and consequences of using multiple lens assemblies as just described.  Dr. Sasián has a Ph.D. in optical sciences and is a tenured professor of the same at the University of Arizona, with over thirty years of academic and industry experience.

Appx1188-1192; *see also* Appx506 (Counsel for Corephotonics: "[Sasián]
writes textbooks in lens design.  He has surely forgotten more about
lens design than I will ever know.").

Dr. Sasián explained that a person of ordinary skill in the art
(POSITA) would have understood that, in a configuration like May's
Figure 10A above where there are sensors positioned in distinct planes,
each sensor would be "mounted on a different printed circuit board"
(PCB).  Appx1270 (¶ 66); *accord* Appx2479 (¶ 22) ("Thus, each sensor
typically has its own miniature PCB.").  By teaching that the lens
assemblies can be mounted in separate planes and, thus, on separate
boards, May offers a "modular" approach so that multi-camera devices
"may be reconfigured as needed."  Appx2479 (¶ 21); *see also* Appx1274
(¶ 77).

A person of ordinary skill in the art would have understood this
"PCB modularity" feature to be advantageous for a number of reasons.
It "provide[s] increased flexibility for the design of a digital camera"
with different kinds of lenses, different focal lengths, and different
configurations that account for the placement of other components in
the device.  Appx2481 (¶ 26).  PCB modularity also "leads to lower cost

to the consumer" because "it is cheaper to replace a camera module than

to replace an entire camera device."  Appx2482 (¶ 27).

***The '840 patent claims a device with two lens assemblies
mounted on separate printed circuit boards.***

The patent at issue here, U.S. Patent No. 10,288,840, describes a

mobile electronic device with two lens assemblies, a wide-lens

assembly 602 and a telephoto-lens assembly 604.  Appx69 (Abstract).



FIG. 6B

Appx85 (Fig. 6B) (shading and wide/telephoto annotations added).

Claim 1 of the '840 patent teaches one such device containing wide and telephoto lens assemblies with specific attributes, including the relative spacing of the lenses (shaded red) and sensors.  Appx97 (19:45-20:16).  It also specifies that the lenses be made of "different polymer materials" with certain "Abbe numbers," an industry measure that describes the degree to which a lens disperses light as it passes through.  Appx97 (19:53-54).

Claims 3 and 4 add another prior-art teaching:  The two camera units, 602 and 604 in Figure 6B, "are mounted on separate printed circuit boards," 605a and 605b shaded green above, Appx97 (20:22-23) (claim 3), and those separate boards "are located in different spaced-apart substantially parallel planes," Appx97 (20:25-26) (claim 4).  In the figure, green circuit board 605a sits in a plane slightly above and parallel to the plane of circuit board 605b.

***In the IPR proceeding, the Board finds claims 1-2, 5-7, 11-13, 15-16, 18, and 20-21 unpatentable but finds that Apple did not show claims 3 and 4 to be obvious.***

In 2019, Corephotonics filed suit against Apple, alleging infringement of ten patents, including the '840 patent.  *Corephotonics, Ltd. v. Apple Inc.*, No. 3:19-cv-04809-JD (N.D. Cal.).  In response, Apple

petitioned for inter partes review of claims 1-7, 11-13, 15-16, 18, and 20-21. Appx99-210 (IPR2020-00877). Corephotonics did not file a preliminary response to the petition, and the Board instituted review as to all challenged claims. Appx233-285. Corephotonics then filed a patent owner response disputing obviousness as to claims 3 and 4 only; Corephotonics made no patentability arguments as to the remainder of the claims. Appx310.

Before the Board, the parties agreed that no claims needed construction. Appx312; Appx331. They also agreed on the level of ordinary skill in the art: A person of ordinary skill would have had, as of the '840 patent's priority date, a bachelor's degree in physics, optical science, or equivalent training, as well as approximately three years of experience in designing miniature lens systems for mobile device applications. Appx110-111; Appx312.

The Board's final written decision, Appx1-66, held claims 1-2, 5-7, 11-13, 15-16, 18, and 20-21 unpatentable in view of Parulski and two other prior art references: Huang (U.S. Patent No. 9,726,858, Appx1367-1410) and Tang (U.S. Patent No. 8,363,337, Appx1459-1494). The Board's obviousness analysis with respect to claim 6 also included

the Li reference (U.S. Patent No. 7,918,398, Appx1411-1435). The

Huang, Tang, and Li references teach aspects of the claimed lenses—

including lens spacing and Abbe numbers—not at issue in this appeal.

*See* Appx16-41; Appx60-64.

With respect to claims 3 and 4, however, the Board held that

Apple had not met its burden to establish obviousness in view of

Parulski, Huang, Tang, and May. Appx41-60. Relying on Dr. Sasián's

expert analysis, Apple proffered record evidence that May teaches

mounting image sensors on separate printed circuit boards as required

by claim 3. *See* Appx189-192; Appx195-197. Apple also proffered

expert analysis from Dr. Sasián that flexibility and cost savings would

have motivated a person of ordinary skill in the art to combine those

teachings with the lenses and lens assemblies taught by Parulski,

Huang, and Tang and would have had a reasonable expectation of

success in doing so—rendering obvious claim 3, as well as dependent

claim 4. *See* Appx192-194; Appx197-199.

The Board disagreed on both counts.[3]  First, it concluded that May did not teach mounting on separate printed circuit boards.  Appx51-55.  The Board acknowledged the problem described above—*i.e.*, that the image sensors in many of May's embodiments sit "in different planes."  Appx53.  But the Board accepted Corephotonics' theory of "non-planar" mounting—a theory based solely on attorney argument and proffered without reference to any expert testimony or other record evidence.  In the Board's view, the image sensors in May that sit in different planes do not call for separate printed circuit boards.  Instead, the Board theorized they could be mounted to a single printed circuit board in non-planar fashion, like mounting a painting by its edge, facing the floor or the ceiling rather than the viewer.  *See* Appx52-53.

Second, the Board rejected Dr. Sasián's rationale for combining the prior art.  Appx55-60.  First, the Board concluded that a person of ordinary skill in the art would not have been motivated to draw on May's separate-circuit-board teaching.  It reasoned that May's teaching arises only in the context of a "folded" lens configuration—wherein a

---

[3] The Board's reasoning turned entirely on claim 3; it did not separately analyze claim 4.  *See* Appx55; Appx60.

mirror or prism changes the direction of the light after it passes through the lens—whereas the '840 patent ostensibly concerns "non-folded" configurations. *See* Appx56-57. Second, the Board disagreed with Dr. Sasián that May's teachings would have yielded benefits in cost and flexibility sufficient to motivate the prior-art combination. Appx58-60. Accordingly, the Board found that Apple did not prove by a preponderance of the evidence that claims 3 and 4 were obvious in view of the prior art.

## SUMMARY OF ARGUMENT

I. The Board ignored record evidence of obviousness, including unrebutted expert testimony. In particular, Apple's expert testified that the May prior art reference taught the mounting of image sensors in planar fashion on separate printed circuit boards. That testimony was supported by the record evidence, and Corephotonics offered no evidence to rebut it.

The Board not only ignored the key passage from May, which both parties had invoked and briefed; it also substituted a theory of "non-planar" mounting that was not grounded in any of the evidence, including the prior art. This theory replaced the established expert

testimony of Dr. Sasián. In effect, the Board hypothesized its own technological solution based on mere imagination. That speculative solution lacked substantial evidence. *See, e.g.*, *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 797-99 (Fed. Cir. 2021); *In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016).

II. The Board improperly rejected unrebutted expert testimony and substituted its own views on motivation to combine the cited references. The Board rejected as purportedly unpersuasive the testimony of Apple's expert about the technical benefits of modularity in printed circuit boards, without countervailing expert evidence or any other record basis to do so. Its unsupported disagreement with the expert lacked substantial evidence. *See, e.g.*, *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415, 420 (2007); *Granite Constr. Co. v. United States*, 962 F.2d 998, 1006 (Fed. Cir. 1992). And the Board's reliance on this Court's cases about generic expert assertions was misplaced; Apple's expert gave developed and factually supported testimony that satisfies this Court's precedent. *See, e.g.*, *Intel*, 21 F.4th at 797; *Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 993-94 (Fed. Cir. 2017); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312,

1328 (Fed. Cir. 2012). Moreover, the Board misread the May reference, focusing only on a single figure rather than "consider[ing] [the art] for everything that it teaches." *In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012).

## STANDARD OF REVIEW

This Court reviews the Board's legal conclusions de novo. *ESIP Series 2, LLC v. Puzhen Life USA, LLC*, 958 F.3d 1378, 1383 (Fed. Cir.), *cert. denied*, 141 S. Ct. 557 (2020). It reviews factual determinations for substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "Obviousness is a question of law with underlying factual findings relating to the scope and content of the prior art; differences between the prior art and the claims at issue; the level of ordinary skill in the pertinent art; the presence or absence of a motivation to combine or modify prior art with a reasonable expectation of success; and any objective indicia of non-obviousness." *Id.*

15

## ARGUMENT

### I. The Board Erred In Concluding That May Does Not Teach Mounting Image Sensors On Separate Printed Circuit Boards.

As Dr. Sasián explained, it was "well-known in the art" to mount image sensors on printed circuit boards. Appx2479 (¶ 22). It was also well known that sensors would be mounted on their boards in "planar fashion," *i.e.*, next together in parallel planes, like mounting a painting flat against a wall. That's how May depicts them, with the image sensors 614 and 618 shaded blue and the printed circuit board 620 shaded green:



FIG. 24A

Appx1563 (Fig. 24A) (shading added).

That's also how Ryu—another reference considered by the Board, Appx54—depicts them:



**FIG. 6**

Appx1584 (Fig. 6) (shading added).

And that's how Parulski depicts them:



*FIG. 16B*

Appx1335 (Fig. 16B) (shading added).

And, as Dr. Sasián explained, in the prior art, "each sensor typically has its own miniature PCB." Appx2479 (¶ 22). But like

Parulski's Figure 16B above, the May reference departed from that typical one-sensor-one-board arrangement in certain circumstances. Referencing this deviation, May explains that "in *some* embodiments," like Figure 24A below, "the sensors … may be positioned next to each other on a *common* circuit board assembly." Appx1568 (10:14-16) (emphases added). In Figure 24A, the blue image sensors 614 and 618 are mounted on a common green circuit board 620:



FIG. 24A

Appx1563 (Fig. 24A) (shading added).

As May's language makes plain, this is only the case "in *some* embodiments." Appx1568 (10:14) (emphasis added). In other embodiments, such as when image sensors are not next to each other in the same plane, they cannot be mounted on a single printed circuit

board.  Take, for instance, May's Figure 10E, which depicts three image

sensors 12a, 12b and 12c (shaded blue below):



FIG. 10E

Appx1552 (Fig. 10E) (shading and annotations added).

Image sensors 12b and 12c demonstrate the challenge of circuit-

board mounting.  Image sensor 12b is shown in cross-section and sits in

the plane transecting the page orthogonally, with the sensor facing to

the left and recording light from its corresponding lens 2b.  Image

sensor 12c sits in a perpendicular plane, facing upward to

corresponding lens 2c.  *See* Appx1567 (8:31-54).

Using the planar mounting depicted in the prior art, these non-

parallel sensors could not be mounted on a single circuit board.  As the

annotated Figure 10E above shows, a single circuit board (in red dashed

lines) could not be aligned in planar fashion (*i.e.*, flat and parallel) with both sensors 12b and 12c.

Instead, as Dr. Sasián explained, a person of ordinary skill in the art would have understood that this arrangement required separate circuit boards, each of which would have been mounted in planar, *i.e.*, parallel, alignment with its corresponding sensor.  Appx2480 (¶ 24) ("However, in *other* embodiments … in which the subassemblies are *not* on a common plane (such as Figs. 10D-10F), a POSITA would understand that the camera subassemblies in May would not be mounted on a common circuit board.").[4]  As an example, separate printed circuit boards are depicted as dashed red lines below, situated parallel to and flat against image sensors 12b and 12c:

---

[4] *Accord* Appx1269-1270 (¶ 66) ("In these embodiments, a POSITA would understand that each camera of the image capture assembly includes a sensor (*i.e.*, 12a, 12b …) mounted on a different printed circuit board."); Appx2475 (¶ 15) ("Specifically, a POSITA would have understood that the image sensors being *in different places* in May's embodiments shows that *the image sensor on each subassembly is mounted on its own PCB*."); Appx2477 (¶ 18) ("Since each subassembly has a sensor mounted in a different orientation, a POSITA would have understood each sensor to be mounted on a different PCB due to the image sensors not being parallel and in the same plane.").



FIG. 10E

Appx1552 (Fig. 10E) (shading and annotations added).

Figure 10E does not depict the printed circuit boards on which the sensors are mounted like Figure 24A does. But as Dr. Sasián explained—in unrebutted expert testimony—"[a] POSITA would have … recognized" based on Figure 24A "that May's other optical assemblies would also include image sensors mounted on a PCB." Appx2474 (¶ 13); *accord* Appx1270 (¶ 67) ("[E]ach of the camera subassemblies of May is mounted on a substrate that also carries other electronic components … and therefore is understood to be a printed circuit board as claimed."). This was proper expert testimony: As this Court has long held, in considering obviousness, "a reference must be

21

considered not only for what it expressly teaches, but also for what it fairly suggests." *In re Burckel*, 592 F.2d 1175, 1179 (CCPA 1979).

Despite all this evidence, the Board concluded that May does not "teach[] or suggest[] placing different lens units on separate printed circuit boards." Appx52. Instead, the Board concluded that all of the image sensors contemplated in May could and would have been mounted on a single, common circuit board. Appx52-53. How did the Board deal with embodiments like Figure 10E, in which the sensors are not all positioned in a single plane? The Board hypothesized that "image sensors 12a through 12d [in May's figures] could be connected, *e.g.*, *in a non-planar fashion*, to a single printed circuit board." Appx54. In other words, instead of mounting the image sensors flat, in parallel, against their circuit boards, the Board imagined, for example, that a skilled artisan could have mounted some of the sensors at odd angles or even perpendicular to the PCB—like hanging a painting by its edge, facing the ceiling or the floor.

But this non-planar theory was just that: a theory. There was no evidence in the record to support it. As explained above (at 16-17), the prior art uniformly described and depicted an image sensor mounted

flat against a circuit board in parallel, *i.e.*, "planar" fashion.  So did the '840 patent itself.  *See, e.g.*, Appx85-86 (Figs. 6A, 6B, 7 & 8).  Neither Corephotonics nor the Board identified any record evidence embodying (or even suggesting) their non-planar mounting theory.  Indeed, at the Board hearing, instead of pointing to specific evidence on this point, instead of pointing to *any* example in the record of non-planar mounting, Corephotonics just waved its hands and speculated:  "I submit that the world is full of things that are electrically connected without being mounted flat against one another."  Appx523.

The Board faulted Dr. Sasián for failing to debunk that attorney argument.  *See* Appx54 ("Neither does May or Dr. Sasián's testimony explain why a POSITA would not have, instead, understood image sensors 12a through 12d could be connected, *e.g.*, *in a non-planar fashion*, to a single printed circuit board ….").  But there was nothing for Dr. Sasián to debunk:  The record contained zero evidence of non-planar mounting.  As one Board judge acknowledged at the hearing, Corephotonics first offered a non-planar theory "in its sur-reply," Appx488, long after the record evidence was developed, leaving no opportunity for Dr. Sasián to respond to that theory.

23

In adopting the non-planar mounting theory, the Board's conclusion rested on two errors.

*First*, the Board's analysis ignored entirely Apple's argument and evidence showing that May's discussion of a common circuit board teaches the underlying prior-art norm, described by Dr. Sasián, that image sensors are typically mounted on their own, separate boards. Although the Board noted this argument in its summary of the parties' positions, the Board's analysis does not respond to or rebut the argument, nor does it discuss at all the relevant evidence—the "some embodiments" passage of May or Dr. Sasián's interpretation thereof, *see* Appx51-55—even though both parties expressly and repeatedly invoked it, *see* Appx193 (Apple Petition); Appx318 (Corephotonics Response); Appx339-340 (Apple Reply); Appx378 (Corephotonics Surreply).

The Board is not permitted merely "to summarize and reject arguments without explaining why [it] accepts the prevailing argument." *In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016). For instance, in *Ethicon LLC v. Intuitive Surgical, Inc.*, the petitioner offered expert testimony to support a particular motivation to combine, that expert's testimony went unrebutted, and this Court held that "the

Board erred by not addressing" that undisputed expert evidence.
No. 2020-1528, 2021 WL 3716397, at *7 (Fed. Cir. Aug. 23, 2021)
(unpublished).

*Second*, the Board substituted its own views for the unrebutted
testimony of the only expert in the case.  The Board acknowledged as
much, explaining perfunctorily that Dr. Sasián's expert opinion on
May's disclosure "is not persuasive."  Appx52.  According to the Board,
"[t]here is insufficient evidence of record" to support his conclusions.
Appx52.  But the *only* evidence in the record—namely, the relevant
portions of May and Dr. Sasián's explication of May as supported and
corroborated above—supported Dr. Sasián's conclusion.  Corephotonics
submitted no contrary evidence of its own—just attorney speculation.
This was especially true with respect to the parties' dispute on planar
versus non-planar mounting, which Corephotonics raised only by way of
attorney argument in its surreply and at the hearing.  Because there
was zero evidence in the record to support the Board's non-planar
mounting theory, that theory could not have provided the substantial
evidence necessary to reject Dr. Sasián's unrebutted testimony.

This Court has explained that the Board "may reject even uncontroverted expert testimony when it is intrinsically unpersuasive," but this is not such a case. *Granite Constr. Co. v. United States*, 962 F.2d 998, 1006 (Fed. Cir. 1992). Instead, as in *Granite Construction*, "the record is devoid of any evidence indicating that the expert testimony was either exaggerated, inherently improbable, self-conflicting, or opinion not founded in fact." *Id.* Where the Board reaches a finding by rejecting expert testimony without any such basis in the record, that "finding is not supported by substantial evidence." *Id.*; *see also Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 799 (Fed. Cir. 2021) (holding Board's rejection of expert testimony was "not supported by substantial evidence"); *Ethicon*, 2021 WL 371639, at *7 (reversing Board's non-obviousness determination).

The Board ignored unrebutted expert testimony and, in its place, substituted a speculative theory that lacks a basis in the record evidence. These twin errors formed the basis for the Board's mistaken obviousness determination as to claims 3 and 4, and that determination should accordingly be set aside.

## II.    The Board Erred In Concluding That There Was No Motivation To Combine May With The Other Prior Art.

In finding claim 1 of the '840 patent unpatentable, the Board correctly concluded that it was obvious in view of Parulski, Huang, and Tang.  Appx10-35.  Corephotonics did not dispute and has not appealed the obviousness of claim 1.  *See* Appx310.  The motivation-to-combine question with respect to claims 3 and 4, then, is whether a person of ordinary skill in the art would have been motivated to combine that prior art with May's teaching that the image sensors are mounted on separate printed circuit boards.  *See* Appx55-60.

As Dr. Sasián explained, the use of separate circuit boards yields beneficial "PCB modularity."  That modularity confers additional design flexibility, because it "made it easier to rearrange lenses to accommodate other components such as electronics, screens, and batteries" and facilitated the use of "different lens assemblies from different sources."  Appx2481 (¶ 26).  It also "leads to lower cost to the consumer," because "it is cheaper to replace a camera module than to replace an entire camera device."  Appx2482 (¶ 27); *accord id.* ("It is well-known that component modularity is an important factor in designing and building devices as it impacts fabrication, reparability,

27

and cost."); Appx1274 (¶ 77).  This expert testimony was unrebutted, and the Board should have credited it as part of the "expansive and flexible approach" to determining obviousness.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007).

Instead, the Board's motivation analysis committed the same error described above:  It substituted its own speculation for the record evidence, including the unrebutted expert testimony.  The Board began by reviewing Apple's arguments and explaining its disagreement.  Appx58-60.  Then the Board turned briefly to Dr. Sasián's testimony and rejected it out of hand:  Observing that "Dr. Sasián's testimony … largely reiterates [Apple]'s contentions and cites to substantially similar portions of the references," the Board found "his testimony similarly unpersuasive."  Appx60.  But that gives away the game:  The Board treated unrebutted expert testimony as if it were attorney argument that it could upturn based on the Board's own say-so.  That was error.  *E.g.*, *Granite Constr. Co. v. United States*, 962 F.2d 998, 1006 (Fed. Cir. 1992).

Even if the Board were permitted to counter unrebutted expert testimony with its own views, the Board's views lacked support in the

record and this Court's precedent.  As justification for rejecting Dr. Sasián's purportedly "too generic and factually unsupported" testimony, the Board relied on this Court's decision in *ActiveVideo*. Appx55 (citing *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012)).  But the testimony this Court confronted in *ActiveVideo* was self-evidently broad and vague; as the Court explained, it did not even mention "any specific combination of prior art elements."  694 F.3d at 1328.[5]  This Court has subsequently rejected the Board's attempt to apply this precise aspect of *ActiveVideo* to cases (like this one) where the expert *did* actually explain "how and why a skilled artisan would have combined the references."  *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 797 (Fed. Cir. 2021); *accord Huawei Techs. Co. v. Iancu*, 813 F. App'x 505, 510 (Fed. Cir. 2020) ("This is not a case where the motivation of increased efficiency is asserted so generically as to be legally insufficient.").

---

[5] Verizon's expert testified:  "The motivation to combine would be because you wanted to build something better.  You wanted a system that was more efficient, cheaper, or you wanted a system that had more features, makes it more attractive to your customers, because by combining these two things you could do something new that hadn't been able to do before."  *Id.*

Here, Apple and Dr. Sasián delved deeply into the references and the specific combination and explained why a person of ordinary skill in the art would have arrived at that combination.  In addition to the desired PCB modularity, Dr. Sasián pointed to a variety of reasons a skilled artisan would have looked to these references.  For example, Parulski and May share an identical figure depicting image sensors mounted on a common circuit board.  *See* Appx1207 (¶ 44) (reproducing Appx1335 (Parulski Fig. 16B)); Appx1270 (¶ 67) (reproducing Appx1563 (May Fig. 24A)).  In fact, Parulski's disclosure incorporates by reference figures identical to *all* of the figures in May.  *See* Appx1355 (13:9-13) (Parulski) (incorporating Appx2332-2371 (Labaziewicz)).  Parulski and May also share two inventors, Wilbert Janson and Parulski himself, who like May were employees of Eastman Kodak.  *See* Appx1318; Appx1540.  As Dr. Sasián explained, "[t]he shared disclosure, figures, and inventors of Parulski and May would have motivated a POSITA to rely on the teachings of both patents."  Appx2480 (¶ 25).  The Board expected "a motivation to pick out those two references," and Dr. Sasián provided exactly that.  Appx55 (quoting *Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 993-94 (Fed. Cir. 2017)).

In rejecting Dr. Sasián's opinion, the Board did not engage with any of Dr. Sasián's particularized explanations for the combination. Doing so would have plainly undermined its reliance on *ActiveVideo* and *Personal Web*, because Dr. Sasián here offered exactly the testimony that those cases found missing. *Compare, e.g.*, Appx2480 (¶ 25) (describing why a skilled artisan "would have been motivated" to combine the prior art references), *with Personal Web*, 848 F.3d at 993-94 (holding it was "not enough" to say that references "*could be* combined" without a "motivation to pick out those two references;"); *and ActiveVideo*, 694 F.3d at 1328 (rejecting testimony that "bears no relation to any specific combination of prior art elements").

On the substance of the combination, the Board had two objections, neither of which accurately characterized the record evidence.

*First*, May contains two camera configurations, folded and non-folded. In a non-folded configuration, the lenses and image sensor are arranged in a straight line, and light follows the optical path through the lenses directly to the sensor. In a folded configuration, the optical path between the lenses and the image sensor turns—by way of a

prism, for example. *E.g.*, Appx1568 (10:60-67). As May explained, "[w]hile the folded optics are used in many of the preferred embodiments, a folded optical path is not generally necessary for the practice of the invention." Appx1566 (6:37-39). The Board concluded that because May teaches separate circuit boards in the context of these preferred *folded* embodiments, a person of ordinary skill in the art would not have drawn on that teaching to inform the *non-folded* combination of Parulski, Tang, and Huang. Appx57.

The folded vs. non-folded distinction is a red herring. May's teaching of image sensors mounted on separate printed circuit boards is "not limited to folded designs"; a skilled artisan would have understood it "to apply to both folded and non-folded fixed-lens configurations," as Dr. Sasián explained. Appx2483 (¶ 30). The Board's mistake appears to stem from its erroneous reliance on a single embodiment from May, Figure 24A. *See* Appx57. Figure 24A (*supra* at 18) shows a non-folded configuration with a single circuit board, but Figure 24A is just one embodiment. Nothing in May—and no evidence cited by Corephotonics nor any of the record evidence—undermines Dr. Sasián's testimony that the separate-boards teaching could and would be applied in a non-folded

configuration like Figure 24A, too. *See, e.g.*, *In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012) ("A reference must be considered for everything that it teaches, not simply the described invention or a preferred embodiment.").

Even if May's separate-boards teaching were somehow confined to folded configurations, a person of ordinary skill in the art could have drawn on May and applied it in the non-folded context. The Supreme Court has rejected the proposition that a skilled artisan "attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem." *KSR*, 550 U.S. at 420. Instead, the prior art "must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing." *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985). And there is no reason—except Corephotonics's and the Board's unsupported speculation—to think that the folded or non-folded configuration of a lens assembly would have any effect on this distinct circuit-board design choice. The unrebutted record evidence on this point was Dr. Sasián's testimony that a skilled artisan "would have

33

understood" May's teaching of separate circuit boards "to apply to both folded and non-folded" configurations. Appx2483 (¶ 30).

*Second*, the Board rejected Dr. Sasián's testimony that a skilled artisan would have been motivated to add May's teaching to this combination by the PCB modularity described above, even though there is no record evidence to the contrary and Corephotonics pointed to none. The Board concluded that "the record does not indicate that May is any more 'modular' than any other lens assembly in the cited references" and that, even if it were, "that does not imply a POSITA would have understood its components to be interchangeable or any more capable of being rearranged." Appx58.

But in the record, Dr. Sasián offered testimony—unrebutted and ignored by the Board—explaining exactly these characteristics of May. According to Dr. Sasián, May's teaching of mounting image sensors on separate printed circuit boards *is* the desirable modularity. "PCB modularity is a well-known practice in the electronic device industry where different device functions are performed by electronics assembled in different printed boards that can be replaced." Appx2482 (¶ 27). A person of ordinary skill in the art would have looked to May's teaching

of "PCB modularity" because it would "provide increased flexibility for the design of a digital camera," including by accounting for arrangement of other device components and the use of different lenses and focal lengths. Appx2481 (¶ 26). A person of ordinary skill also would have looked to May's PCB modularity as an economic matter, because it would facilitate the "ease of camera module replacement"; "it is cheaper to replace a camera module than to replace an entire camera device." Appx2482 (¶ 27). This modularity "is an important factor in designing and building devices" because "it impacts fabrication, reparability and cost." Appx2482 (¶ 27). To the extent the beneficial modularity of May needed explaining, Dr. Sasián provided that very explanation from the point of view of a person of ordinary skill in the art. The Board lacked any rational basis for rejecting that testimony, and its contrary conclusion was without substantial evidentiary support.

On each of these fronts, the Board's motivation analysis fails to pass muster under this Court's precedent. The Board erred in rejecting Dr. Sasián's extensive, detailed testimony as too generic under *ActiveVideo*, and the Board took a fatally cramped view of all that the

35

prior art teaches under *KSR*. The record evidence—including Apple's unrebutted expert testimony—demonstrates that a person of ordinary skill in the art would have been motivated to combine May with the other cited references, and the Board's contrary determination was without substantial evidence.

\* \* \*

The Board's obviousness determinations with respect to claim 3— and, a fortiori, claim 4, *see supra* at 11-12 & n.3—lacked substantial evidence. Because the only view substantially supported by the record is that these claims were obvious, the Board's determinations should be reversed. *E.g.*, *Google LLC v. Lee*, 759 F. App'x 992, 996-98 (Fed. Cir. 2019); *CRFD Rsch., Inc. v. Matal*, 876 F.3d 1330, 1349 (Fed. Cir. 2017). In the alternative, the Board's decision should be vacated and remanded for proper consideration of the record evidence, including the unrebutted expert testimony.

## CONCLUSION

Apple respectfully requests that this Court reverse (or, in the alternative, vacate and remand) the Board's conclusion that claims 3 and 4 of the '840 patent are not unpatentable.

Respectfully submitted,

*/s/ James Anglin Flynn*
James Anglin Flynn
Mark S. Davies
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC  20005
(202) 339-8400

*Counsel for Appellant*

June 14, 2022

# ADDENDUM

Final Written Decision,
    Paper No. 26, filed November 2, 2021 ........................................ Appx1

U.S. Patent No. 10,288,840 ........................................................... Appx69

Trials@uspto.gov                                    Paper 26
571-272-7822                            Entered: November 2, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

_____

IPR2020-00877
Patent 10,288,840 B2

_____

Before BRYAN F. MOORE, MONICA S. ULLAGADDI, and
JOHN R. KENNY, *Administrative Patent Judges.*

ULLAGADDI, *Administrative Patent Judge.*


JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-00877
Patent 10,288,840 B2

# I.    INTRODUCTION

Apple Inc. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1–7, 11–13, 15, 16, 18, 20, and 21 ("the challenged claims") of U.S. Patent No. 10,288,840 B2 (Ex. 1001, "the '840 patent"). Paper 2 ("Petition" or "Pet."). Patent Owner did not file a preliminary response. We instituted trial on all challenged claims and on all grounds set forth in the Petition. Paper 7 ("Institution Decision" or "Inst. Dec.").

After institution, Patent Owner filed a Patent Owner Response (Paper 12, "PO Resp."), Petitioner filed a Reply to Patent Owner's Response (Paper 13, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 18, "PO Sur-reply"). An oral hearing was held on August 3, 2021, and a copy of the transcript was entered in the record. Paper 25 ("Tr.").

We have jurisdiction pursuant to 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of the claims on which we instituted trial. Petitioner bears the burden of proving unpatentability of the challenged claims, and the burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must prove unpatentability by a preponderance of the evidence. *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019). Having reviewed the arguments and the supporting evidence, we determine that Petitioner has shown, by a preponderance of the evidence, that 1, 2, 5–7, 11–13, 15, 16, 18, 20, and 21 of the '840 patent are unpatentable. We further determine that Petitioner has not shown, by a preponderance of the evidence, that claims 3 and 4 of the '840 patent are unpatentable.

2

IPR2020-00877
Patent 10,288,840 B2

## II.    BACKGROUND

### A.    Related Proceedings

Petitioner and Patent Owner identify the following corresponding district court proceeding: *Corephotonics, Ltd. v. Apple Inc.*, No. 5:19-cv-04809-LHK (N.D. Cal.).  Pet. 1; Paper 6, 1.[1]  Pending U.S. Application No. 16/276,034 claims priority to the application underlying the '840 patent.

### B.    The '840 Patent

The '840 patent concerns a mobile electronic device having an integrated camera.  Ex. 1001, code (57).  The camera includes a wide camera unit having a wide lens unit, and a telephoto camera unit having a telephoto lens unit.  *Id.* at 5:28–30.  The telephoto lens unit has a total track length (TTL) to effective focal length (EFL) ratio smaller than 1 and the wide lens unit larger has a TTL/EFL ratio of larger than 1.  *Id.* at 5:31–32.  The wide and telephoto lens units provide respectively main and auxiliary optical/imaging paths.  *Id.* at 17:46–47.  Figure 1C, reproduced below, illustrates a telephoto lens unit.  *Id.* at 7:1–2; 8:22–23.

---

[1] Patent Owner cites *Corephotonics, Ltd. v. Apple Inc.*, No. 3:19-cv-04809-LHK (N.D. Cal.) (Paper 6, 1), but this case number appears to reflect a typographical error.  A PACER search of Case No. 5:19-cv-04809 reveals that Patent Owner's complaint in that case was erroneously identified as "Civil Action No. 3:19-cv-4809" on its cover page.

3



FIG. 1C

Figure 1C shows a telephoto lens unit. *Id.*

Telephoto lens unit 20 includes "multiple lens elements made of different polymer materials, i.e., materials having different Abbe numbers." *Id.* at 8:22–26. The multiple lens elements define a telephoto lens assembly 22A and field lens assembly 22B on optical axis OA with gap G between assemblies, as shown in Figure 1C. *Id.* at 8:26–31. Gap G is larger than 1/5th of the TTL of telephoto lens unit 22A, which corrects for "field curvature of telephoto lens assembly 22A by the field lens assembly 22B." *Id.* at 8:43–47.

Telephoto lens assembly 22A has at least three lenses, L1, L2, and L3, in which lens L1 has positive optical power and lenses L2 and L3, combined, have negative optical power. *Id.* at 8:48–52. Lenses L2 and L3 are made of polymer materials having Abbe numbers selected to reduce chromatic aberrations of telephoto lens assembly 22A. *Id.* at 8:52–55. Field lens assembly 22B has at least two lenses L4 and L5 which are made of different polymer materials having different Abbe numbers. *Id.* at 8:55–58. Lenses L4 and L5 compensate for *residual* chromatic aberrations of telephoto lens assembly 22A that are dispersed when light passes through

4

IPR2020-00877
Patent 10,288,840 B2

gap G between telephoto lens assembly 22A and field lens assembly 22B. *Id.* at 8:58–61.

### C.    Challenged Claims

Petitioner challenges claims 1–7, 11–13, 15, 16, 18, 20, and 21 of the '840 patent.  Sole independent claim 1 is illustrative and reproduced below.

1. *[1.0]* A mobile electronic device comprising an integrated camera,

*[1.1]* wherein the camera comprises a Wide camera unit comprising a Wide lens unit and a Telephoto camera unit comprising a Telephoto lens unit,

*[1.2]* the Telephoto lens unit and the Wide lens unit having, respectively, total track length (TTL)/effective focal length (EFL) ratios smaller and larger than 1 and

*[1.3]* defining separate Telephoto and Wide optical paths,

*[1.4]* wherein the Telephoto lens unit comprises multiple lens elements made of at least two different polymer materials having different Abbe numbers,

*[1.5]* wherein the multiple lens elements comprise a first group of at least three lens elements configured to form a telephoto lens assembly and a second group of at least two lens elements,

*[1.6]* the second group of at least two lens elements spaced apart from the first group of at least three lens elements by a predetermined effective gap equal to or larger than 1/5 of the TTL of the Telephoto lens unit,

*[1.7]* wherein the first group of at least three lens elements comprises, in order from an object plane to an image plane along an optical axis of the Telephoto lens unit, a first lens element having positive optical power and

*[1.8]* a pair of second and third lens elements having together negative optical power such that the Telephoto lens assembly provides a Telephoto optical effect of the Telephoto lens unit and

IPR2020-00877
Patent 10,288,840 B2

*[1.9]* such that the second and third lens elements are each made of one of the at least two different polymer materials having a different Abbe number for reducing chromatic aberrations of the Telephoto lens,

*[1.10]* wherein the second group of lens elements includes a fourth lens element and a fifth lens element made of the different polymer materials having different Abbe numbers and

*[1.11]* is configured to correct a field curvature and to compensate for residual chromatic aberrations of the Telephoto lens assembly dispersed during light passage through the effective gap between the Telephoto lens assembly and the second group of at least two lens elements, and

*[1.12]* wherein the first, third and fifth lens elements have each an Abbe number greater than 50 and

*[1.13]* the second and fourth lens elements have each an Abbe number smaller than 30.[2]

Ex. 1001, 19:45–20:15.

### D.    *Asserted Grounds of Unpatentability*

Petitioner challenges claims 1–7, 11–13, 15, 16, 18, 20, and 21 as follows.  *See* Pet. 10–11.  In support, Petitioner relies on the First and Second Declarations of Dr. José Sasián (Ex. 1003, Ex. 1022).[3]

---

[2] Spacing and bracketed numbering are added for ease of readability.

[3] Petitioner alternatively references pages and paragraphs when citing Dr. Sasián's Declaration.  We refer to pages or paragraphs, as appropriate.

IPR2020-00877
Patent 10,288,840 B2

| Claim(s) Challenged | 35 U.S.C. §[4] | Reference(s)/Basis |
|---|---|---|
| 1, 2, 5, 7, 11–13, 15, 16, 18, 20, 21 | 103 | Parulski[5], Huang[6], Tang[7] |
| 3, 4 | 103 | Parulski, Huang, Tang, May[8] |
| 6 | 103 | Parulski, Huang, Tang, Li II[9] |

III.    ANALYSIS

A.    *Principles of Law*

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when available, objective evidence of

---

[4] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (September 16, 2011) ("AIA"), included revisions to 35 U.S.C. § 103 that became effective on March 16, 2013. Because the '840 patent issued from an application filed after March 16, 2013, we apply the AIA version of the statutory basis for unpatentability. *See* Ex. 1001, codes (22), (86).

[5] U.S. Patent No. 7,859,588 B2, issued Dec. 28, 2010 (Ex. 1005, Parulski").

[6] U.S. Patent No. 9,726,858 B2, issued Aug. 8, 2017 (Ex. 1006, "Huang"). Petitioner asserts that Huang is entitled to an effective filing date of December 30, 2014, the filing date of the Taiwanese application from which Huang claims foreign priority, because the U.S. application underlying the Huang patent was filed in English and a certified copy of the Taiwanese application was received by the Patent Office. Pet. 10.

[7] U.S. Patent No. 8,363,337 B2, issued Jan. 29, 2013 (Ex. 1009, "Tang").

[8] U.S. Patent No. 7,561,191 B2, issued July 14, 2009 (Ex. 1011, "May").

[9] U.S. Patent No. 8,189,100 B2, issued May 29, 2012 (Ex. 1018, "Li II").

7

IPR2020-00877
Patent 10,288,840 B2

nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). The burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware*, 800 F.3d at 1378 (citing *Tech. Licensing Corp. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in an *inter partes* review). Furthermore, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *Magnum*, 829 F.3d at 1380.

Thus, to prevail in an *inter partes* review, Petitioner must explain how the proposed combinations of prior art render the challenged claims unpatentable.

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

### B.     *Level of Ordinary Skill in the Art*

Petitioner contends

[A] person of ordinary skill in the art ("POSITA") would include someone who had, as of the priority date of the '840 Patent (i) a Bachelor's degree in Physics, Optical Sciences, or equivalent training, as well as (ii) approximately three years of experience in designing miniature lens systems for mobile device applications. . . . Such a person would have had experience in analyzing, tolerancing, adjusting, and optimizing multi-lens systems, and would have been familiar with the specifications of lens systems, especially lenses configured for use in mobile

8

IPR2020-00877
Patent 10,288,840 B2

> devices, such as cell phones. . . . In addition, a POSITA would
> have known how to use lens design software such as Code V,
> Oslo, or Zemax, and would have taken a lens design course. . . .
> Such a POSITA would have been familiar with photographic
> lenses and with mechanical and electronic devices. Lack of work
> experience can be remedied by additional education, and vice
> versa.

Pet. 6–7 (citing Ex. 1003, 10).  Patent Owner "applies the level of ordinary skill in the art set forth in the petition and used by the Board in its Institution Decision."  PO Resp. 3 (Inst. Dec. 8).

We determine that the level of ordinary skill in the art proposed by Petitioner is consistent with the '840 patent and the asserted prior art.  We apply Petitioner's definition in making the findings and conclusions rendered in this Decision.

### C.    Claim Construction

For *inter partes* reviews filed on or after November 13, 2018, we apply the same claim construction standard used by Article III federal courts and the ITC, both of which follow *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and its progeny.  37 C.F.R. § 42.100(b) (2019).  Accordingly, we construe each challenged claim of the '840 patent to generally have "the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent."  *Id.*

We construe claim terms to the extent necessary for our analysis on whether to institute a trial.  *See, e.g.*, *Nidec Motor Corp. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to

9

resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Independent claim 1 recites "the Telephoto lens unit and the Wide lens unit having, respectively, total track length (TTL)/effective focal length (EFL) ratios smaller and larger than 1 and defining separate Telephoto and Wide optical paths." Ex. 1001, 19:48–52. Petitioner asserts that "a POSITA would find, in light of the specification, the term 'total track length (TTL)' to include 'the length of the optical axis spacing between the object-side surface of the first lens element and the image plane.'" Pet. 8 (citing Ex. 1003, 20) (emphasis omitted). Petitioner further asserts that, although the Specification of the '840 patent does not expressly define EFL, "its meaning is well known in the art, as exemplified in Li ([Ex.] 1007), which states that '[t]he focal length of a lens assembly [is] also referred to as the effective focal length[.]'" Pet. 8–9 (quoting Ex. 1007, 2:59–61) (alterations in the original). Patent Owner "does not believe that any terms require construction to resolve the disputes addressed in this response." PO Resp. 3.

We do not discern a dispute as to the claim terms TTL and EFL in this proceeding and as such, we need not expressly construe these terms. *Nidec Motor Corp.*, 868 F.3d at 1017.  .

### D.    Obviousness over Parulski, Huang, and Tang

Petitioner contends that claims 1, 2, 5, 7, 11–13, 15, 16, 18, 20, and 21 are unpatentable as obvious under 35 U.S.C. § 103 over Parulski, Huang, and Tang. Patent Owner did not dispute Petitioner's challenge to these claims. *See* PO Resp. 1 (explaining that Patent Owner "limits this response to rebutting" only the ground for claims 3 and 4). For the reasons that follow, we determine that Petitioner's showing establishes unpatentability by

IPR2020-00877
Patent 10,288,840 B2

a preponderance of the evidence with respect to the challenge to claims 1, 2, 5, 7, 11–13, 15, 16, 18, 20, and 21.

### 1.    Overview of Parulski

Parulski concerns "a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability." *See, e.g.*, Ex. 1005, 1:7–10.  In one embodiment, an image capture assembly includes two image capture stages. *Id.* at 12:36–45.  For example, the image capture assembly can include a fixed focal length wide angle lens and a fixed focal length telephoto lens. *Id.* at 23:28–40.  The two image capture stages can be contained within a single stage for a mobile phone camera, as seen in Figures 16A and 16B, reproduced below.



**FIG. 16A**

**FIG. 16B**

Figure 16A of Parulski is a top view of integrated capture assembly 610 taken along lines 24B-24B in Figure 16B. *Id.* at 23:29–30.

In both Figures 16A and 16B, integrated capture assembly 610 includes an integrated packaging of optical and imaging components on

11

IPR2020-00877
Patent 10,288,840 B2

common substrate 620. *Id.* at 23:31–32. Integrated capture assembly 610 includes first fixed focal length lens 612 and first image sensor 614, as well as second fixed focal length lens 616 and second image sensor 618. *Id.* at 23:33–36. First lens 612 is preferably a fixed focal length wide angle lens that forms an image on first image sensor 614, and second lens 616 is preferably a fixed focal length telephoto lens that forms an image on the second image sensor 618. *Id.* at 23:36–40. Lenses 612 and 616 are both "oriented in the same direction in order to form images of the same portion of the overall scene in front of them, albeit with different fields of view." *Id.* at 23:40–43.

### 2.    *Overview of Huang*

Huang concerns a compact photographing optical lens assembly and image capturing device. Ex. 1006, 1:16–17. Huang discloses a lens assembly that corrects astigmatism and balances refractive power to correct aberrations. *Id.* at 5:38–52. An exemplary lens assembly is depicted in Figure 1, reproduced below.

12

IPR2020-00877
Patent 10,288,840 B2



Fig. 1

Figure 1 of Huang is a schematic view of an image capturing
device according to a first embodiment. *Id.* at 9:19–20.

The lens assembly includes, from an object side to an image side,
aperture stop 100, first though sixth lens elements 110, 120, 130, 140, 150,
160, IR-cut filter 170, image surface 180, and image sensor 190. *Id.* at 9:26–
31. The optical data for the first embodiment is shown in Table 1,
reproduced below.

TABLE 1

| 1st Embodiment | | | | | | | |
|---|---|---|---|---|---|---|---|
| f = 6.60 mm, Fno = 2.85, HFOV = 16.3 deg. | | | | | | | |
| Surface # | | Curvature Radius | | Thickness | Material | Index | Abbe # | Focal Length |

| Surface # | | Curvature Radius | | Thickness | Material | Index | Abbe # | Focal Length |
|---|---|---|---|---|---|---|---|---|
| 0 | Object | Plano | | Infinity | | | | |
| 1 | Ape. Stop | Plano | | −0.616 | | | | |
| 2 | Lens 1 | 1.401 | ASP | 0.885 | Plastic | 1.544 | 55.9 | 2.26 |
| 3 | | −7.705 | ASP | 0.074 | | | | |

IPR2020-00877
Patent 10,288,840 B2

TABLE 1-continued

1st Embodiment
f = 6.60 mm, Fno = 2.85, HFOV = 16.3 deg.

| Surface # | | Curvature Radius | | Thickness | Material | Index | Abbe # | Focal Length |
|---|---|---|---|---|---|---|---|---|
| 4 | Lens 2 | 19.967 | ASP | 0.240 | Plastic | 1.640 | 23.3 | −3.57 |
| 5 | | 2.042 | ASP | 0.454 | | | | |
| 6 | Lens 3 | 55.581 | ASP | 0.240 | Plastic | 1.530 | 55.8 | −8.42 |
| 7 | | 4.126 | ASP | 1.345 | | | | |
| 8 | Lens 4 | −1.523 | ASP | 0.270 | Plastic | 1.530 | 55.8 | 24.02 |
| 9 | | −1.444 | ASP | 0.264 | | | | |
| 10 | Lens 5 | −7.396 | ASP | 0.581 | Plastic | 1.650 | 21.4 | 20.42 |
| 11 | | −4.895 | ASP | 0.131 | | | | |
| 12 | Lens 6 | −1.157 | ASP | 0.200 | Plastic | 1.535 | 55.7 | −2.61 |
| 13 | | −7.189 | ASP | 0.200 | | | | |
| 14 | IR-cut filter | Plano | | 0.210 | Glass | 1.517 | 64.2 | — |
| 15 | | Plano | | 0.254 | | | | |
| 16 | Image | Plano | | — | | | | |

Note:
Reference wavelength is 587.6 nm (d-line).

Table 1 depicts optical parameters for the lens arrangement of Huang's first embodiment. *Id.* at 12:53–54.

Table 1 depicts, among other things, lens thicknesses, distances between lenses, Abbe numbers, and focal lengths. *Id.*

### 3.    *Overview of Tang*

Tang concerns a compact imaging lens assembly. Ex. 1009, 1:7. An exemplary lens assembly is depicted in Figure 1A, reproduced below.

14

IPR2020-00877
Patent 10,288,840 B2



# Fig. 1A

Figure 1A of Tang shows an imaging lens assembly in accordance with a first embodiment. *Id.* at 7:66–67.

The imaging lens assembly includes, from an object side to an image side, first though fifth lens elements 100, 110, 120, 130, 140, IR filter 160, and image plane 170. *Id.* at 8:2–29. The optical data of the first embodiment are depicted in Table 1 of Figure 7, reproduced below.

| TABLE 1 | | | | | | | |
|---|---|---|---|---|---|---|---|
| (Embodiment 1) | | | | | | | |
| f = 4.34 mm, Fno = 2.85, HFOV = 33.2 deg. | | | | | | | |
| Surface # | | Curvature Radius | Thickness | Material | Index | Abbe # | Focal length |
| 0 | Object | Plano | Infinity | | | | |
| 1 | Lens 1 | 1.424400 (ASP) | 0.562 | Plastic | 1.544 | 55.9 | 2.55 |
| 2 | | -43.791100 (ASP) | -0.010 | | | | |
| 3 | Ape. Stop | Plano | 0.096 | | | | |
| 4 | Lens 2 | -15.543700 (ASP) | 0.351 | Plastic | 1.632 | 23.4 | -5.28 |
| 5 | | 4.287000 (ASP) | 0.559 | | | | |
| 6 | Lens 3 | -3.112200 (ASP) | 0.302 | Plastic | 1.632 | 23.4 | -26.30 |
| 7 | | -3.973100 (ASP) | 0.274 | | | | |
| 8 | Lens 4 | -3.011300 (ASP) | 0.790 | Plastic | 1.544 | 55.9 | 2.03 |
| 9 | | -0.881520 (ASP) | 0.250 | | | | |
| 10 | Lens 5 | -2.171820 (ASP) | 0.360 | Plastic | 1.530 | 55.8 | -1.73 |
| 11 | | 1.674970 (ASP) | 0.700 | | | | |
| 12 | IR-filter | Plano | 0.300 | Glass | 1.517 | 64.2 | - |
| 13 | | Plano | 0.334 | | | | |
| 14 | Image | Plano | | | | | |

# Fig.7

Figure 7 depicts the optical parameters for the lens arrangement of Tang's first embodiment. *Id.* at 4:5–6.

Figure 7 depicts, among other things, lens thicknesses, distances between lenses, Abbe numbers, and focal lengths.

### 4.    Independent Claim 1

*[1.0] "A mobile electronic device comprising an integrated camera"*

Petitioner contends that Parulski discloses a "mobile phone camera with two image capture stages." Pet. 26 (quoting Ex. 1005, 9:5–6). According to Petitioner, an ordinarily skilled artisan would have understood

16

this disclosure to be a mobile electronic device that includes an integrated camera. *Id.* at 27–28 (citing Ex. 1003, 38; Ex. 1005, 23:4–20).

Parulski discloses that "[t]he concept of multiple lenses and multiple sensors, and the use of an integrated image capture assembly, may be adapted for use in a cell phone of the type having a picture taking capability." Ex. 1005, 23:4–7.

Patent Owner does not dispute Petitioner's showing as to this limitation. *See generally* PO Resp.

We have reviewed the record developed during trial, and find that Petitioner has shown that the cited portions of Parulski teach the preamble of independent claim 1.[10]

> *[1.1]* *"wherein the camera comprises a Wide camera unit comprising a Wide lens unit and a Telephoto camera unit comprising a Telephoto lens unit"*

Petitioner contends that Parulski's "integrated capture assembly 610 includes 'a fixed focal length wide angle lens' (612) and 'fixed focal length telephoto lens' (610)."[11] Pet. 28 (citing Ex. 1005, 23:28–43) (emphasis omitted). Petitioner further contends that "Parulski's first lens 612 is a telephoto camera unit comprising a telephoto lens unit and Parulski's second lens 614 is a wide camera unit comprising a wide lens unit." *Id.* at 29 (citing Ex. 1005, 23:28–43; Ex. 1003, 40); *see also* n.11 (noting that Petitioner's cites to element numbers are incorrect). Petitioner's annotated Figures 16A and 16B, however, appear to point to wide angle lens 612 and first image

---

[10] In light of this determination, the panel need not decide whether the preamble is limiting.

[11] In its discussion, Petitioner references the cited elements with inaccurate reference numbers. *See* Pet. 28–29.

sensor 614 as teaching the claimed wide camera unit, and telephoto lens 616 and second image sensor 618 as teaching the claimed telephoto camera unit.[12]

The cited portion of Parulski discloses, in relevant part,

[T]he assembly 610 includes a first fixed focal length lens 612 and a first image sensor 614, and a second fixed focal length lens 616 and a second image sensor 618. The first lens 612, preferably a fixed focal length wide angle lens (such as a 40 mm equiv. lens), forms an image on the first image sensor 614, and the second lens 616, preferably fixed focal length telephoto lens (such as 100 mm equiv. lens), forms an image on the second image sensor 618.

Ex. 1005, 23:33–40.

Patent Owner does not dispute Petitioner's showing as to this limitation.  *See generally* PO Resp.

We have reviewed the record developed during trial, and find that Petitioner's annotated Figures 16A and 16B and the cited portion in column 23 of Parulski sufficiently support Petitioner's contentions that Parulski teaches the claimed camera.

*[1.2] "the Telephoto lens unit and the Wide lens unit having, respectively, total track length (TTL)/effective focal length (EFL) ratios smaller and larger than 1 and"*

Petitioner contends that the combination of Parulski's wide angle lens 612 and Tang's optical parameters for a specific wide angle lens assembly renders obvious the claimed TTL to EFL ratio greater than one.  *See* Pet. 29–34.  Likewise, Petitioner contends that the combination of Parulski's

---

[12] We note that Parulski uses different names for elements identified by the same reference number throughout its specification. *See* Ex. 1005. We similarly use Parulski's element names as appropriate.

telephoto lens 616 and Huang's optical parameters for a specific telephoto lens assembly renders obvious the claimed TTL to EFL ratio smaller than one. *Id.* at 29, 34–39.

In particular, Petitioner contends that in Huang's Example 1, the TTL is 5.348 mm, which Petitioner calculates by "summing the distances between the object-side surface of the first lens 100 and the image surface 180 . . . " which are shown in the thickness column of Huang's Table 1. *Id.* at 30–32 (citing Ex. 1006, Table 1 (spanning columns 12–13); Ex. 1003, 43). Petitioner points to Huang's first embodiment focal length (f) of the lens assembly, 6.60 mm, and contends an ordinarily skilled artisan would have understood this to be the EFL of Huang's lens assembly. *Id.* at 33 (citing Ex. 1006, Table 1). Petitioner calculates Huang's ratio of TTL to EFL as 5.384/6.60 = 0.81. *Id.* at 33–34. We presume Petitioner's calculation of the ratio includes a typographical error and should be a ratio of 5.3*48* to 6.60, which equates to 0.81 and is smaller than one. *See id.* at 32 (discussing 5.348 mm as the TTL).[13]

Petitioner further contends that in Tang's Embodiment 1, the "wide angle lens unit has a TTL of 4.878 mm and an EFL of 4.34 mm, thus yielding a ratio of 4.878/4.34 which is larger than one." *Id.* at 35. According to Petitioner, the TTL of Tang's Embodiment 1 lens can be determined by "summing the distances between the object-side surface of the first lens 100 and the image plane 170 . . . " using Tang's Table 1, and dividing by Tang's focal length (f), 4.34 mm, which Petitioner contends is the EFL. *Id.* at 35–37 (citing Ex. 1009, Figs. 1A, 7, 8:51). Petitioner

---

[13] The ratio of 5.384 to 6.60 is also less than 1.

calculates the Tang's first embodiment to have a ratio of 4.878 to 4.34, which is 1.12. *Id.* at 38 (citing Ex. 1003, 47). Petitioner's calculations are undisputed. *See generally* PO Resp.

*(1)    Petitioner's Rationale for Combining*

Petitioner presents the following reasons in support of combining the teachings of Parulski and Huang.

*First*, that Parulski generally teaches a wide angle lens and a telephoto lens, but "does not provide lens prescription data for either the wide or telephoto fixed-focal length lens in image assembly 610." Pet. 20. According to Petitioner, "[s]ince Parulski offers nothing more, a POSITA looking to implement this embodiment would have sought a suitable telephoto lens unit to incorporate in the cell phone camera, like Huang's embodiment." *Id.* (citing Ex. 1003, 31). *Second*, that Huang's lenses are "just one possible option" because they are applicable to mobile devices in general and smart phones in particular. *Id.* at 21 (citing Ex. 1003, 32; Ex. 1006, 8:44–51, 35:53–60). *Third*, that Parulski seeks to use lenses to reduce cell phone thickness, and Huang's telephoto lens "has the benefits of reducing both the manufacturing costs and the track length of the lens assembly (*i.e.*, thickness)." *Id.* at 22 (citing Ex. 1005, 24:20–27; Ex. 1006, 7:56–8:3). *Fourth*, that an ordinary skilled artisan would have had a reasonable expectation of success in making the combination, based on the similarity between the fields of view of Parulski and Huang's lenses. *Id.* at 23–24 (citing Ex. 1003, 35; Ex. 1006, Table 1; Ex. 1019, 9–10).

Petitioner presents the following reasons in support of combining the teachings of Parulski and Tang.

20

IPR2020-00877
Patent 10,288,840 B2

*Fifth,* that "Parulski does not provide lens prescription data for either the wide or telephoto fixed-focal length lens unit in image assembly 610," and "[t]o create a working lens image assembly 610," the ordinarily skilled artisan would have looked to Tang, "which provides not only a similar fixed-focal length wide-angle lens, but also provides lens data that specifies the properties and configuration . . . ." *Id.* at 24–25 (citing Ex. 1003, 35; Ex. 1009, Fig. 7). *Sixth*, that "Tang describes the use of its lens in 'portable electronic devices' such as smart phones and PDAs." *Id.* at 25 (citing Ex. 1003, 35; Ex. 1009, 1:6–8, 1:37–38). *Seventh*, that "Tang further states that its lens 'features better image quality, maintains a moderate total track length and is applicable to compact portable electronic products,' thus satisfying Parulski's desire for selecting lenses that offer reduced thickness compatible with a mobile device." *Id.* at 25 (citing Ex. 1005, 24:20–27; Ex. 1009, 1:47–50).[14]

---

[14] Petitioner also argues that that a "POSITA would have understood Tang's wide-angle lens with a similar HFOV [half field of view] of 33.2 degrees to be essentially equivalent to Parulski's wide-angle lens, based on the similarity between the fields of view of the lenses." *Id.* (citing Ex. 1003, 36; Ex. 1005, 23:23–43; Ex. 1009, Fig. 7; Ex. 1019, 9–10 ("A wide-angle lens will cover an angular semifield of about 30° to 35°")). Petitioner calculates Parulski's HFOV as 28.40 degrees for a 35 mm lens. *Id.* (citing Ex. 1016, 107). Petitioner misquotes Kingslake (Ex. 1019) and cites the wrong pages of Kingslake—we cite to the original page numbers of the Kingslake text. We do not address this eighth reason in light of Petitioner's seven other reasons that we find persuasive and in light of the fact that Patent Owner does not dispute this reason, nor any of the seven reasons set forth in this section and discussed in the following section.

21

IPR2020-00877
Patent 10,288,840 B2

*(2)    Discussion of Rationale for Combining*

We have reviewed the record developed at trial including the cited portions of Parulski, Huang, and Tang.  We determine that Petitioner has supported its seven reasons for combining Parulski, Huang, and Tang with sufficient rational underpinning evidenced by the exhibits cited above.

Patent Owner does not dispute Petitioner's rationale for combining. *See generally* PO Resp.  We determine that Petitioner has shown that an ordinarily skilled artisan would have been motivated to combine Parulski, Huang, and Tang, and that such motivation is supported by sufficient rational underpinning.

Based on the complete record developed at trial, we determine that cited portions of Parulski, Huang, and Tang sufficiently support Petitioner's contentions with respect to the telephoto lens unit and the wide lens unit as claimed.

*[1.3] "defining separate Telephoto and Wide optical paths"*

Petitioner provides annotated versions of Figures 16A and 16B of Parulski that add a dashed blue line through each of wide-angle lens unit 612 and telephoto lens unit 616 and contends "[a] POSITA would have understood that light passing through the Wide camera unit to the first sensor 614 defines a Wide optical path and the light passing through the Telephoto camera unit to the second sensor 618 defines a separate Telephoto optical path."  Pet. 40 (citing Ex. 1005, Figs. 16A, 16B; Ex. 1003, 50–51).

Patent Owner does not dispute Petitioner's showing as to this limitation.  *See generally* PO Resp.

22

We have reviewed the record developed during trial, and find that the cited portions of Parulski sufficiently support Petitioner's contentions that Parulski teaches the claimed optical paths.

> *[1.4] "wherein the Telephoto lens unit comprises multiple lens elements made of at least two different polymer materials having different Abbe numbers"*

Petitioner contends that "Huang's Example 1 lens is listed as plastic, which a POSITA would understand to be a polymer material." Pet. 44 (citing Ex. 1006, Table 1; Ex. 1003, 53). As identified by Petitioner, Huang's plastic lenses comprising its lens assembly are disclosed as having different Abbe numbers, ranging from 21.4 to 55.9. *Id.* at 44–45 (citing Ex. 1006, Table 1); *see* Ex. 1001, 8:25–27 ("lens elements made of different polymer materials, i.e., materials having different Abbe numbers.").

Patent Owner does not dispute Petitioner's showing as to this limitation. *See generally* PO Resp.

We have reviewed the record developed during trial, and find that the cited portions in Huang's Table 1 sufficiently support Petitioner's contentions that Huang teaches lenses of different polymer materials having different Abbe numbers.

> *[1.5] "wherein the multiple lens elements comprise a first group of at least three lens elements configured to form a telephoto lens assembly and a second group of at least two lens elements"*

Petitioner contends that Figure 1 of Huang depicts a first group of lenses 110, 120, 130 and second group of lenses 140, 150, and 160. Pet. 45–46. According to Petitioner's first interpretation, the first group of lenses "'form a telephoto lens assembly' because its TTL is less than its EFL (5.348 mm<6.60 mm)." *Id.* at 46 (citing Ex. 1006, Table 1). Under this

theory, Petitioner appears to take the position that the *entire* telephoto lens unit, including the first group *and* the second group, forms a telephoto lens assembly.

Under an alternative theory, Petitioner contends that if the claim limitation is interpreted such that the first group of lenses *together* form a telephoto lens assembly with TTL<EFL, Huang also meets this limitation. *Id.* at 46–49. According to Petitioner, the TTL of the first group equals "[t]hicknesses of lenses and spaces for L1-L3 (1.893 mm) + Distance to image plane for L1-L3." *Id.* at 47 (citing Ex. 1006, Table 1). Petitioner explains that

> This value [1.893 mm] is then added to *the distance to the image plane* for a total TTL of 4.57583 mm, as calculated below in Zemax. . . . The EFL of Huang's Example 1 first lens group was determined by Zemax to be 5.61 mm. Therefore, the TTL of Huang's Example 1 first lens group (4.57583 mm) is smaller than the EFL (5.61 mm) . . . .

*Id.* at 48 (citing Ex. 1003, Appendix, Fig. 1) (emphasis added).[15]

Patent Owner does not dispute Petitioner's showing as to this limitation. *See generally* PO Resp.

We have reviewed the record developed during trial, and find that, Huang sufficiently supports Petitioner's contentions that Huang teaches the first group and the second group as claimed under either Petitioner's primary theory or its alternative theory.

> *[1.6] "the second group of at least two lens elements spaced apart from the first group of at least three lens elements by a*

---

[15] Petitioner characterizes Zemax as a lens design software. *Supra* § III.B (citing Pet. 6–7).

*predetermined effective gap equal to or larger than 1/5 of the
TTL of the Telephoto lens unit"*

Petitioner contends that Huang's Table 1 discloses the distance
between the image side of lens 3 and object side of lens 4 is 1.345 mm, and
as discussed above, that the TTL is 5.348. Pet. 51. Based on these values,
Petitioner calculates 5.348/5 as 1.0696, and thus, asserts that Huang's gap of
1.345 mm is larger than 1/5 of the TTL. *Id.* at 49–51 (citing Ex. 1006,
Fig. 1; Ex. 1003, 56, 57).

Patent Owner does not dispute Petitioner's showing as to this
limitation. *See generally* PO Resp.

We have reviewed the record developed during trial, and find that the
gap and thicknesses disclosed in Table 1 of Huang sufficiently support
Petitioner's contentions that Huang teaches the claimed predetermined
effective gap and the claimed relation to the TTL of the telephoto lens unit.

*[1.7] "wherein the first group of at least three lens elements
comprises, in order from an object plane to an image plane along
an optical axis of the Telephoto lens unit, a first lens element
having positive optical power and"*

Petitioner contends that lenses 110, 120, 130 are depicted in Figure 1
of Huang along an optical axis and provides an annotated version of this
figure in the Petition. Pet. 53 (citing Ex. 1006, Fig. 1). Petitioner also
contends that first lens element 110 has a positive optical power. *Id.* at 55
(citing Ex. 1006, 9:23–33, 42) ("The first lens element 110 with positive
refractive power . . . ."). According to Petitioner, "[a] POSITA would have
understood 'positive refractive power' as stated by Huang to be equivalent to
'positive optical power' as recited in the claim." *Id.* (citing Ex. 1003, 60).

Patent Owner does not dispute Petitioner's showing as to this limitation. *See generally* PO Resp.

We have reviewed the record developed during trial, and find that Figure 1 of Huang sufficiently supports Petitioner's contention that Huang teaches the lenses in the claimed arrangement, and the cited portion in column 9 of Huang sufficiently supports Petitioner's contention that Huang's first lens has positive optical power as claimed.

> *[1.8] "a pair of second and third lens elements having together negative optical power such that the Telephoto lens assembly provides a Telephoto optical effect of the Telephoto lens unit and"*

Petitioner contends that "the second and third lens elements in Huang's first group both have negative optical power." Pet. 55 (citing Ex. 1006, 9:51–52 ("[t]he second lens element 120 with negative refractive power"); 9:58 ("[t]he third lens element 130 with negative refractive power")). According to Petitioner, an ordinarily skilled artisan would have understood that these lens elements together also have a negative optical power. *Id.* at 55–56 (citing Ex. 1003, 60). Petitioner also points to the negative focal lengths for Lens 2 and Lens 3 (i.e., –3.57 and –8.42, respectively) in Huang's Table 1. *Id.* at 57. Petitioner supports its assertion that these lens elements together also have a negative optical power by substituting the negative focal lengths into a formula that evaluates to the combined focal length of two or more lenses, in this case, –0.3998.[16] *Id.* at 56–58.

---

[16] Petitioner calculates the combined power of lenses 2 and 3 as –0.3998, but also notes that the "negative optical power of the combined second and third lens elements is confirmed by Zemax, which calculates $1/f = -0.42$." Pet. 58

Under a first theory, Petitioner again contends that if the claim limitation is interpreted such that the first group of lenses *together* form the claimed telephoto lens assembly, then that assembly provides a telephoto optical effect as evidenced by a calculation from Zemax discussed above with respect to limitation 1.5. *Id.* at 58 (citing Ex. 1003, Appendix, Figs. 2 and 3). Specifically, "the optical data for Huang's Example 1 lens assembly provides for a focal length of 4.57583 mm and a track length of 5.163 mm for lenses L1-L3 combined, as calculated by Zemax." *Id.* According to Petitioner, "since the TTL is longer than the EFL for these lenses, the first lens group of Huang is a 'Telephoto lens assembly [that] provides a Telephoto optical effect of the Telephoto lens unit' as recited by the claim." *Id.* at 58–59 (citing Ex. 1003, 62). We presume this is a typographical error on the part of Petitioner. The optical data that Petitioner presented above with respect to limitation 1.5 included a TTL of 4.57583 mm and an EFL of 5.61 mm, as calculated above by Zemax—with this correction, the TTL is still *less* than the EFL, and Huang meets this limitation.

Under a second theory, Petitioner further contends that "a POSITA would have understood that a Telephoto lens assembly would necessarily provide a Telephoto optical effect." Pet. 59 (citing Ex. 1003, 62). According to the cited testimony of Dr. Sasián, "[a] POSITA would have also understood that telephoto lenses, such as those referenced by Huang, generally include a first positive lens followed by a second negative lens,

_____

(citing Ex. 1003, 63, Appendix, Fig. 2) (emphasis omitted). Petitioner explains neither the reason for the difference between the value determined from the formula and the value calculated by Zemax, nor why these two values would have been considered equivalent.

27

providing a telephoto effect."  Ex. 1003, 62–63 (citing Ex. 1016, 155–156).[17]

Petitioner also points to portions of Huang that describe a "telephoto ability" with respect to "the arrangement of lens elements."  Pet. 59 (citing Ex. 1006, 5:58–60, 6:7–12) (emphasis omitted).

Patent Owner does not dispute Petitioner's showing as to this limitation.  *See generally* PO Resp.

We have reviewed the record developed during trial, and find that the lenses in the lens assembly of Huang's first embodiment sufficiently support Petitioner's contentions that Huang teaches the second and third lenses with negative optical power as claimed under either Petitioner's first theory or its second theory.

> *[1.9] "such that the second and third lens elements are each made of one of the at least two different polymer materials having a different Abbe number for reducing chromatic aberrations of the Telephoto lens"*

Petitioner contends that the second and third lens elements in Huang's Table 1 are "made of plastic (polymer)" with different Abbe numbers and "different polymer materials (based on their being plastic and having different refractive indices)."  Pet. 60–61 (citing Ex. 1003, 63).  According to Petitioner, "[a] POSITA would have understood that the combination of two consecutive lenses with different Abbe numbers would help to correct

---

[17] The cited reference, Katz (Ex. 1016), does not contain pages 155 and 156, and does not appear to relate to the subject matter for which it was cited.

chromatic aberration . . . ." *Id.* at 61 (citing Ex. 1017, 3:1–5 (Sverdrup patent); Ex. 1003, 63–64; Ex. 1019, 37).[18]

Petitioner's annotated version of Huang's Table 1 points out that the Abbe number of Lens 2 is 23.3 and the Abbe number of Lens 3 is 55.8. *Id.* at 60. Dr. Sasián testifies that "[a] POSITA would understand that both L2 and L3 are made of at least two different polymer materials (based on their being plastic and having different refractive indices)." Ex. 1003, 64. Based on the cited portions of Huang and Dr. Sasián's testimony, we are persuaded that Huang's Lens 2 and Lens 3 teach "second and third lens elements are each made of one of the at least two different polymer materials having a different Abbe number."

With respect to reducing chromatic aberrations, Petitioner's cited portion in Sverdrup (Ex. 1017) discloses not only that "[c]hromatic aberration can be addressed in lenses by combining two different materials with differing Abbe numbers," as quoted by Petitioner, but also that "[o]ne of the materials is made into a positive lens, and the other into a negative lens," and that "[t]he powers are not equal, so that the overall power is non-zero." Ex. 1017, 3:1–5. Dr. Sasián testifies that "a POSITA would have understood that L1 of Huang's Example 1 lens system introduces positive chromatic aberration and L2 reduces this chromatic aberration as is well known in the art." Ex. 1003, 65 (citing Ex. 1017, 3:1–5; Ex. 1019, 37); *see* n.13. We understand Petitioner's position to be that Huang's Lens 1 teaches

---

[18] Dr. Sasián's testimony (Ex. 1003, 65) cites page 37 of Kingslake. The cited portion, page 37, of Kingslake (Ex. 1019) does not appear to exist.

IPR2020-00877
Patent 10,288,840 B2

the positive lens and Huang's Lens 2 teaches the negative lens to reduce chromatic aberrations.

Patent Owner does not dispute Petitioner's showing as to this limitation. *See generally* PO Resp.

We have reviewed the record developed during trial, and find that Huang's Lenses 2 and 3, as evidenced by Sverdrup, sufficiently support Petitioner's contentions that Huang teaches the second and third lenses reducing chromatic aberrations as claimed in this limitation.

> *[1.10] "wherein the second group of lens elements includes a fourth lens element and a fifth lens element made of the different polymer materials having different Abbe numbers and"*
>
> *[1.11] "is configured to correct a field curvature and to compensate for residual chromatic aberrations of the Telephoto lens assembly dispersed during light passage through the effective gap between the Telephoto lens assembly and the second group of at least two lens elements, and"*

According to Petitioner, although Huang's lenses in the second group are numbered Lens 4 through Lens 6,

> Huang's Lens 5 may be a "fourth lens element" and Lens 6 may be a "fifth lens element" because the claim language does not include any restriction requiring identification of each lens along the optical axis for lenses in the second group, and also indicates that the second group can have more than two lens elements.

Pet. 64 (citing Ex. 1003, 67–68). Huang's Lens 5, cited as teaching the claimed fourth lens element, has an Abbe number of 21.4. *Id.* at 63 (citing Ex. 1006, Table 1). Huang's Lens 6, cited as teaching the claimed fifth lens element, has an Abbe number of 55.7. *Id.*

Petitioner contends that "the field curvature of Huang's Example 1 lens assembly is corrected by the second group of lenses." *Id.* at 64.

IPR2020-00877
Patent 10,288,840 B2

Petitioner supports its contention with Zemax plots, which are reproduced below. *Id.* at 65.



**Group 1 (L1-L3)**            **Groups 1 & 2 (L1-L6)**

Petitioner's Zemax plots depicting a reduction in field curvature in Groups 1 and 2 as compared with Group 1 alone, with respect to Huang's Example 1.[19] *Id.* at 65.

In particular, Petitioner contends that

> [T]he standard field curves show that lenses L1-L3 in the first group have some residual field curvature with a maximum of about -0.22 mm for the light beam at 16.3°, and that the field curves are curved. The field curves for the complete objective, L1-L6, show that the second group of lenses L4-L6 corrects for the residual field curvature of the first lens group L1-L3 as the

---

[19] Petitioner's Zemax plots are reproduced with as much clarity as possible from the Petition and/or the Appendix of Dr. Sasián's Declaration.

31

IPR2020-00877
Patent 10,288,840 B2

field curves have a maximum of about 0.1 mm and are nearly straight.

*Id.* (citing Ex. 1003, 68). We determine that the Zemax plots reproduced above depict some change along the x-axis, which we understand to represent millimeters of field curvature. *See* Ex. 1003, Appendix (Figs. 1– 8).

We accept as sufficient Dr. Sasián's testimony that Figure 4 depicts the field curvature of Huang's Example 1 lens assembly. Ex. 1003, 68.

Petitioner further contends that "a POSITA would have understood that lateral and longitudinal chromatic aberration can be shown by optical path difference meridional plots and chromatic focal shift curves." Pet. 66. Petitioner contends that its Zemax plots, reproduced below, are representative of Huang's Example 1 lens assembly. *Id.*



Zemax plots purportedly depicting optical path difference meridional plots. *Id.* (citing Ex. 1003, Appendix (Fig. 5)); *see supra* n.18.

32

IPR2020-00877
Patent 10,288,840 B2

According to Petitioner,

[T]he optical path difference meridional plot for the light beam at 16.3° shows lateral and longitudinal chromatic aberration for the first group of lenses L1-L3 as the plots for the F and C wavelengths are tilted and curved with respect to each other. The same plots for the complete lens assembly L1-L6 shows no tilt or curvature for the F and C wavelengths, indicating that the second group compensates for residual chromatic aberration from the first group.

Pet. 66–67 (citing Ex. 1003, 70).

We accept as sufficient Dr. Sasián's testimony that "lateral and longitudinal chromatic aberration can be shown by optical path difference meridional plots . . . for *Huang's Example 1 lens assembly* as generated by Zemax . . . ." with respect to Figure 5. Ex. 1003, 69 (emphasis added). We determine that the Zemax plot for the complete lens assembly, Lens 1 through Lens 6, depicts a flattening as well as a reduction in tilt for the depicted curves, as Petitioner contends.

Lastly, Petitioner contends that

[T]he chromatic focal shift curve for the first group of lenses (L1-L3) shows longitudinal chromatic aberration, while the same curve for the complete lens assembly (L1-L6) shows that residual longitudinal chromatic aberration has been compensated as at least two wavelengths focused at the same focal distance. Thus, a POSITA would have known that the second group of lens elements is configured to "compensate for residual chromatic aberrations of the Telephoto lens assembly dispersed during light passage through the effective gap between the Telephoto lens assembly and the second group of at least two lens elements."

Pet. 67–68 (citing Ex. 1003, 70). Reproduced below are Petitioner's Zemax plots depicting chromatic focal shift curves representative of Huang's Example 1 lens assembly.

33

IPR2020-00877
Patent 10,288,840 B2

## Chromatic Focal Shift Curves




**Group 1 (L1-L3)**          **Groups 1 & 2 (L1-L6)**

Zemax plots depicting chromatic focal shift curves comparing
Group 1 alone and Groups 1 and 2 together. *Id.* at 67 (citing
Ex. 1003, Appendix (Fig. 6)); *see supra* n.18.

The Zemax plots reproduced above depict a focal shift that is more
significant at lower wavelengths.

Patent Owner does not dispute Petitioner's showing as to this
limitation. *See generally* PO Resp.

We have reviewed the record developed during trial, and find Dr.
Sasián's testimony that "lateral and longitudinal chromatic aberration can be
shown by . . . chromatic focal shift curves for *Huang's Example 1 lens
assembly* as generated by Zemax . . . ." with respect to Figure 6 (Ex. 1003,
69 (emphasis added)) and text in Figure 6 that states "Huang example 1,
configuration 1 of 1" (*id.*, Appendix) is sufficient.

We are also persuaded that Petitioner's Zemax plots and the cited
portions of Huang sufficiently support Petitioner's contentions that Huang

IPR2020-00877
Patent 10,288,840 B2

teaches a second group that corrects a field curvature and compensates for residual chromatic aberrations as claimed.

> *[1.12] "wherein the first, third and fifth lens elements have each an Abbe number greater than 50"*

> *[1.13] "and the second and fourth lens elements have each an Abbe number smaller than 30."*

Petitioner contends that Huang's lenses have Abbe numbers greater than 50 because Huang's Table 1 includes "lens elements annotated as L1, L3, and L5 hav[ing] Abbe numbers of 55.9, 55.8, and 55.7, respectively." Pet. 69 (citing Ex. 1006, Table 1). Petitioner further contends that Huang's lenses have Abbe numbers smaller than 30 because Huang's Table 1 includes "lens elements annotated as L2 and L4 hav[ing] Abbe numbers of 23.3 and 21.4, respectively." *Id.* at 71 (citing Ex. 1006, Table 1).

Patent Owner does not dispute Petitioner's showing as to this limitation. *See generally* PO Resp.

We have reviewed the record developed during trial, and find that Huang's disclosure of the Abbe numbers corresponding to Lenses 1 through 5 sufficiently supports Petitioner's contentions that Huang teaches lenses with the claimed Abbe numbers.

For the foregoing reasons, and based on the entire record developed during trial, and find that the cited evidence sufficiently supports Petitioner's contentions so as to establish unpatentability by a preponderance of the evidence with respect to the challenge to independent claim 1 over the combination Parulski, Huang, and Tang.

### 5.    *Dependent Claim 2*

Claim 2 recites, "wherein light receiving outer surfaces of the Wide and Telephoto lens units are located substantially in the same plane, thereby

35

IPR2020-00877
Patent 10,288,840 B2

reducing shadowing and light blocking effects therebetween." Ex. 1001, 20:17–20.  Claim 2 depends from claim 1.

Petitioner annotates Figures 16A and 16B of Parulski to point out how "Telephoto and Wide camera units include light receiving outer surfaces (opposite image sensors 614 and 618) that lie along a same plane." Pet. 73 (citing Ex. 1006, Figs. 16A, 16B).

Patent Owner does not dispute Petitioner's showing as to this claim. *See generally* PO Resp.

We have reviewed Petitioner's annotated versions of Parulski's Figures 16A and 16B and are persuaded that they sufficiently support Petitioner's contentions so as to establish unpatentability by a preponderance of the evidence with respect to the challenge to dependent claim 2 over the combination Parulski, Huang, and Tang.

### 6.    *Dependent Claim 5*

Claim 5 recites, "wherein the Wide and Telephoto camera units are mounted directly on a single printed circuit board." Ex. 1001, 20:27–29. Claim 5 depends from claim 1.

According to Petitioner, "Parulski's cell phone camera includes an integrated capture assembly that includes a Wide camera with a Wide lens unit and a Telephoto camera unit with a Telephoto lens unit." Pet. 74 (citing Ex. 1005, 23:28–43).  Petitioner contends that "[t]he Wide and Telephoto camera units of this integrated capture assembly are mounted directly on *a common substrate 620* as shown in Figs. 16A and 16B." *Id.* (citing Ex. 1006, Figs. 16A and 16B) (emphasis added).

Patent Owner does not dispute Petitioner's showing as to this claim. *See generally* PO Resp.

IPR2020-00877
Patent 10,288,840 B2

We have reviewed Parulski's Figures 16A and 16B and are persuaded that they sufficiently support Petitioner's contentions so as to demonstrate unpatentability by a preponderance of the evidence with respect to the challenge to dependent claim 5 over the combination Parulski, Huang, and Tang.

### 7.     Dependent Claims 7, 12, and 18

Claim 7 recites, "wherein the Telephoto lens unit has a TTL less than 6.5 mm." Ex. 1001, 20:33–34. Claim 12, "wherein the Telephoto lens unit TTL is less than 5.5 mm." *Id.* at 20:51–52. Claim 18 recites "wherein the Telephoto lens unit has an F# smaller than 3.2 and a TTL smaller than 6.2 mm." *Id.* at 20:65–67. Each of claims 7, 12, and 18 depends from claim 1.

With respect to the TTL requirements of claims 7, 12, and 18, Petitioner relies on Huang's Table 1 and calculates the TTL of Huang's first embodiment as 5.348 mm, as it did with respect to independent claim 1. Pet. 76–78, 81. Huang's Table 1 further indicates that the F# of Huang's first embodiment is 2.85. *Id.* at 81

Patent Owner does not dispute Petitioner's showing as to these claims. *See generally* PO Resp.

We have reviewed Huang's Table 1 and Petitioner's calculation and are persuaded that they sufficiently support Petitioner's contentions so as to establish unpatentability by a preponderance of the evidence with respect to the challenge to dependent claims 7, 12, and 18 over the combination Parulski, Huang, and Tang.

### 8.     Dependent Claims 11, 13, and 16

Claim 11 recites "wherein the Telephoto lens unit TTL/EFL ratio is smaller than 0.9." Ex. 1001, 20:49–50. Claim 11 depends from claim 1.

According to Petitioner "Huang's Example 1 lens system is a Telephoto lens unit with TTL = 5.348 mm and EFL = 6.6 mm," and therefore, discloses a "ratio of TTL/EFL = 5.348/6.6 = 0.81, which is smaller than 0.9." Pet. 78 (citing Ex. 1003, 78).

Claims 13 and 16 recite "wherein the Telephoto lens unit EFL is greater than 5.9 mm." Ex. 1001, 20:53–54, 61–62. Claim 13 depends from claim 1. Claim 16 depends from claim 11, which in turn, depends from claim 1.

As discussed above, Petitioner contends "Huang's Example 1 lens system is a Telephoto lens unit with EFL = 6.6 mm, which is greater than 5.9 mm." Pet. 78.

Patent Owner does not dispute Petitioner's showing as to these claims. *See generally* PO Resp.

We have reviewed Huang's Table 1 and Petitioner's calculation and are persuaded that they sufficiently support Petitioner's contentions so as to establish unpatentability by a preponderance of the evidence with respect to the challenge to dependent claims 11, 13, and 16 over the combination Parulski, Huang, and Tang.

*9.    Dependent Claim 15*

Claim 15 recites "wherein the Telephoto camera unit includes an image sensor and wherein an image captured by the Telephoto camera unit has a field of view that is no larger than 44 degrees." Ex. 1001, 20:57–60. Claim 15 depends from claim 1.

Petitioner points to Huang's image sensor 190 as teaching the claimed image sensor. Pet. 79. Petitioner also points out that Huang's first embodiment has a half field of view (HFOV) that is depicted in Table 1 as

38

IPR2020-00877
Patent 10,288,840 B2

16.3 degrees, and contends that a "POSITA would have thus understood that the full Field of View of Example 1 lens assembly is twice the HFOV, or 32.6 degrees, which is FOV = 2*HFOV = 32.6 degrees, which is 'no larger than 44 degrees' as claimed." *Id.* at 80–81 (citing Ex. 1003, 79–80).

Patent Owner does not dispute Petitioner's showing as to this claim. *See generally* PO Resp.

We have reviewed Huang's Table 1 and Petitioner's calculation and are persuaded that they sufficiently support Petitioner's contentions so as to establish unpatentability by a preponderance of the evidence with respect to the challenge to dependent claim 15 over the combination Parulski, Huang, and Tang.

### 10.    Dependent Claim 20

Claim 20 recites "wherein the first, second and third lens elements have respective focal lengths f1, f2 and f3, and wherein the respective focal lengths satisfy the condition 1.2|f3|>|f2|> 1.5|f1| and wherein the Telephoto lens unit has an F# smaller than 3.2, wherein the Telephoto lens unit TTL is smaller than 6.2 mm." Ex. 1001, 21:4–9. Claim 20 depends from claim 1.

According to Petitioner, "in Table 1, Huang's Example 1 lens system includes lenses L1, L2, and L3 having focal lengths of f1=2.26 mm, f2=-3.57 mm, and f3=-8.42 mm, respectively." Pet. 82–83. Petitioner sufficiently demonstrates that the focal lengths disclosed in Huang meet the condition recited in claim 20: 1.2|-8.42|>|-3.57|>1.5(2.26) = 10.104>3.57>3.39. *Id.* The second and third wherein clauses of claim 20 are the same as the limitations recited in claim 18. Petitioner points to its showing for claim 18 to meet the second and third wherein clauses, which

we consider persuasive for the same reasons as set forth above with respect to claim 18.

Patent Owner does not dispute Petitioner's showing as to this claim. *See generally* PO Resp.

We have reviewed Huang's Table 1 and Petitioner's calculations and are persuaded that they sufficiently support Petitioner's contentions so as to establish unpatentability by a preponderance of the evidence with respect to the challenge to dependent claim 20 over the combination Parulski, Huang, and Tang.

### 11.    *Dependent Claim 21*

Claim 21 recites "wherein the Telephoto camera unit includes an image sensor with an image sensor size ¼" or ⅓"." Ex. 1001, 21:10–12. According to Petitioner,

> Huang's Example 1 telephoto lens and Tang's Embodiment 1 wide-angle lens produce image heights of 2.0 mm and 2.86 mm, respectively. Using the formula provided by Smith as discussed above, Huang's Example 1 lens has a 4 mm diagonal and Tang's Embodiment 1 wide-angle lens has a 5.72 mm diagonal. A POSITA would have understood these diagonals to be compatible with sensor diagonals for ¼" and ⅓" sensors, with diagonals of about 4.4 mm and 6 mm. Furthermore, a POSITA would have understood that the use of the lens assemblies of Huang and Tang with ¼" and ⅓" sensors would avoid clipping the lens image, or providing many more unnecessary pixels as a ½" sensor would provide.

> Furthermore, a POSITA would have understood that the lens assemblies of Huang and Tang are designed for electronic sensors such as a CCD or CMOS, and would therefore be motivated to provide a suitable sensor with these lenses. A POSITA would have been motivated to provide Huang's telephoto lens with an image sensor having a ¼" or ⅓" format to

40

meet cost, size, and other design requirements of modern cell phones.

Pet. 84–85 (citing Ex. 1005, 7:28–31, 24:20–31; Ex. 1006, 1:20–30, Fig. 2; Ex. 1009, 1:10–19, Fig. 1B; Ex. 1015, 26; Ex. 1003, 84–85).[20]

Patent Owner does not dispute Petitioner's showing as to this claim. *See generally* PO Resp.

Although Huang does not explicitly disclose the size of its sensor, we have reviewed the cited portions and determine that they sufficiently support Petitioner's contentions so as to establish unpatentability by a preponderance of the evidence with respect to the challenge to dependent claim 21 over the combination Parulski, Huang, and Tang.

### E.    *Obviousness over Parulski, Huang, Tang, and May*

Petitioner contends that claims 3 and 4 are unpatentable as obvious under 35 U.S.C. § 103 over Parulski, Huang, Tang, and May.  For the reasons that follow, we determine that Petitioner's showing is not sufficiently supported so as to establish unpatentability by a preponderance of the evidence with respect to the challenge to claims 3 and 4.

### 1.    *Overview of May*

May concerns "a digital camera that uses multiple lenses and image sensors to provide an extended zoom range."  Ex. 1011, 1:8–10.  By providing a plurality of optical image capture modalities, each having a lens-sensor combination with a different focal length or combination of focal lengths (i.e., a zoom factor), "a large zoom ratio, e.g., 10:1, can be accomplished in a smaller scale space at lower cost with higher quality optical results than heretofore achieved."  *Id.* at 4:45–54.

---

[20] Smith (Ex. 1015) does not have a page 26 as cited by Petitioner.

IPR2020-00877
Patent 10,288,840 B2

An exemplary embodiment, a "folded lens assembly configuration," is depicted in Figure 10D, reproduced below.



FIG. 10D

Figure 10A is an optical layout of an embodiment of image capture assembly 1. *Id.* at 7:4–8.

According to May,

> in FIG. 10A, an image capture assembly 1 includes the first lens 2 and the first image sensor 12 mounted at opposing ends of a first optical relay subassembly la having a folded optical path arranged between the first image sensor 12 and the lens 2. The first lens 2, which preferably is a fixed focal length wide angle lens, forms a first image of a scene on the first image sensor 12. The image capture assembly 1 also includes the zoom lens 3 and the second image sensor 14 mounted at opposing ends of a second optical relay subassembly lb having a folded optical path arranged between the second image sensor 14 and the zoom lens 3. The zoom lens 3, which has a range of focal lengths adjustable between a minimum focal length and a maximum focal length, forms a second image of the scene on the second image sensor 14. In this embodiment, the first lens 2 is a wide angle lens having a focal length less, and preferably substantially less, than the minimum focal length of the zoom lens 3.

*Id.* at 7:19–35.

42

Another exemplary embodiment, a "non-folded lens assembly configuration" is depicted in Figure 24A, reproduced below.



Figure 24A is a schematic sectional view of an image capturing assembly for a cell phone. *Id.* at 23:32–36.

"[A]ssembly 610 contains an integrated packaging of optical and imaging components on common substrate 620," and includes first fixed focal length lens 612 and first image sensor 614, and second fixed focal length lens 616 and second image sensor 618. *Id.* at 23:35–40. The sensors in the image capture assembly may be positioned next to each other on a common circuit board assembly, or may be packaged in a common integrated circuit package. *Id.* at 10:14–17.

2. *Dependent Claims 3 and 4*

Claim 3 recites "wherein the Wide and Telephoto camera units are mounted on separate printed circuit boards." Ex. 1001, 20:21–26.

Petitioner intermingles its contentions about how a POSITA would have understood May to teach the limitation of claim 3 and its rationale for combining May with Parulski, Huang, and Tang. We address these issues separately.

43

IPR2020-00877
Patent 10,288,840 B2

*Petitioner's Initial Contentions Regarding May's Teachings*

Petitioner cites elements from both May's folded configuration (*see, e.g.,* Ex. 1011, Figs. 10D–10F) and its non-folded configuration (*see, e.g., id.* at Fig. 24A).

Petitioner contends that "a POSITA would understand that each camera of the image capture assembly includes a sensor (i.e., 12a, 12b, 14, 16) mounted on a different printed circuit board," as disclosed in May. Pet. 86 (citing Ex. 1011, Figs. 10D–10F, ¶¶ 48, 58), 91–92 (citing Ex. 1003, 92; Ex. 1011, Figs. 10D–10F, 7:4–15).[21]  Petitioner further contends that

> May specifically describes embodiments with a telephoto lens and a wide-angle lens in reference to Fig. 10D: "[i]n a fourth embodiment, the digital camera employs a first fixed focal length lens 2a with a first image sensor 12a, and a second fixed focal length lens 2b with a second image sensor 12b . . . In this embodiment, the first fixed focal length lens 2a is preferably a wide angle lens and second fixed focal lens 2b is a telephoto lens."

*Id.* at 87–88 (quoting Ex. 1011, 8:15–30).  Petitioner also contends that "May additionally teaches that the cameras, including a wide-angle and telephoto lens, are mounted on different subassemblies 1a, 2a and 'positioned next to each other on *a common circuit board assembly.*'" *Id.* at 89 (Ex. 1011, Figs. 10D-10F, 7:4–15, 10:14–17) (emphasis added).

Petitioner further contends

---

[21] We understand Dr. Sasián's testimony to reference paragraph numbers in the pre-grant publication of the May patent (U.S. Patent Application Pub. 2006/0187338 A1).  We have reviewed column 7, lines 4–15 and column 10, lines 6–23 in the May patent—the subject matter disclosed therein corresponds to the subject matter in paragraphs 48 and 58 of the pre-grant publication.

44

IPR2020-00877
Patent 10,288,840 B2

A POSITA would have also understood that each sensor is disposed on a printed circuit board extending along a plane (such as sensor 618 on substrate 620 above). For example, each of the camera subassemblies of May is mounted on a substrate that also carries other electronic components (e.g., an autofocus mechanism), including a flex connector (626) and therefore is understood to be a printed circuit board as claimed.

*Id.* at 87 (citing Ex. 1005, 23:28–40, Figs. 16A–16B; Ex. 1011, Figs. 24A–24B, 23:48–57). Petitioner points to "camera subassemblies including a lens, a lens barrel, and IR [infrared] filter, and an image sensor" and "flex connector 626" in both Parulski and May to support its contention that "a POSITA would have understood that both Parulski and May teach mounting Wide and Telephoto camera units on separate printed circuit boards." *Id.* at 92–93 (citing Ex. 1005, Figs. 1, 16A–16B, 12:42–54, 23:28–40, 23:44–50, 23:48–54; Ex. 1011, Figs. 1, 24A–24B, 10:60–67, 23:48–57; Ex. 1003, 91–92).

To support its contentions, Petitioner asserts that "[t]he inclusion of a camera module on a printed circuit board in this fashion was well-known in the art, as evidenced by Ryu (APPL-1012)." *Id.* at 90 (citing Ex. 1003 ¶ 74; Ex. 1012, code (57), Fig. 8, 1:30–50).

*Petitioner's Initial Contentions Regarding a Rationale for Combining*

*First* and *second*, Petitioner contends that one of ordinary skill in the art would have combined May with Parulski, Huang, and Tang because May and Parulski share an inventor in common, "are in the same technical field," "are analogous prior art," and "are in the same field of endeavor." Pet. 88–89 (citing Ex. 1003 ¶ 71; Ex. 1005, 9:8–10; Ex. 1006, 8:44–51; Ex. 1009, 1:6–8; Ex. 1011, 4:27–28).

45

IPR2020-00877
Patent 10,288,840 B2

*Third*, Petitioner contends that "a POSITA would have understood that Huang's Example 1 lens assembly and Tang's Embodiment 1 lens assembly have different track lengths, so the image sensors would naturally be placed at different planes." *Id.* at 90 (citing Ex. 1003 ¶ 75; Ex. 1006, Table 1; Ex. 1009, Table 1).

*Fourth*, Petitioner contends that

> a POSITA would have understood that placing the wide and telephoto lens units of Parulski on different substrates with the ability to vary their layout would provide a greater range of optical performance and more economically produce camera lenses . . . [and] provide a cost savings as compared to a single zoom lens camera.

*Id.* at 93 (citing Ex. 1003, 93; Ex. 1005, 6:20–44, 8:15–30, 10:37–59; Ex. 1011, 4:6–15, 45–54); *see also id.* at 90 (citing Ex. 1003 ¶¶ 76, 77) (collectively reiterating that the combination would "provide a greater range of optical performance and more economically produce camera lenses" and "would provide cost savings as compared to a single zoom lens camera").

With respect to this reason, Petitioner elaborates that a POSITA would have been motivated to make the combination because: "May's image capture assembly layout [] provide[s] additional flexibility for optical performance and camera lens arrangement" (Pet. 89 (citing Ex. 1003 ¶ 73; Ex. 1011, 4:19–24)); "May's mounting, arrangement, and modularity of the camera subassemblies is desirable in designing and implementing a photographic camera" (*id.* (citing Ex. 1003 ¶ 74)); and "May states that the various embodiments of its image capture assembly with multiple cameras 'can reduce the cost and size of the camera, and improve its optical performance'" (*id.* at 88 (citing Ex. 1011, 6:20–24)); *see also id.* at 90 (citing Ex. 1011, 4:6–15, 6:20–44, 10:37–59) (reiterating that "May's

46

various image capture assemblies offer the additional benefit of reduction of size and cost of the camera and improvement of its optical performance").

### Patent Owner's Contentions

Patent Owner contends that "Apple's petition does not explain how it proposes using the Huang and Tang lenses in May's layout for folded lenses." PO Resp. 7. Patent Owner further contends that "[t]he description of the folded lens layouts that Apple quotes describes 'a common circuit board assembly'" and "the non-folded Figure 24A layout is described as having a single 'substrate 620' with electronic circuit components 'such as resistors, capacitors and power management components' mounted on it." *Id.* at 9 (citing Ex. 1011, 10:14–17, 23:48–57; Pet. 88–90).

Patent Owner also contends that the "cost and size benefits cited in May are not tied to the use of separate circuit boards." *Id.* at 10. Patent Owner contends that "[t]he claims of reduced cost from using separate circuit boards also defy common sense," and that, instead, "combin[ing] multiple components onto a single board [is] a way to reduce costs." *Id.* at 11.

Patent Owner still further contends that "Dr. Sasián's declaration and CV suggest that he is a highly experienced designer of lenses and teacher of lens design," but that Petitioner "provide[s] no reason to believe that Dr. Sasián has any expertise in circuit board assembly or costs [thereof] that would be useful to this Board." *Id.* at 12 (citing Ex. 1003 ¶¶ 6–17; Ex. 1004).

### Petitioner's Responsive Contentions

Pointing to May's Fig. 24A with substrate 620 as teaching a printed circuit board, Petitioner contends that a "POSITA would have recognized

IPR2020-00877
Patent 10,288,840 B2

May's other optical assemblies would also include image sensors mounted on a PCB [printed circuit board]." Pet. Reply 8 (citing Pet. 90; Ex. 1003 ¶ 67; Ex. 1011, Fig. 17; Ex. 1022 ¶ 13).  Petitioner more particularly contends that "a POSITA would have understood that the image sensors being in different planes in May's embodiments shows that the image sensor on each subassembly is mounted on its own PCB." *Id.* at 9 (citing Pet. 91–92; Ex. 1003 ¶¶ 66–67, 86; Ex. 1022 ¶ 15; Ex. 1005, Figs. 15A–15C, 16A–16B, 23:28–40; Ex. 1011, Figs. 10D–10F); *see id.* at 8–9 (citing Ex. 1003 ¶¶ 66, 74; Pet. 89–90; Ex. 1022 ¶ 14).  Petitioner explains that "[s]ince each subassembly has a sensor mounted in a different orientation, a POSITA would have understood each sensor to be mounted on a different PCB due to the image sensors not being parallel and in the same plane." *Id.* at 11 (citing Ex. 1022 ¶ 18).

Petitioner explains that "a POSITA would have understood May's modular camera subassemblies (e.g., as shown in Figs. 10D-10F) to apply to both folded and non-folded fixed-lens configurations" and as such, "[a] POSITA would have been motivated to apply the teachings of May in a non-folded configuration to the wide-angle lens of Tang and the telephoto lens of Huang, at least because these lenses have nonfolded layouts." *Id.* at 20 (citing Pet 95; Ex. 1003, 96; Ex. 1006, Table 1; Ex. 1009, Table 1; Ex. 1011, 23:8–11; Ex. 1022 ¶ 30).

Petitioner further explains that "May's teachings that these camera subassemblies are modular would have indicated to a POSITA that the camera subassemblies in these embodiments use multiple printed circuit boards." *Id.* at 11 (citing Pet. 87, 92; Ex. 1022 ¶ 19).  Petitioner asserts that "[b]ecause May shows that each of these camera subassemblies as separate

and oriented in different configurations, a POSITA would have understood that May teaches that its camera subassemblies are modular, and thus teaches the use of different circuit boards, distinct, and spaced apart." *Id.* at 11–12 (citing Pet. 89–90; Ex. 1003 ¶¶ 66, 74, p. 93; Ex. 1011, Figs. 10A–15C, 9:54–59; Ex. 1022 ¶ 20); *see also id.* at 12 (citing Pet. 89–90; Ex. 1003 ¶¶ 66, 73–74; Ex. 1022 ¶ 21) ("May teaches independent, modular optical assemblies . . . [a] POSITA would have understood May to teach that the camera subassemblies are mounted on separate PCBs to maintain their modular nature.").

Petitioner further contends that "May's modular subassemblies would have made it easier to rearrange lenses to accommodate other components such as electronics, screens, and batteries within the 'confined space of the digital camera.'" Pet. Reply 17 (citing Ex. 1011, 9:19–26; Ex. 1022 ¶ 26). Petitioner also contends that "[t]he use of modular subassemblies on different boards would also allow the use of wide-angle and telephoto lenses optimized for their specific purposes, without trying to align them on the same plane so that they are mounted on the same PCB [printed circuit board]." *Id.* (citing Pet. 90).

Petitioner contends that "[i]n a camera incorporating the lens designs of Huang and Tang (each with a different track length), sensors would be placed at different distances from the lens, as in the May examples" and that "[a] POSITA would look to May's teachings of alternative ways of assembling those camera modules, including having them on the same plane or separate planes," and further that "[i]n the case that the camera modules are on separate planes, they would also be on different PCBs [printed circuit boards]." *Id.* at 19 (citing Ex. 1022 ¶ 29).

49

IPR2020-00877
Patent 10,288,840 B2

*Overview of Analysis of Dependent Claims 3 and 4*

As to whether Petitioner is relying on May's embodiments individually, in the alternative, or in combination with each other, during the hearing, Petitioner clarified its position as follows:

> MR. MAUCOTEL: Our combination combines May with the telephoto assemblies or the telephoto lens of Huang and the wide-angle lens of Tang. These are non-folded lenses and they have different track lengths. So, given this art that a POSITA would have in front of them, they would look to the *instructions of May that have to do with imaging assemblies that have different track lengths and can be placed at different orientations. So, that's why we rely on Figures 10D through F* of May.

Tr. 16:8–14 (emphasis added). Petitioner further clarified that:

> MR. MAUCOTEL: And a POSITA would -- and May, in Figure 24A, showing non-folded lenses, it works in this case for two lenses mounted on a single PCB because the track length is the same for those imaging assemblies.
>
> *                  *                  *
>
> . . . what we're relying on for May, again, kind of going back to Figures 10E through F, we're not relying on the actual lenses of May. *In fact, we're relying on the lenses of Huang and Tang instead, which are non-folded lenses.* They are linear lenses that would extend straight down the page. We're using those imaging assemblies; however, what we're using for May is the teachings *that imaging assemblies are mounted on printed circuit boards and each imaging assembly would have its own printed circuit boards.* That's what we're using for May.

*Id.* at 15:4–6, 22:11–19 (emphases added). During the hearing, Petitioner further asserted that

> MR. MAUCTOEL: We'd also like to point out that both May and Parulski include both folded and non-folded lens designs and use them interchangeably. So, there's no problem with jumping

50

IPR2020-00877
Patent 10,288,840 B2

> between the folded and non-folded lens designs.  They stand for
> the same proposition.

*Id.* at 24:4–8; *see also id.* at 15:1–3 (Mr. Maucotel arguing that "a POSITA
would understand -- so, an interesting aspect of May is it uses folded and
non-folded configurations interchangeably").

Based on the Petition, Petitioner's Reply, and arguments presented
during the hearing, we understand Petitioner to rely on May's non-folded
configuration—because Huang and Tang have non-folded lens assemblies—
to teach non-folded camera subassemblies on a printed circuit board, and
May's folded configuration to teach that there is a separate printed circuit
board for each of the non-folded camera subassemblies.

Contrary to Petitioner's assertion, whether May's invention can
interchangeably rely on its folded or non-folded configurations is not the
relevant inquiry.  Instead, we consider whether (1) given the teachings of
May a POSITA would have understood that image sensors 12a through 12d
of May's Figures 10D–10F each have their own, separate printed circuit
board and whether (2) a POSITA would have understood May or Parulski's
flex connectors to teach or suggest connecting one printed circuit board to
another printed circuit board.

*Analysis of Whether a POSITA Would Have Understood
May to Teach or Suggest "separate printed circuit boards"
in Figures 10D through 10F*

We are not persuaded by Petitioner's argument that, because May's
Figures 10D–10F depict image sensors 12a through 12d on different planes,
each image sensor would have been understood by a POSITA to be
connected to its own, separate printed circuit board and in a planar fashion.
Initially, we find that Petitioner has not shown sufficient evidence that May

discloses separate printed circuit boards. Pet 91–92 (citing Ex. 1003, 92; Ex. 1011, 7:4–15, Figs. 10D–10F). The portions of May cited in the Petition do not teach or suggest more than one printed circuit board, let alone placing each different type of lens unit (i.e., the claimed Wide and Telephoto lens units) on separate printed circuit boards as claimed. *See* Ex. 1011, Figs. 10D–10F, Fig. 24A, 7:4–15. We have considered all of Dr. Sasián's testimony (Ex. 1003 ¶¶ 65–73; Ex. 1022 ¶¶ 8–35; Ex. 2003) and supporting evidence, and it is not persuasive that May teaches or suggests placing different lens units on separate printed circuit boards. Although Dr. Sasián cites to evidence, we find that evidence does not support his position and thus is unavailing, for the reasons discussed below.

As Patent Owner observes, "[n]othing in May's description of these figures says that there are printed circuit boards for each image sensor, as opposed to a single board that could be located behind the image capture assemblies shown in Figures 10A–10F that all of the image capture assembles could be mounted on." PO Sur-Reply 4; *id.* at 3 (Patent Owner disputing Petitioner's contention 'that the elements 12a–12d in these figures are 'image sensors mounted on different printed circuit boards'" and arguing that May "expressly describes elements 12a–12d, as well as elements 14 and 16 as 'image sensors.'"). There is insufficient evidence of record that would tend to support a finding that a POSITA would have understood May's image sensors 12a through 12d to be *mounted in a planar fashion* to separate printed circuit boards. At most, Petitioner explains that "a POSITA would have understood that *the image sensors being in different planes* in May's embodiments shows that the image sensor on each subassembly is mounted on its own PCB." Pet. Reply 9 (citing Ex. 1003 ¶¶ 66–67, 86; Ex. 1005,

IPR2020-00877
Patent 10,288,840 B2

Figs. 15A–15C, 16A–16B, 23:28–40; Ex. 1011, Figs. 10D-10F) (emphasis added).  Dr. Sasián does not explain why image sensors situated in different planes would have been understood to have a particular, e.g., planar, alignment with respect to a printed circuit board.  *See, e.g.,* Ex. 1003, p. 93 (citing Ex. 1005, 23:44–50); *id.* ¶¶ 67, 74 (citing Ex. 1005, Figs. 16A–16B, 23:28–40; Ex. 1011, Figs. 24A–24B, 23:48–57).

        With respect to May's disclosure that "[w]hile not in an exactly coaxial arrangement with respect to each other, the multiple lenses *and sensors are generally aligned* with respect to each other so as to be viewing substantially the same object, albeit with different fields of view," Petitioner has not sufficiently explained why May's "generally aligned" lens assemblies, including image sensors, would have been understood to involve mounting the multiple lenses and sensors in a *planar* fashion which, in turn, would have been understood to lead to separate printed circuit boards.  Ex. 1011, 6:26–30 (emphasis added); *see e.g.,* Tr. 13:11–16, 25:7–10.

> *Analysis of Whether a POSITA Would Have Understood
> May or Parulski's flex connectors to Teach or Suggest
> Connecting One Printed Circuit Board to Another*

        Dr. Sasián testifies that, like May, "Parulski includes a flex connector 626 and a POSITA would have understood that this may be used to similarly connect different boards with lens units together" and thus, "a POSITA would have understood that both Parulski and May teach mounting Wide and Telephoto camera units on separate printed circuit boards."  Ex. 1003, 93 (Ex. 1005, 23:44–50).  Dr. Sasián also testifies that "each of the camera subassemblies of May is mounted on a substrate that also carries other electronic components (*e.g.*, an autofocus mechanism), including a flex connector (626) and *therefore is understood to be a printed circuit board as*

*claimed*." Ex. 1003 ¶¶ 67, 74 (Ex. 1005, Figs. 16A–16B, 23:28–40; Ex.
1011, Figs. 24A–24B, 23:48–57) (emphasis added). But we are not
persuaded that Parulski's flex connector or May's flex connector would have
been understood to connect to another printed circuit board with the other
type (Wide or Tele) of lens unit.

There is nothing in May or Dr. Sasián's testimony that indicates why
a POSITA would have understood either Parulski's or May's flex connector
to connect to another printed circuit board instead of, for example, "some
other electronics." *Cf.* Tr. 21:15–18. Neither does May or Dr. Sasián's
testimony explain why a POSITA would not have, instead, understood
image sensors 12a through 12d could be connected, e.g., *in a non-planar
fashion*, to a single printed circuit board that is parallel to fixed focal length
lenses 2a through 2d via, for example, wires, "flex connectors or by some
other electronics." *Id.* at 20:18–21:2 (Petitioner's counsel arguing that
separate printed circuit boards would be connected by flex connectors or
other electronics). Petitioner's citation to Ryu does not support Petitioner's
position any further because the cited disclosure teaches "[a]n image sensor
(not shown) is connected to one end of the upper surface of the PCB [printed
circuit board] 12 by wire, and the header connector 14." Ex. 1012, 1:34–36.

We are also not persuaded by Petitioner's citation to May's Figure 17
because that figure shows only one image sensor and does not explain how
and why any component of the figure would have been understood to teach
or suggest a printed circuit board. *See* PO Sur-Reply 6 (arguing that "May
never says what these unlabeled structures [in Figure 17] are, and there is
nothing in May to indicate that these are printed circuit boards, as opposed
to some sort of connector, cable, or structural component").

For the reasons discussed above, we determine that Petitioner fails to establish unpatentability of claim 3, and claim 4 which depends therefrom, by a preponderance of the evidence because Petitioner's challenge does not sufficiently show that the combination of Parulski, Huang, Tang, and May, as evidenced by Ryu, teaches or suggests that "the Wide and Telephoto camera units are mounted on separate printed circuit boards."

Petitioner's challenge does not succeed for an *additional* reason—its rationale for combining May with Parulski, Huang, and Tang is not supported by sufficient rational underpinning, as discussed in detail below.

### Analysis of Rationale for Combining May with Parulski, Huang, and Tang

Petitioner's reasons for combining May with Parulski, Huang, and Tang are too generic and factually unsupported. *See ActiveVideo Networks, Inc. v. Verizon Communications, Inc.* 694 F.3d 1312, 1328 (finding expert testimony about the "modular" nature of references "generic and bear[ing] no relation to any specific combination of prior art elements"). As discussed in further detail below, Petitioner's reasoning "say[s] no more than that a skilled artisan, once presented with the two references, would have understood that they could be combined. And that is not enough; it does not imply a motivation to pick out those two references and combine them to arrive at the claimed invention." *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 993–94 (Fed. Cir. 2017). "[O]bviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention." *Belden Inc. v. Berk–Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015); *see In re Nuvasive*, 842 F.3d at 1383 (holding conclusory statements

insufficient if not supported by a reasoned explanation) (citing *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("The factual inquiry whether to combine references must be thorough and searching.")).

Petitioner cites Tang's optical parameters to specify the dimensions of a wide angle lens assembly. *See* Pet. 29–34. Likewise, Petitioner cites Huang's optical parameters to specify the dimensions of a telephoto lens assembly. *Id.* at 29, 34–39. Petitioner contends that Tang's wide optical parameters specify a lens assembly having a track length that differs from a lens assembly specified by Huang's Tele optical parameters. *Id.* at 90 (arguing that a POSITA would have understood Tang's Embodiment 1 lens assembly and Huang's Example 1 lens assembly to have different track lengths and thus, "the image sensors would naturally be placed at different planes").

Petitioner's combination turns to May to determine how to mount lens units of differing track lengths. Pet. Reply 19 ("[I]n a camera incorporating the lens designs of Huang and Tang (each with a different track length), sensors would be placed at different distances from the lens," a "POSITA would look to May's teachings of . . . having them on the *same plane or separate planes*.") (emphasis added). As Parulski, Huang, and Tang show wide lens assemblies and tele lens in non-folded configurations, Petitioner argues that "[a] POSITA would have been motivated to apply the teachings of May in a non-folded configuration [Fig. 24A] . . . at least because these lenses have non-folded layouts." *Id.* at 20 (citing Ex. 1006, Table 1; Ex. 1009, Table 1; Ex. 1022 ¶ 30). Petitioner *also* relies on May's folded configurations from Figures 10D–10F because, as it asserts, "May's modular camera subassemblies (e.g., as shown in Figs. 10D-10F) to apply to both

folded and non-folded fixed-lens configurations." *Id.* (citing Pet. 95; Ex. 1003, 96; Ex. 1022 ¶ 30; Ex. 1011, 23:8–11).

We are not persuaded that a POSITA would have looked to May's folded configuration embodiments, given that May also discloses a non-folded configuration embodiment and each of Parulski, Tang, and Huang disclose non-folded configurations for their lens assemblies. Further, in May's non-folded embodiment depicted in Figure 24A, reproduced below, May shows both a wide angle lens and telephoto lens on a single substrate 620.



FIG. 24A

IPR2020-00877
Patent 10,288,840 B2

*Petitioner's Reasons Related to Modularity and Improvements
in Cost, Size, and Optical Performance*

We further determine that the record does not indicate that May is any
more "modular" than any other lens assembly in the cited references. *See
ActiveVideo Networks*, 694 F.3d at 1328. None of the lens assemblies in the
cited references appear to share any elements with other lens assemblies and
appear to be able to perform imaging independently of other lens assemblies
and as such, are modular to the same extent May can be considered to be
modular. Even if May does describe modularity in connection with its
invention, that does not imply a POSITA would have understood its
components to be interchangeable or any more capable of being rearranged
than any other lens assembly in the cited references. Also, there is
insufficient evidence of record to support a finding that May teaches the
*desirability* of rearranging its camera subassemblies—particularly in light of
May's teaching, and Petitioner's recognition, that "May gives specific
reasons for the alignment of its subassemblies (as shown in the above
figures), teaching that 'multiple lenses and sensors are generally aligned
with respect to each other so as to be viewing substantially the same object,
albeit with different fields of view.'" Pet. Reply 23 (citing Ex. 1011, 6:28–
30). We find that Patent Owner has the better position—that "[t]he Petition
has no discussion of camera subassemblies that can be 'reconfigured,'
'rearranged' or swapped as if they were LEGO bricks." PO Sur-Reply 9
(citing Pet. Reply 12, 17). At best, May states that "the spatial relationship
of the components has been rearranged" in the examples shown in Figures
14A–14C. In other words, May states that it discloses different
arrangements of subassemblies, but May does not indicate that camera

58

subassemblies can be readily 'rearranged' in a modular fashion during design or in a finished device or that such "modular" rearrangement would be desirable or any easier to do for May's subassembly than it would be with the lens assemblies in the cited references.  Ex. 1011, 9:54–59.

Even assuming, *arguendo*, that May teaches rearranging electronic components, there is insufficient evidence supporting Petitioner's assertion that it is due to any "modular" quality of May's invention.  We disagree that camera assemblies that are modular, a term that could be used to describe any camera assembly and not just May's, would have conveyed to a POSITA anything about a camera assembly's mounting and connection to a printed circuit board, either a shared printed circuit board or its own, separate printed circuit board.  The record does not contain specific evidence that would support a finding that placing image sensors on separate printed circuit boards would make May's camera assemblies more able to be rearranged or interchanged as compared with mounting them, in some non-planar fashion, on a shared printed circuit board.

There is insufficient evidence of record that would tend to support a finding that placing wide-angle and telephoto lenses on separate printed circuit boards would "optimize" them for their specific purposes any more than aligning them on the same plane on a shared printed circuit board, contrary to Petitioner's contentions.  Pet. Reply 17 (citing Pet. 90).  In this regard, Petitioner cites multiple portions of May in columns 4, 6, 9, and 10. In the cited portions, May states its objective to reduce the size and cost of its camera and produce higher-quality optical results.  In a cited portion in column 6, May even states that the improvements in the cost, size, and optical performance of its dual-lens camera are relative to a camera having a

single sensor, and a large zoom lens. *See* Ex. 1011, 6:20–26. None of the statements in May suggest that any improvements in cost, size, or optical performance result from having a separate printed circuit board for each camera subassembly, which is what Petitioner relies on May to teach in its combination. *See also* Ex. 1005, 10:17–25 (Parulski generally describing a desire to reduce cost and size of a camera assembly). Also, there is insufficient evidence of record that would tend to support a finding that placing May's different camera subassemblies on separate printed circuit boards would improve or increase the range of optical performance of its camera assemblies, as Petitioner contends. *See* Pet. 88–90, 93.

As such, we are not persuaded that "[a] POSITA would look to May's teachings of alternative ways of assembling those camera modules, including having them on the same plane or separate planes." *See* Pet. Reply (Ex. 1022 ¶ 29) (emphasis omitted).

As discussed above, Dr. Sasián's testimony in his First and Second Declarations largely reiterates Petitioner's contentions and cites to substantially similar portions of the references. *See e.g.*, Ex. 1003 ¶¶ 70–77; Ex. 1024 ¶¶ 26–31. As such, we find his testimony similarly unpersuasive.

For the foregoing reasons, we are not persuaded that Petitioner's rationale for combining May with Parulski, Huang, and Tang is supported by sufficient rational underpinning. Accordingly, for this *additional* reason, we conclude that Petitioner does not establish unpatentability of claim 3 or claim 4, which depends from claim 3, by a preponderance of the evidence.

### F. Obviousness over Parulski, Huang, Tang, and Li II

Petitioner contends that claim 6, which depends directly from claim 1, is unpatentable as obvious under 35 U.S.C. § 103 over Parulski, Huang,

IPR2020-00877
Patent 10,288,840 B2

Tang, and Li II.  Patent Owner did not dispute Petitioner's challenge to

claim 6.  *See* PO Resp. 1.  For the reasons that follow, we determine that

Petitioner's showing is sufficiently supported so as establish unpatentability

of claim 6 by a preponderance of the evidence.

*1.    Overview of Li II*

Li II concerns a mobile device with dual digital camera sensors.  Ex.

1018, 1:7–8.  Sensor position controller of the mobile device 106 "may

adjust locations and/or positions of the two sensors 102, 104, such as [by]

rotating, shifting or sliding the sensors 102,104 in one or more directions."

*Id.* at 3:9–12.  A mobile device with sensors is depicted in Figure 1,

reproduced below.

61

IPR2020-00877
Patent 10,288,840 B2



**FIG. 1**

Figure 1 of Li II illustrates a mobile device with two or more
camera sensors. *Id.* at 1:36–37.

Li II explains "[a]djustable sensors 102, 104 may enable a number of
advanced features, such as image quality improvement, 3-D image and video
visualization, and 360-degree panoramic video generation." *Id.* at 3:16–19.

### 2.    *Dependent Claim 6*

Dependent claim 6 recites, "wherein the Wide and Telephoto camera
units are spaced from one another a distance d of about 1 mm." Ex. 1001,
20:30–32.

62

IPR2020-00877
Patent 10,288,840 B2

Petitioner contends that Li II discloses "a mobile device with dual digital camera sensors [102, 104]" that "are adjustable by 'rotating, shifting or sliding the sensors 102, 104 in one or more directions.'" Pet. 100 (citing Ex. 1018, 1:7–8, 3:7–12, Fig. 1). According to Petitioner, "Li II states that the sensors may be adjusted to a range including 6 cm apart as well as closer together, such that 'the distance between the two sensors 102, 104 approaches zero.'" *Id.* at 101 (citing Ex. 1018, 4:2–5, 4:56–57). Petitioner further contends that "[a] POSITA would have understood that this range includes 'a distance d of about 1 mm' as claimed, especially in the context of Li II's discussion of sensors 'positioned very close to each other,' and considering the sizes of camera units." *Id.* (citing Ex. 1018, 3:66–4:13).

As rationale for combining the teachings of Parulski, Huang, Tang, and Li II, Petitioner contends

> [A] POSITA would have been motivated to modify Parulski's mobile device with Li II's method of varying the distance between imaging lenses to provide additional control over the imaging capabilities of the mobile device including increasing image dynamic range. For example, Parulski includes various embodiments with different spacing between lenses including a first embodiment that includes a first zoom imaging stage and a second imaging stage "for the purpose of autofocus of the first imaging stage." In a second embodiment, "two image capture stages are used together to form a high resolution rangefinder similar to a dual lens rangefinder but with higher resolution, which is provided by the two high resolution image capture stages and a larger separation distance between the two lenses in the two image capture stages."

*Id.* at 98 (citing Ex. 1003, 99, Ex. 1005, 10:26–37, 59–64; Ex. 1018, 4:12–36).

63

IPR2020-00877
Patent 10,288,840 B2

Patent Owner does not dispute Petitioner's showing as to this claim. *See generally* PO Resp.

We have reviewed Petitioner's cited evidence and are persuaded that the rationale for combining is supported by sufficient rational underpinning and that the cited evidence sufficiently supports Petitioner's contentions so as to establish unpatentability by a preponderance of the evidence with respect to the challenge to dependent claim 6 over the combination of Parulski, Huang, Tang, and Li II. *See* Pet. 95–104.

## IV.    CONCLUSION

We conclude that Petitioner has established unpatentability by a preponderance of the evidence with respect to its challenge to claims 1, 2, 5–7, 11–13, 15, 16, 18, 20, and 21 over Parulski, Huang, and Tang and with respect to its challenge to claim 6 over Parulski, Huang, Tang, and Li II. We further conclude that Petitioner has not established unpatentability by a preponderance of the evidence with respect to its challenge to claims 3 and 4 over Parulski, Huang, Tang, and May.

Our conclusions regarding the challenged claims are summarized below:

| Claims Challenged | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 5, 7, 11–13, 15, 16, 18, 20, 21 | 103(a) | Parulski, Huang, Tang | 1, 2, 5, 7, 11–13, 15, 16, 18, 20, 21 | |
| 6 | 103(a) | Parulski, Huang, Tang, Li II | 6 | |

IPR2020-00877
Patent 10,288,840 B2

| Claims Challenged | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 3, 4 | 103(a) | Parulski, Huang, Tang, May | | 3, 4 |
| **Overall Outcome** | | | 1, 2, 5–7, 11–13, 15, 16, 18, 20, 21 | 3, 4 |

## V.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, 5–7, 11–13, 15, 16, 18, 20, and 21 are determined to be unpatentable;

ORDERED that claims 3 and 4 are determined to be not unpatentable; and

FURTHER ORDERED that, because this a Final Written Decision, parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

65

IPR2020-00877
Patent 10,288,840 B2

For PETITIONER:

Michael Parsons
Andrew Ehmke
Jordan Maucotel
HAYNES AND BOONE, LLP
michael.parsons.ipr@haynesboone.com
andy.ehmke.ipr@haynesboone.com
jordan.maucotel@haynesboone.com

For PATENT OWNER:

Neil Rubin
C. Jay Chung
RUSS AUGUST & KABAT
nrubin@raklaw.com
jchung@raklaw.com

66



US010288840B2

(12) **United States Patent**
Shabtay et al.

(10) Patent No.: **US 10,288,840 B2**
(45) **Date of Patent:** **May 14, 2019**

(54) **MINIATURE TELEPHOTO LENS MODULE AND A CAMERA UTILIZING SUCH A LENS MODULE**

(71) Applicant: **Corephotonics Ltd.**, Tel-Aviv (IL)

(72) Inventors: **Gal Shabtay**, Tel-Aviv (IL); **Ephraim Goldenberg**, Ashdod (IL)

(73) Assignee: **Corephotonics Ltd**, Tel Aviv (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/540,676**

(22) PCT Filed: **Jan. 3, 2015**

(86) PCT No.: **PCT/IB2015/050044**
§ 371 (c)(1),
(2) Date: **Jun. 29, 2017**

(87) PCT Pub. No.: **WO2016/108093**
PCT Pub. Date: **Jul. 7, 2016**

(65) **Prior Publication Data**
US 2017/0353645 A1    Dec. 7, 2017

(51) **Int. Cl.**
| | |
|---|---|
| *G02B 13/00* | (2006.01) |
| *G02B 9/60* | (2006.01) |
| *H04N 5/225* | (2006.01) |
| *G02B 7/02* | (2006.01) |
| *G02B 13/06* | (2006.01) |
(Continued)

(52) **U.S. Cl.**
CPC ........... *G02B 13/001* (2013.01); *G02B 7/021* (2013.01); *G02B 9/60* (2013.01); *G02B 13/0045* (2013.01); *G02B 13/02* (2013.01); *G02B 13/06* (2013.01); *G03B 17/00* (2013.01); *H04N 5/2253* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .. G02B 13/001; G02B 13/0015; G02B 13/02; G02B 13/0025; G02B 13/003; G02B 13/0035; G02B 13/004; G02B 13/0045; G02B 13/04; G02B 9/06; G02B 9/12;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,354,503 | A | 7/1944 | Cox |
| 2,378,170 | A | 6/1945 | Aklin |
(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 102739949 | A | 10/2012 |
| CN | 103024272 | A | 4/2013 |
(Continued)

OTHER PUBLICATIONS

A compact and cost effective design for cell phone zoom lens, Chang et al., Sep. 2007, 8 pages.
(Continued)

*Primary Examiner* — Jordan M Schwartz
(74) *Attorney, Agent, or Firm* — Nathan & Associates; Menachem Nathan

(57) **ABSTRACT**

The presently disclosed subject matter includes a mobile electronic comprising an integrated camera, comprising a Wide camera unit comprising a Wide lens unit, and a Telephoto camera unit comprising a telephoto lens unit, the telephoto lens unit and the wide lens unit having respectively TTL/EFL ratios smaller and larger than 1 and defining separate telephoto and wide optical paths.

**22 Claims, 15 Drawing Sheets**



APPL-1001 / Page 1 of 30
APPLE INC. v. COREPHOTONICS LTD.

Appx69

US 10,288,840 B2

Page 2

(51) **Int. Cl.**
   *G03B 17/00*    (2006.01)
   *G02B 13/02*    (2006.01)
   *G02B 1/04*    (2006.01)

(52) **U.S. Cl.**
   CPC ......... *H04N 5/2254* (2013.01); *H04N 5/2258*
         (2013.01); *G02B 1/041* (2013.01)

(58) **Field of Classification Search**
   CPC .......... G02B 9/34; G02B 9/60; H04N 5/2258;
                H04N 5/2253; H04N 5/2254
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,441,093 A | 5/1948 | Aklin | |
| 3,388,956 A | 6/1968 | Eggert et al. | |
| 3,524,700 A | 8/1970 | Eggert et al. | |
| 3,864,027 A | 2/1975 | Harada | |
| 3,942,876 A | 3/1976 | Betensky | |
| 4,134,645 A | 1/1979 | Sugiyama et al. | |
| 4,139,264 A * | 2/1979 | Takahashi ............... | G02B 13/02 |
| | | | 359/746 |
| 4,199,785 A | 4/1980 | McCullough et al. | |
| 4,338,001 A | 7/1982 | Matsui | |
| 4,465,345 A | 8/1984 | Yazawa | |
| 5,000,551 A | 3/1991 | Shibayama | |
| 5,005,083 A | 4/1991 | Grage et al. | |
| 5,032,917 A | 7/1991 | Aschwanden | |
| 5,051,830 A | 9/1991 | von Hoessle | |
| 5,172,235 A | 12/1992 | Wilm et al. | |
| 5,248,971 A | 9/1993 | Mandl | |
| 5,287,093 A | 2/1994 | Amano et al. | |
| 5,436,660 A | 7/1995 | Sakamoto | |
| 5,444,478 A | 8/1995 | Lelong et al. | |
| 5,459,520 A | 10/1995 | Sasaki | |
| 5,657,402 A | 8/1997 | Bender et al. | |
| 5,682,198 A | 10/1997 | Katayama et al. | |
| 5,768,443 A | 6/1998 | Michael et al. | |
| 5,926,190 A | 7/1999 | Turkowski et al. | |
| 5,940,641 A | 8/1999 | McIntyre et al. | |
| 5,982,951 A | 11/1999 | Katayama et al. | |
| 6,101,334 A | 8/2000 | Fantone | |
| 6,128,416 A | 10/2000 | Oura | |
| 6,148,120 A | 11/2000 | Sussman | |
| 6,208,765 B1 | 3/2001 | Bergen | |
| 6,268,611 B1 | 7/2001 | Pettersson et al. | |
| 6,549,215 B2 | 4/2003 | Jouppi | |
| 6,611,289 B1 | 8/2003 | Yu et al. | |
| 6,643,416 B1 | 11/2003 | Daniels et al. | |
| 6,650,368 B1 | 11/2003 | Doron | |
| 6,654,180 B2 | 11/2003 | Ori | |
| 6,680,748 B1 | 1/2004 | Monti | |
| 6,714,665 B1 | 3/2004 | Hanna et al. | |
| 6,724,421 B1 | 4/2004 | Glatt | |
| 6,738,073 B2 | 5/2004 | Park et al. | |
| 6,741,250 B1 | 5/2004 | Furlan et al. | |
| 6,750,903 B1 | 6/2004 | Miyatake et al. | |
| 6,778,207 B1 | 8/2004 | Lee et al. | |
| 7,002,583 B2 | 2/2006 | Rabb, III | |
| 7,015,954 B1 | 3/2006 | Foote et al. | |
| 7,038,716 B2 | 5/2006 | Klein et al. | |
| 7,187,504 B2 | 3/2007 | Horiuchi | |
| 7,199,348 B2 | 4/2007 | Olsen et al. | |
| 7,206,136 B2 | 4/2007 | Labaziewicz et al. | |
| 7,248,294 B2 | 7/2007 | Slatter | |
| 7,256,944 B2 | 8/2007 | Labaziewicz et al. | |
| 7,305,180 B2 | 12/2007 | Labaziewicz et al. | |
| 7,339,621 B2 | 3/2008 | Fortier | |
| 7,346,217 B1 | 3/2008 | Gold, Jr. | |
| 7,365,793 B2 | 4/2008 | Cheatle et al. | |
| 7,411,610 B2 | 8/2008 | Doyle | |
| 7,424,218 B2 | 9/2008 | Baudisch et al. | |
| 7,509,041 B2 | 3/2009 | Hosono | |
| 7,515,351 B2 | 4/2009 | Chen et al. | |

| | | | |
|---|---|---|---|
| 7,533,819 B2 | 5/2009 | Barkan et al. | |
| 7,564,635 B1 | 7/2009 | Tang | |
| 7,619,683 B2 | 11/2009 | Davis | |
| 7,643,225 B1 | 1/2010 | Tsai | |
| 7,660,049 B2 | 2/2010 | Tang | |
| 7,684,128 B2 | 3/2010 | Tang | |
| 7,688,523 B2 | 3/2010 | Sano | |
| 7,692,877 B2 | 4/2010 | Tang et al. | |
| 7,697,220 B2 | 4/2010 | Iyama | |
| 7,738,016 B2 | 6/2010 | Toyofuku | |
| 7,738,186 B2 | 6/2010 | Chen et al. | |
| 7,773,121 B1 | 8/2010 | Huntsberger et al. | |
| 7,777,972 B1 | 8/2010 | Chen et al. | |
| 7,813,057 B2 | 10/2010 | Lin | |
| 7,821,724 B2 | 10/2010 | Tang et al. | |
| 7,826,149 B2 | 11/2010 | Tang et al. | |
| 7,826,151 B2 | 11/2010 | Tsai | |
| 7,869,142 B2 | 1/2011 | Chen et al. | |
| 7,880,776 B2 | 2/2011 | LeGall et al. | |
| 7,898,747 B2 | 3/2011 | Tang | |
| 7,916,401 B2 | 3/2011 | Chen et al. | |
| 7,918,398 B2 | 4/2011 | Li et al. | |
| 7,957,075 B2 | 6/2011 | Tang | |
| 7,957,076 B2 | 6/2011 | Tang | |
| 7,957,079 B2 | 6/2011 | Tang | |
| 7,961,406 B2 | 6/2011 | Tang et al. | |
| 7,964,835 B2 | 6/2011 | Olsen et al. | |
| 7,978,239 B2 | 7/2011 | Deever et al. | |
| 8,000,031 B1 | 8/2011 | Tsai | |
| 8,004,777 B2 | 8/2011 | Souma | |
| 8,046,026 B2 | 10/2011 | Koh | |
| 8,077,400 B2 | 12/2011 | Tang | |
| 8,115,825 B2 | 2/2012 | Culbert et al. | |
| 8,149,327 B2 | 4/2012 | Lin et al. | |
| 8,149,523 B2 | 4/2012 | Ozaki | |
| 8,154,610 B2 | 4/2012 | Jo et al. | |
| 8,218,253 B2 | 7/2012 | Tang | |
| 8,228,622 B2 | 7/2012 | Tang | |
| 8,233,224 B2 | 7/2012 | Chen | |
| 8,238,695 B1 | 8/2012 | Davey et al. | |
| 8,253,843 B2 | 8/2012 | Lin | |
| 8,274,552 B2 | 9/2012 | Dahi et al. | |
| 8,279,537 B2 | 10/2012 | Sato | |
| 8,363,337 B2 | 1/2013 | Tang et al. | |
| 8,390,729 B2 | 3/2013 | Long et al. | |
| 8,391,697 B2 | 3/2013 | Cho et al. | |
| 8,395,851 B2 | 3/2013 | Tang et al. | |
| 8,400,555 B1 | 3/2013 | Georgiev et al. | |
| 8,400,717 B2 | 3/2013 | Chen et al. | |
| 8,439,265 B2 | 5/2013 | Ferren et al. | |
| 8,446,484 B2 | 5/2013 | Muukki et al. | |
| 8,451,549 B2 | 5/2013 | Yamanaka et al. | |
| 8,483,452 B2 | 7/2013 | Ueda et al. | |
| 8,503,107 B2 | 8/2013 | Chen et al. | |
| 8,514,491 B2 | 8/2013 | Duparre | |
| 8,514,502 B2 | 8/2013 | Chen | |
| 8,547,389 B2 | 10/2013 | Hoppe et al. | |
| 8,553,106 B2 | 10/2013 | Scarff | |
| 8,587,691 B2 | 11/2013 | Takane | |
| 8,619,148 B1 | 12/2013 | Watts et al. | |
| 8,780,465 B2 | 7/2014 | Chae | |
| 8,803,990 B2 | 8/2014 | Smith | |
| 8,810,923 B2 | 8/2014 | Shinohara | |
| 8,854,745 B1 | 10/2014 | Chen | |
| 8,958,164 B2 | 2/2015 | Kwon et al. | |
| 8,976,255 B2 | 3/2015 | Matsuoto et al. | |
| 9,019,387 B2 | 4/2015 | Nakano | |
| 9,025,073 B2 | 5/2015 | Attar et al. | |
| 9,025,077 B2 | 5/2015 | Attar et al. | |
| 9,041,835 B2 | 5/2015 | Honda | |
| 9,137,447 B2 | 9/2015 | Shibuno | |
| 9,185,291 B1 | 11/2015 | Shabtay et al. | |
| 9,215,377 B2 | 12/2015 | Sokeila et al. | |
| 9,215,385 B2 | 12/2015 | Luo | |
| 9,229,194 B2 | 1/2016 | Yoneyama et al. | |
| 9,235,036 B2 | 1/2016 | Kato et al. | |
| 9,270,875 B2 | 2/2016 | Brisedoux et al. | |
| 9,279,957 B2 | 3/2016 | Kanda et al. | |
| 9,286,680 B1 | 3/2016 | Jiang et al. | |

**US 10,288,840 B2**

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,344,626 B2 | 5/2016 | Silverstein et al. |
| 9,360,671 B1 | 6/2016 | Zhou |
| 9,369,621 B2 | 6/2016 | Malone et al. |
| 9,413,930 B2 | 8/2016 | Geerds |
| 9,413,984 B2 | 8/2016 | Attar et al. |
| 9,420,180 B2 | 8/2016 | Jin |
| 9,438,792 B2 | 9/2016 | Nakada et al. |
| 9,485,432 B1 | 11/2016 | Medasani et al. |
| 9,488,802 B2 | 11/2016 | Chen et al. |
| 9,568,712 B2 | 2/2017 | Dror et al. |
| 9,578,257 B2 | 2/2017 | Attar et al. |
| 9,618,748 B2 | 4/2017 | Munger et al. |
| 9,678,310 B2 | 6/2017 | Iwasaki et al. |
| 9,681,057 B2 | 6/2017 | Attar et al. |
| 9,723,220 B2 | 8/2017 | Sugie |
| 9,736,365 B2 | 8/2017 | Laroia |
| 9,736,391 B2 | 8/2017 | Du et al. |
| 9,768,310 B2 | 9/2017 | Ahn et al. |
| 9,800,798 B2 | 10/2017 | Ravirala et al. |
| 9,817,213 B2 | 11/2017 | Mercado |
| 9,851,803 B2 | 12/2017 | Fisher et al. |
| 9,894,287 B2 | 2/2018 | Qian et al. |
| 9,900,522 B2 | 2/2018 | Lu |
| 9,927,600 B2 | 3/2018 | Goldenberg et al. |
| 2002/0005902 A1 | 1/2002 | Yuen |
| 2002/0006371 A1 | 5/2002 | Park et al. |
| 2002/0075258 A1 | 6/2002 | Park et al. |
| 2002/0122113 A1 | 9/2002 | Foote |
| 2003/0030729 A1 | 2/2003 | Prentice et al. |
| 2003/0093805 A1 | 5/2003 | Gin |
| 2003/0160886 A1 | 8/2003 | Misawa et al. |
| 2003/0202113 A1 | 10/2003 | Yoshikawa |
| 2004/0008773 A1 | 1/2004 | Itokawa |
| 2004/0017386 A1 | 1/2004 | Liu et al. |
| 2004/0027367 A1 | 2/2004 | Pilu |
| 2004/0061788 A1 | 4/2004 | Bateman |
| 2004/0240052 A1 | 12/2004 | Minefuji et al. |
| 2005/0013509 A1 | 1/2005 | Samadani |
| 2005/0046740 A1 | 3/2005 | Davis |
| 2005/0141103 A1 | 6/2005 | Nishina |
| 2005/0157184 A1 | 7/2005 | Nakanishi et al. |
| 2005/0168840 A1 | 8/2005 | Kobayashi et al. |
| 2005/0200718 A1 | 9/2005 | Lee |
| 2006/0054782 A1 | 3/2006 | Olsen et al. |
| 2006/0056056 A1 | 3/2006 | Ahiska et al. |
| 2006/0125937 A1 | 6/2006 | LeGall et al. |
| 2006/0170793 A1 | 8/2006 | Pasquarette et al. |
| 2006/0175549 A1 | 8/2006 | Miller et al. |
| 2006/0187310 A1 | 8/2006 | Janson et al. |
| 2006/0187312 A1* | 8/2006 | Labaziewicz .......... H04N 5/225 348/218.1 |
| 2006/0187322 A1 | 8/2006 | Janson et al. |
| 2006/0187338 A1 | 8/2006 | May et al. |
| 2007/0024737 A1 | 2/2007 | Nakamura et al. |
| 2007/0177025 A1 | 8/2007 | Kopet et al. |
| 2007/0188653 A1 | 8/2007 | Pollock et al. |
| 2007/0189386 A1 | 8/2007 | Imagawa et al. |
| 2007/0229983 A1 | 10/2007 | Saori |
| 2007/0257184 A1 | 11/2007 | Olsen et al. |
| 2007/0285550 A1 | 12/2007 | Son |
| 2008/0017557 A1 | 1/2008 | Witdouck |
| 2008/0024614 A1 | 1/2008 | Li et al. |
| 2008/0025634 A1 | 1/2008 | Border et al. |
| 2008/0030592 A1 | 2/2008 | Border et al. |
| 2008/0030611 A1 | 2/2008 | Jenkins |
| 2008/0084484 A1 | 4/2008 | Ochi et al. |
| 2008/0117316 A1 | 5/2008 | Orimoto |
| 2008/0166115 A1 | 7/2008 | Sachs et al. |
| 2008/0218611 A1 | 9/2008 | Parulski et al. |
| 2008/0218612 A1 | 9/2008 | Border et al. |
| 2008/0218613 A1 | 9/2008 | Janson et al. |
| 2008/0219654 A1 | 9/2008 | Border et al. |
| 2008/0247055 A1 | 10/2008 | Chang |
| 2008/0304161 A1 | 12/2008 | Souma |
| 2009/0086074 A1 | 4/2009 | Li et al. |
| 2009/0122195 A1 | 5/2009 | Van Baar et al. |
| 2009/0122406 A1 | 5/2009 | Rouvinen et al. |
| 2009/0122423 A1 | 5/2009 | Park et al. |
| 2009/0128644 A1 | 5/2009 | Camp et al. |
| 2009/0219547 A1 | 9/2009 | Kauhanen et al. |
| 2009/0252484 A1 | 10/2009 | Hasuda et al. |
| 2009/0295949 A1 | 12/2009 | Ojala |
| 2010/0013906 A1 | 1/2010 | Border et al. |
| 2010/0020221 A1 | 1/2010 | Tupman et al. |
| 2010/0060746 A9 | 3/2010 | Olsen et al. |
| 2010/0103194 A1 | 4/2010 | Chen et al. |
| 2010/0238327 A1 | 9/2010 | Griffith et al. |
| 2010/0283842 A1 | 11/2010 | Guissin et al. |
| 2010/0302360 A1* | 12/2010 | Take .................... G02B 15/173 359/557 |
| 2010/0328471 A1 | 12/2010 | Boland et al. |
| 2011/0001838 A1 | 1/2011 | Lee |
| 2011/0064327 A1 | 3/2011 | Dagher et al. |
| 2011/0080487 A1 | 4/2011 | Venkataraman et al. |
| 2011/0115965 A1 | 5/2011 | Engelhardt et al. |
| 2011/0128288 A1 | 6/2011 | Petrou et al. |
| 2011/0164172 A1 | 7/2011 | Shintani et al. |
| 2011/0229054 A1 | 9/2011 | Weston et al. |
| 2011/0234853 A1 | 9/2011 | Hayashi et al. |
| 2011/0234881 A1 | 9/2011 | Wakabayashi et al. |
| 2011/0242286 A1 | 10/2011 | Pace et al. |
| 2011/0242355 A1 | 10/2011 | Goma et al. |
| 2012/0026366 A1 | 2/2012 | Golan et al. |
| 2012/0062780 A1 | 3/2012 | Morihisa |
| 2012/0069235 A1 | 3/2012 | Imai |
| 2012/0075489 A1 | 3/2012 | Nishihara |
| 2012/0092777 A1 | 4/2012 | Tochigi et al. |
| 2012/0105579 A1 | 5/2012 | Jeon et al. |
| 2012/0105708 A1 | 5/2012 | Hagiwara |
| 2012/0113515 A1 | 5/2012 | Karn et al. |
| 2012/0154929 A1 | 6/2012 | Tsai et al. |
| 2012/0196648 A1 | 8/2012 | Havens et al. |
| 2012/0229663 A1 | 9/2012 | Nelson et al. |
| 2012/0249815 A1 | 10/2012 | Bohn et al. |
| 2012/0287315 A1 | 11/2012 | Huang et al. |
| 2012/0320467 A1 | 12/2012 | Baik et al. |
| 2013/0002928 A1 | 1/2013 | Imai |
| 2013/0093842 A1 | 4/2013 | Yahata |
| 2013/0135445 A1 | 5/2013 | Dahi et al. |
| 2013/0182150 A1 | 7/2013 | Asakura |
| 2013/0201360 A1 | 8/2013 | Song |
| 2013/0202273 A1 | 8/2013 | Ouedraogo et al. |
| 2013/0208178 A1 | 8/2013 | Park |
| 2013/0235224 A1 | 9/2013 | Park et al. |
| 2013/0250150 A1 | 9/2013 | Malone et al. |
| 2013/0258044 A1 | 10/2013 | Betts-LaCroix |
| 2013/0286488 A1 | 10/2013 | Chae |
| 2013/0321668 A1 | 12/2013 | Kamath |
| 2014/0022436 A1 | 1/2014 | Kim et al. |
| 2014/0049615 A1 | 2/2014 | Uwagawa |
| 2014/0118584 A1 | 5/2014 | Lee et al. |
| 2014/0192238 A1 | 7/2014 | Attar et al. |
| 2014/0192253 A1 | 7/2014 | Laroia |
| 2014/0204480 A1 | 7/2014 | Jo et al. |
| 2014/0285907 A1 | 9/2014 | Tang et al. |
| 2014/0293453 A1 | 10/2014 | Ogino et al. |
| 2014/0313316 A1 | 10/2014 | Olsson et al. |
| 2014/0362242 A1 | 12/2014 | Takizawa |
| 2014/0362274 A1 | 12/2014 | Christie et al. |
| 2015/0002683 A1 | 1/2015 | Hu et al. |
| 2015/0042870 A1 | 2/2015 | Chan et al. |
| 2015/0092066 A1 | 4/2015 | Geiss et al. |
| 2015/0116569 A1 | 4/2015 | Mercado |
| 2015/0154776 A1 | 6/2015 | Zhang et al. |
| 2015/0162048 A1 | 6/2015 | Hirata et al. |
| 2015/0195458 A1 | 7/2015 | Nakayama et al. |
| 2015/0215516 A1 | 7/2015 | Dolgin |
| 2015/0237280 A1 | 8/2015 | Choi et al. |
| 2015/0242994 A1 | 8/2015 | Shen |
| 2015/0253647 A1 | 9/2015 | Mercado |
| 2015/0271471 A1 | 9/2015 | Hsieh et al. |
| 2015/0316744 A1 | 11/2015 | Chen |
| 2015/0334309 A1 | 11/2015 | Peng et al. |

**US 10,288,840 B2**

Page 4

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2015/0370039 A1* | 12/2015 | Bone .................. G02B 13/004 359/715 |
| 2016/0044250 A1 | 2/2016 | Shabtay et al. |
| 2016/0070088 A1 | 3/2016 | Koguchi |
| 2016/0085089 A1 | 3/2016 | Mercado |
| 2016/0154202 A1 | 6/2016 | Wippermann et al. |
| 2016/0154204 A1 | 6/2016 | Lim et al. |
| 2016/0187630 A1* | 6/2016 | Choi .................. G02B 17/086 359/729 |
| 2016/0187631 A1 | 6/2016 | Choi et al. |
| 2016/0212358 A1 | 7/2016 | Shikata |
| 2016/0301840 A1 | 10/2016 | Du et al. |
| 2016/0313537 A1 | 10/2016 | Mercado |
| 2016/0353012 A1 | 12/2016 | Kao et al. |
| 2017/0019616 A1 | 1/2017 | Zhu et al. |
| 2017/0102522 A1 | 4/2017 | Jo |
| 2017/0115471 A1 | 4/2017 | Shinohara |
| 2017/0214846 A1 | 7/2017 | Du et al. |
| 2017/0214866 A1 | 7/2017 | Zhu et al. |
| 2017/0289458 A1 | 10/2017 | Song et al. |
| 2018/0120674 A1 | 5/2018 | Avivi et al. |
| 2018/0150973 A1 | 5/2018 | Tang et al. |
| 2018/0224630 A1 | 8/2018 | Lee et al. |
| 2018/0241922 A1 | 8/2018 | Baldwin et al. |
| 2018/0295292 A1 | 10/2018 | Lee et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 104297906 A | 1/2015 |
| EP | 1536633 A1 | 6/2005 |
| EP | 2523450 A1 | 11/2012 |
| JP | S54157620 A | 12/1979 |
| JP | S59121015 A | 7/1984 |
| JP | H07318864 A | 12/1995 |
| JP | 2004133054 A | 4/2004 |
| JP | 2007228006 A | 9/2007 |
| JP | 2007306282 A | 11/2007 |
| JP | 2008076485 A | 4/2008 |
| JP | 2012203234 A | 10/2012 |
| JP | 2013106289 A | 5/2013 |
| KR | 20140014787 A | 2/2014 |
| KR | 20140023552 A | 2/2014 |
| WO | 2013058111 A1 | 4/2013 |
| WO | 2013063097 A1 | 5/2013 |
| WO | 2014/199338 A2 | 12/2014 |
| WO | 2014/083489 A2 | 6/2015 |

OTHER PUBLICATIONS

Consumer Electronic Optics: How small a lens can be? The case of panomorph lenses, Thibault et al., Sep. 2014, 7 pages.
Optical design of camera optics for mobile phones, Steinich et al., 2012, pp. 51-58 (8 pages).
The Optics of Miniature Digital Camera Modules, Bareau et al., 2006, 11 pages.
Modeling and measuring liquid crystal tunable lenses, Peter P. Clark, 2014, 7 pages.
Mobile Platform Optical Design, Peter P. Clark, 2014, 7 pages.
Statistical Modeling and Performance Characterization of a Real-Time Dual Camera Surveillance System, Greienhagen et al., Publisher: IEEE, 2000, 8 pages.
Dual camera intelligent sensor for high definition 360 degrees surveillance, Scotti et al., Publisher: IET, May 9, 2000, 8 pages.
Dual-sensor foveated imaging system, Hua et al., Publisher: Optical Society of America, Jan. 14, 2008, 11 pages.
Defocus Video Matting, McGuire et al., Publisher: ACM SIGGRAPH, Jul. 31, 2005, 11 pages.
Compact multi-aperture imaging with high angular resolution, Santacana et al., Publisher: Optical Society of America, 2015, 10 pages.
Multi-Aperture Photography, Green et al., Publisher: Mitsubishi Electric Research Laboratories, Inc., Jul. 2007, 10 pages.
Multispectral Bilateral Video Fusion, Bennett et al., Publisher: IEEE, May 2007, 10 pages.
Super-resolution imaging using a camera array, Santacana et al., Publisher: Optical Society of America, 2014, 6 pages.
Optical Splitting Trees for High-Precision Monocular Imaging, McGuire et al., Publisher: IEEE, 2007, 11 pages.
High Performance Imaging Using Large Camera Arrays, Wilburn et al., Publisher: Association for Computing Machinery, Inc., 2005, 12 pages.
Superimposed multi-resolution imaging, Carles et al., Publisher: Optical Society of America, 2017, 13 pages.
Viewfinder Alignment, Adams et al., Publisher: Eurographics, 2008, 10 pages.
Dual-Camera System for Multi-Level Activity Recognition, Bodor et al., Publisher: IEEE, Oct. 2014, 6 pages.
Engineered to the task: Why camera-phone cameras are different, Giles Humpston, Publisher: Solid State Technology, Jun. 2009, 3 pages.
International Search Report and Written Opinion issued in related PCT patent application PCT/IB2015/050044 dated Jul. 7, 2015. 8 pages.

* cited by examiner



Wide lens     Tele lens

KNOWN ART

FIG. 1A



FIG. 1B



FIG. 1C

APPL-1001 / Page 6 of 30
APPLE INC. v. COREPHOTONICS LTD.



FIG. 2A

Case: 22-1324     Document: 13     Page: 121     Filed: 06/14/2022



FIG. 2B

APPL-1001 / Page 8 of 30
APPLE INC. v. COREPHOTONICS LTD.
Appx76



FIG. 2C



FIG. 3A

Case: 22-1324  Document: 13  Page: 124  Filed: 06/14/2022



FIG. 3B



FIG. 3C

Case: 22-1324    Document: 13    Page: 126    Filed: 06/14/2022



FIG. 4A

Case: 22-1324     Document: 13     Page: 127     Filed: 06/14/2022



FIG. 4B



FIG. 4C

APPL-1001 / Page 15 of 30
APPLE INC. v. COREPHOTONICS LTD.



FIG. 5





FIG. 6A

FIG. 6B



FIG. 7

FIG. 8



FIG. 9

US 10,288,840 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# MINIATURE TELEPHOTO LENS MODULE AND A CAMERA UTILIZING SUCH A LENS MODULE

## TECHNOLOGICAL FIELD

The present invention is generally in the field of imaging techniques, and relates to a camera and mobile electronic devices utilizing such a camera.

## BACKGROUND

Digital camera modules are currently being incorporated into a variety of portable electronic devices. Such devices include for example mobile phones (e.g. smartphones), personal data assistants (PDAs), computers, and so forth. Digital camera modules for use in portable devices have to meet certain requirements such as good quality imaging, small footprint, as well as low weight.

Several techniques for small digital camera modules providing good quality imaging are described in WO14083489 and WO14199338, both assigned to the assignee of the present application.

According to the technique described in WO14083489, a multi-aperture imaging system comprises a first camera with a first sensor that captures a first image and a second camera with a second sensor that captures a second image. The two cameras have either identical or different FOVs. Either image may be chosen to be a primary or an auxiliary image, based on a zoom factor. An output image with a point of view determined by the primary image is obtained by registering the auxiliary image to the primary image.

The technique described in WO14199338 relates to a dual-aperture zoom digital camera operable in both still and video modes. The camera includes Wide and Tele imaging sections with respective lens/sensor combinations and image signal processors and a camera controller operatively coupled to the Wide and Tele imaging sections. The controller is configured to combine in still mode at least some of the Wide and Tele image data to provide a fused output image from a particular point of view, and to provide, without fusion, continuous zoom video mode output images, each output image having a given output resolution. The video mode output images are provided with a smooth transition when switching between a lower zoom factor (ZF) value and a higher ZF value or vice versa. At the lower ZF the output resolution is determined by the Wide sensor, while at the higher ZF value the output resolution is determined by the Tele sensor.

General Description

There is a need in the art for a novel camera module for use in modern portable electronic devices, such as smart phones, laptops, notepads, etc.

As noted above, the requirements for the camera modules for use in such devices are related to the size, weight and image quality of the camera. Moreover, these requirements become more essential when the camera module is to be installed within the portable device, unlike other external camera units attachable to the portable device. In the case of an internal (integral) camera unit, the dimensions of the camera optics should be as small as possible in order to be suitable to operate with commonly used detectors and to fit the thickness of the device in which the camera is installed (preferably without protruding from the device's casing), while the trend in such devices is to reduce the thickness as much as possible.

This problem is even more crucial when using, in a portable device, a lens with a long length with a fixed and relatively high zooming effect. Considering for example the dual-aperture zoom digital camera described in above-indicated publications WO014083489 and WO014199338 mentioned above, it utilizes Wide and Tele imaging channels which provide advanced imaging capabilities such as zoom and image quality by image fusion between the two channels.

One of the problems with dual-aperture zoom cameras relates to the dimensions (heights) of Wide and Tele cameras along the optical axis. Such dimensions depend on total track lengths (TTLs) of the Tele and Wide lenses used in the respective imaging channels.

As schematically illustrated in FIG. 1B, the TTL is typically defined as the maximal distance between the object-side surface of the lens module and an image plane IP defined by such a lens module (where the sensing surface of a camera detector is placed). In most miniature lenses, the TTL is larger than the effective focal length (EFL) of the lens module, which is equal to the distance between the effective principal plane of the lens and its focal plane (which substantially coincides with image plane IP).

With regard to the term effective principal plane, the following should be understood. Generally, the lens (or lens module) has front and rear principal planes, which have the property that a ray emerging from the lens appears to have crossed the rear principal plane at the same distance from the axis that that ray appeared to cross the front principal plane, as viewed from the front of the lens. This means that the lens can be treated as if all of the refraction occurred at the principal planes. The principal planes are crucial in defining the optical properties of the system, since it is the distance of the object and image from the front and rear principal planes that determine the magnification of the system. The principal points are the points where the principal planes cross the optical axis.

Considering dual-aperture optical zoom in a mobile phone (e.g. a smartphone) with the typically used lenses, i.e. typical TTL/EFL ratio of about 1.3, the Wide and Tele lenses would have TTLs of about 4.55 mm and 9.1 mm, respectively. This will result in undesirably long camera modules for use in such a smartphone device.

Further, the difference in the TTLs of the Wide and Tele lens modules can cause shadowing and light-blocking problems. Reference is made to FIG. 1A schematically illustrating that part of incoming light incident on the "higher" lens does not reach the "shorter" lens. In this connection, one should keep in mind that a distance between the Tele and Wide lens modules should be as small as possible to meet the overlapping/common FOVs as well as footprint requirements for the camera unit in a portable device.

Another part of the presently disclosed subject matter is associated with the implementation of standard optical image stabilization (OIS) in a dual-aperture zoom camera. Standard OIS compensates for camera tilt ("CT") by a parallel-to-the image sensor (exemplarily in the X-Y plane) lens movement ("LMV"). Camera tilt causes image blur. The amount of LMV (in mm) needed to counter a given camera tilt depends on the cameras lens EFL, according to the relation LMV=CT*EFL where "CT" is in radians and EFL is in mm. Since, as shown above, a dual-aperture zoom camera may include two lenses with significantly different EFLs, it is impossible to move both lenses together and achieve optimal tilt compensation for both Tele and Wide cameras. That is, since the tilt is the same for both cameras, a movement that will cancel the tilt for the Wide camera will

APPL-1001 / Page 20 of 30
APPLE INC. v. COREPHOTONICS LTD.

**3**

be insufficient to cancel the tilt for the Tele camera. Similarly, a movement that will cancel the tilt for the Tele camera will over-compensate the tilt cancellation for the Wide camera. Assigning a separate OIS actuator to each camera can achieve simultaneous tilt compensation, but at the expense of a complicated and costly camera system.

Thus, for both a single-aperture or multi-aperture (dual) camera unit, the use of a telephoto lens would be advantageous, as such a telephoto lens provides reduced TTL while enabling to maintain the relatively high EFL required for the Tele lens, i.e. for telephoto lens TTL<EFL. However, the dimensions of conventional lenses in which the telephoto condition is satisfied do not allow them to be used as integral lenses fully embedded in a thin portable device. The telephoto lens module, in order to be used as an integral lens in a modern portable device, has to satisfy the telephoto condition (i.e. TTL<EFL) while the lens module is to be as short as possible (along the optical path of light passing through it) allowing it to be fully fitted within the portable device casing.

Accordingly, a miniature telephoto lens module is disclosed which is designed with the desired dimensions to enable its integration within a portable device. According to some examples of the presently disclosed subject matter, the miniature telephoto lens module (or telephoto lens unit) is designed to be completely integrated within the casing of a conventional Smartphone, i.e. without protruding therefrom. The disclosed telephoto lens module has a total track length (TTL) smaller than an effective focal lens (EFL) thereof, and is configured such that its dimension along the optical axis is desirably small, i.e. about 4-15 mm or less (e.g. suitable to be fitted in a portable device having a casing as small as 4 mm).

The telephoto lens unit comprises multiple lens elements made of at least two different polymer materials having different Abbe numbers. The multiple lens elements comprise a first group of at least three lens elements being a telephoto lens assembly, and a second group of at least two lens elements being a field lens assembly.

The first group of lens elements comprises, in order from the object plane to the image plane along an optical axis of the telephoto lens unit: a first lens having positive optical power and a pair of second and third lenses having together negative optical power such that said telephoto lens assembly provides a telephoto optical effect of said telephoto lens unit and wherein said second and third lenses are each made of one of said at least two different polymer materials having a different Abbe number, for reducing chromatic aberrations of said telephoto lens. The second group of lens elements is configured to correct field curvature of said telephoto lens assembly, and said field lens module comprises two or more of said lens elements made of the different polymer materials respectively having different Abbe numbers, and configured to compensate for residual chromatic aberrations of said telephoto lens assembly dispersed during light passage through an effective gap located between the telephoto and field lens assemblies. The effective gap is larger than 1/3 of the TTL of the telephoto lens unit, thereby allowing sufficient field separation for reducing chromatic aberration.

Various examples disclosed herein include an optical lens unit comprising, in order from an object side to an image side: a first lens element with positive refractive power having a convex object-side surface, a second lens element with negative refractive power having a thickness $d_2$ on an optical axis and separated from the first lens element by a first air gap, a third lens element with negative refractive power and separated from the second lens element by a

**4**

second air gap, a fourth lens element having a positive refractive power and separated from the third lens element by an effective third air gap, and a fifth lens element having negative refractive power, separated from the fourth lens element by an effective fourth air gap, the fifth lens element having a thickness $d_5$ on the optical axis.

An optical lens unit may further include a stop, positioned before the first lens element, a glass window disposed between the image-side surface of the fifth lens element and an image sensor with an image plane on which an image of the object is formed.

Each lens element has two surfaces, each surface having a respective diameter. The largest diameter among all lens elements is defined as an "optical diameter" of the lens assembly.

As disclosed herein, TTL is defined as the distance on an optical axis between the object-side surface of the first lens element and an image plane where the image sensor is placed. "EFL" has its regular meaning, as mentioned above. In all embodiments, TTL is smaller than the EFL, i.e. the TTL/EFL ratio is smaller than 1.0. In some embodiments, the TTL/EFL ratio is smaller than 0.9. In an embodiment, the TTL/EFL ratio is about 0.85. According to some examples the lens assembly has an F number F#<3.2.

According to an example disclosed herein, the focal length of the first lens element f1 is smaller than TTL/2, the first, third and fifth lens elements have each an Abbe number ("Vd") greater than 50, the second and fourth lens elements have each an Abbe number smaller than 30, the first air gap is smaller than $d_2/2$, the effective third air gap is greater than TTL/5 and the effective fourth air gap is smaller than $1.5d_5$TTL/50. In some embodiments, the surfaces of the lens elements may be aspheric.

In the optical lens unit mentioned above, the first lens element with positive refractive power allows the TTL of the lens unit to be favorably reduced. The combined design of the first, second and third lens elements plus the relative short distances between them enable a long EFL and a short TTL. The same combination, together with the high dispersion (low Vd) for the second lens element and low dispersion (high Vd) for the first and third lens elements, also helps to reduce chromatic aberration. In particular, the ratio TTL/EFL<1.0 and minimal chromatic aberration are obtained by fulfilling the relationship $1.2\times|f3|>|f2|>1.5\times f1$, where "f" indicates the lens element effective focal length and the numerals 1, 2, 3, 4, 5 indicate the lens element number.

The relatively large effective gap between the third and the fourth lens elements plus the combined design of the fourth and fifth lens elements assist in bringing all fields' focal points to the image plane. Also, because the fourth and fifth lens elements have different dispersions and have respectively positive and negative power, they help in minimizing chromatic aberration.

The telephoto lens module disclosed herein may be advantageously adapted to be incorporated in a mobile phone camera that uses a typical 1/4' or 1/3' image sensor. For example, to be competitive with known mobile phone cameras with 1/4' image sensors, it would be advantageous for the TTL of the telephoto lens module to be smaller than 5.5 mm and the largest lens diameter to be smaller than 4 mm. To be competitive with known mobile phone cameras with 1/3' image sensors, it would be advantageous for the TTL of the telephoto lens module to be smaller than 6.5 mm and the largest lens diameter to be smaller than 5 mm.

Accordingly, to an example of the presently disclosed subject matter there is provided an optical lens unit configured to provide an image on an entire area of a 1/4" image

APPL-1001 / Page 21 of 30
APPLE INC. v. COREPHOTONICS LTD.

US 10,288,840 B2

**5**

sensor, the lens unit comprising five lens elements and having a TTL smaller than 5.5 mm, an EFL larger than 5.9 mm, and an optical diameter smaller than 4 mm.

Accordingly in another example of the presently disclosed subject matter there is provided an optical lens unit operative to provide an image on an entire area of a ⅓" image sensor, the lens unit comprising five lens elements and having a TTL smaller than 6.2 mm, an EFL larger than 6.8 mm, and an optical diameter smaller than 5 mm.

Also, as mentioned above, according to the presently disclosed subject matter it is suggested to have all lens elements made of polymer material such as plastic. While lenses made of polymer material are advantageous for reducing the price tag of the telephoto lens module as well as its weight, there are very few polymer materials which are suitable for this purpose. This is different to glass lenses which can be made of a variety of different glass materials, each characterized by a different Abbe number. The scarcity in polymer materials presents a challenge when designing lenses for a telephoto lens module. This challenge is at least partly due to the limitation in possible combinations of different lenses with different Abbe numbers which can be used for the purpose of correcting field curvature and compensating for chromatic aberrations.

Thus, according to one aspect of the presently disclosed subject matter there is provided a mobile electronic device comprising an integrated camera, wherein the camera comprises a Wide camera unit comprising a Wide lens unit, and a Telephoto camera unit comprising a telephoto lens unit, the telephoto lens unit and the wide lens unit having respectively TTL/EFL ratios smaller and larger than 1 and defining separate telephoto and wide optical paths.

In addition to the above features, the mobile electronic device according to this aspect of the presently disclosed subject matter can optionally comprise one or more of features (i) to (xvi) below, in any desired combination or permutation:

(i). wherein light receiving outer surfaces of the Wide and Telephoto lens units are located substantially in the same plane, thereby reducing shadowing and light blocking effects therebetween.

(ii). wherein the Wide and Telephoto camera units are mounted on separate printed circuit boards.

(iii). wherein the printed circuit boards are located in different spaced-apart substantially parallel planes.

(iv). wherein the Wide and Telephoto camera units are mounted directly on a single printed circuit board.

(v). wherein the Wide and Telephoto camera units are spaced from one another a distance d of minimum 1 mm.

(vi). wherein the telephoto lens unit is made of at least two polymer materials.

(vii). wherein the telephoto lens has a total track length (TTL) not exceeding 15 mm.

(viii). wherein the telephoto lens has TTL less than 10 mm.

(ix). wherein the telephoto lens unit comprises multiple lens elements made of at least two different polymer materials having different Abbe numbers, the multiple lens elements comprise a first group of at least three lens elements configured to form a telephoto lens assembly, and a second group of at least two lens elements configured to form a field lens assembly, wherein the field lens assembly is spaced from the telephoto lens assembly by a predetermined effective gap.

**6**

(x). wherein said at least two different polymer materials comprise at least one plastic material with the Abbe number larger than 50, and at least one plastic material with the Abbe number smaller than 30.

(xi). wherein the first group of lens elements comprises, in order from an object plane to an image plane along an optical axis of the telephoto lens unit: a first lens having positive optical power and a pair of second and third lenses having together negative optical power such that said telephoto lens unit, and said second and third lenses are each made of one of said at least two different polymer materials having a different Abbe number, for reducing chromatic aberrations of said telephoto lens; and

the second group of lens elements is configured to correct field curvature of said telephoto lens assembly, and comprises two or more of said lens elements made of the different polymer materials respectively having different Abbe numbers, and configured to compensate for residual chromatic aberrations of said telephoto lens assembly dispersed during light passage through said effective gap between the telephoto and field lens assemblies.

(xii). wherein the first, third and fifth lens elements have each an Abbe number greater than 50, and the second and fourth lens elements have each an Abbe number smaller than 30.

(xiii). wherein the predetermined effective gap is equal to or larger than ⅛ of the TTL of the telephoto lens unit.

(xiv). wherein the lens elements of the field lens assembly are spaced from one another an effective air gap smaller than ⅕₀ of the TTL of the telephoto lens unit.

(xv). wherein the telephoto lens unit has a TTL smaller than 5.5 mm, an effective focal length (EFL) larger than 5.9 mm, and an optical diameter smaller than 4 mm, thereby enabling to provide an image on an entire area of a ¼" image sensor.

(xvi). wherein the telephoto lens unit has a TTL smaller than 6.2 mm, an effective focal length (EFL) larger than 6.8 mm, and an optical diameter smaller than 5 mm, thereby enabling to provide an image on an entire area of a ⅓" image sensor.

According to another aspect of the presently disclosed subject matter there is provided a camera for integrating in a mobile electronic device, the camera comprising a Wide camera unit and a Telephoto camera unit comprising respectively a wide lens unit and a telephoto lens unit having TTL/EFL ratios larger and smaller than 1, respectively, and defining wide and telephoto optical paths.

Wherein according to some examples the lens elements of at least the telephoto lens unit are made of one or more polymer materials.

BRIEF DESCRIPTION OF THE DRAWINGS

In order to better understand the subject matter that is disclosed herein and to exemplify how it may be carried out in practice, embodiments will now be described, by way of non-limiting example only, with reference to the accompanying drawings, in which:

FIG. 1A is a schematic illustration demonstrating shadowing and light-blocking problems caused by height differences between Wide and Tele cameras in a dual-aperture camera;

FIG. 1B is a schematic illustration of a mobile phone device (constituting a portable electronic device) utilizing a camera unit as disclosed herein which is fully integrated inside the smartphone device;

APPL-1001 / Page 22 of 30
APPLE INC. v. COREPHOTONICS LTD.

7

8

FIG. **1**C is a schematic illustration of a telephoto lens unit according to the presently disclosed subject matter;

FIG. **2**A is a schematic illustration of a specific configuration of the telephoto lens unit, according to a first example of the presently disclosed subject matter;

FIG. **2**B shows a graph plotting the modulus of the optical transfer function (MTF) vs. focus shift of the entire optical lens unit of FIG. **2**A for various fields;

FIG. **2**C shows a graph plotting the distortion vs. field angle (+Y direction) for the lens unit of FIG. **2**A;

FIG. **3**A is a schematic illustration of another possible configuration of the telephoto lens unit, according to a first example of the presently disclosed subject matter;

FIG. **3**B shows a graph plotting the MTF vs. focus shift of the entire optical lens assembly for various fields in the lens unit of FIG. **3**B, according to the second example of the presently disclosed subject matter;

FIG. **3**C shows a graph plotting the distortion +Y in percent for the lens unit of FIG. **3**A;

FIG. **4**A is a schematic illustration of a specific configuration of the telephoto lens unit, according to a first example of the presently disclosed subject matter;

FIG. **4**B shows a graph plotting the MTF vs. focus shift of the entire optical lens system for various fields in the lens unit of FIG. **4**A;

FIG. **4**C shows a graph plotting the distortion +Y in percent for the lens unit of FIG. **4**A;

FIG. **5** is a schematic illustration showing the concept of an effective air gap between adjacent lenses in an optical lens unit, according to the presently disclosed subject matter;

FIG. **6**A is a schematic illustration, in perspective cross section, of an example of a dual-aperture zoom camera, with each camera on a separate printed circuit board (PCB), according to the presently disclosed subject matter;

FIG. **6**B is a schematic illustration, in perspective cross section, of another example of a dual-aperture zoom camera, with each camera on a separate PCB, according to the presently disclosed subject matter;

FIG. **7** is a schematic illustration, in perspective cross section, of yet another example of a dual-aperture zoom camera, where both cameras are mounted on a single PCB, according to the presently disclosed subject matter;

FIG. **8** is a schematic illustration of an example of a dual-aperture zoom camera that includes an OIS mechanism, according to the presently disclosed subject matter; and

FIG. **9** shows schematically a functional block diagram of the camera example of FIG. **8**, according to the presently disclosed subject matter.

DETAILED DESCRIPTION OF EMBODIMENTS

The present invention includes novel configuration of a lens unit in a portable camera, advantageously applicable in a portable electronic device. This is schematically illustrated in FIG. **1**B. In this example, such a portable electronic device **10** is constituted by a mobile phone device (e.g. smartphone). The mobile device is typically a few millimeters thick, e.g. 4 mm-15 mm.

However, as explained above and exemplified further below, the problems solved by the technique disclosed herein are relevant for any modern electronic device equipped with a camera **15** and suitable to be implemented in any such device. This is so since any modern electronic device of the kind specified (i.e. a device including an integral camera unit) is to be as slim as possible, as light as possible, and is to acquire pictures with as good quality as possible.

Modern cameras typically require zooming functions. When such a camera is used in an electronic device, such as a mobile phone device, the zooming function is often implemented with static optics. The problems which may arise when trying to incorporate Wide and Tele lenses into a common housing due to the difference in their heights are described above with reference to FIG. **1**A.

As mentioned above, the presently disclosed subject matter includes a novel mobile electronic device **10** which includes an integrated camera unit **15** which is mounted inside the device casing **14**. The camera **15** includes at least one telephoto lens unit (not shown here) which is made of polymer materials. The telephoto lens unit is configured such that its total track lens (TTL) is less than 15 mm and even less than 10 mm, e.g. less than 6 mm or even less than 4 mm. Thus, enabling the camera to be fully integrated in the portable device (substantially not protruding from the device casing).

Reference is made to FIG. **1**C showing schematically the configuration of a telephoto lens unit **20** of the present invention. The telephoto lens unit **20** is composed of multiple lens elements made of different polymer materials, i.e. materials having different Abbe numbers. The multiple lens elements are configured and arranged to define a telephoto lens assembly **22**A and a field lens assembly **22**B arranged along an optical axis OA with a predetermined effective gap G between them (as will be described more specifically further below). The telephoto lens assembly **22**A is configured to provide the telephoto optical effect of the telephoto lens unit **20**. The field lens assembly **22**B spaced from the telephoto lens assembly **22**A by the predetermined effective gap G is configured for correcting field curvature of the telephoto lens assembly **22**A and to compensate for residual chromatic aberrations of the telephoto lens assembly dispersed during light passage through the effective gap G.

The telephoto lens unit **20** is characterized by a total track lens (TTL) and an effective focal lens (EFL) such that TTL<EFL. This will be exemplified further below. According to the invention, the effective gap G between assemblies **22**A and **22**B is selected to be larger than TTL/5 of the telephoto lens unit **22**A, thereby enabling correction of field curvature of telephoto lens assembly **22**A by the field lens assembly **22**B.

The telephoto lens assembly **22**A includes three lens elements (generally three or more) L**1**, L**2**, L**3** (which are shown here schematically and not to scale), where lens L**1** has positive optical power and lenses L**2** and L**3** have together negative optical power. Lenses L**2** and L**3** are made of the first polymer material having a first Abbe number selected for reducing chromatic aberrations of the telephoto lens assembly **22**A. The field lens assembly **22**B includes two (or more) lens elements L**4** and L**5** which are made of different polymer materials respectively having different Abbe numbers. These lenses are configured to compensate for residual chromatic aberrations of the telephoto lens assembly **22**A dispersed during light passage through the effective gap G between the lens assembly **22**A and **22**B.

Lenses L**1**-L**5** can be made for example of two plastic materials, one having an Abbe number greater than 50 and the other—smaller than 30. For example, Lenses L**1**, L**3** and L**5** are made of plastic with an Abbe number greater than 50, and lenses L**2** and L**4** are made of plastic having an Abbe number smaller than 30.

US 10,288,840 B2

9

10

The following are several specific, but non-limiting, examples of the implementation and operation of the telephoto lens unit of the invention described above with reference to FIG. 1C. In the following description, the shape (convex or concave) of a lens element surface is defined as viewed from the respective side (i.e. from an object side or from an image side).

FIG. 2A shows a schematic illustration of an optical lens unit **100**, according to a first example of the presently disclosed subject matter. FIG. 2B shows the MTF vs. focus shift of the entire optical lens unit for various fields in the lens unit configuration **100**. FIG. 2C shows the distortion +Y in percent vs. field.

According to the example illustrated in FIG. 2A, lens unit **100** includes, in order from an object side to an image side, a first plastic lens element **102** (also referred to as "L1") with positive refractive power having a convex object-side surface **102a** and a convex or concave image-side surface **102b**; a second plastic lens element **104** (also referred to as "L2") with negative refractive power and having a meniscus convex object-side surface **104a**, with an image side surface marked **104b**; a third plastic lens element **106** (also referred to as "L3") with negative refractive power having a concave object-side surface **106a** with an inflection point and a concave image-side surface **106b**. These lens elements define together the telephoto lens assembly (**22A** in FIG. 1C). Further provided in lens unit **100** is a fourth plastic lens element **108** (also referred to as "L4") with positive refractive power having a positive meniscus, with a concave object-side surface marked **108a** and an image-side surface marked **108b**; and a fifth plastic lens element **110** (also referred to as "L5") with negative refractive power having a negative meniscus, with a concave object-side surface marked **110a** and an image-side surface marked **110b**. These two lenses define together the field lens assembly (**22B** in FIG. 1C). The optical lens unit **100** may further optionally include a stop element **101**. The telephoto lens unit **100** defines an image plane **114** in which image sensor(s) is/are located, which is not shown here. Also, as exemplified in the figure, an optional glass window **112** is disposed between the image-side window **110b** of fifth lens element **110** and the image plane **114**.

In the example of the telephoto lens unit **100**, all lens element surfaces are aspheric. Detailed optical data is shown in Table 1, and aspheric surface data is shown in Table 2, wherein the units of the radius of curvature (R), lens element thickness and/or distances between elements along the optical axis and diameter are expressed in mm. "Nd" is the refraction index. The equation of the aspheric surface profiles is expressed by:

$$z = \frac{cr^2}{1 + \sqrt{1 - (1+k)c^2 r^2}} + \alpha_1 r^2 +$$
$$\alpha_2 r^4 + \alpha_3 r^6 + \alpha_4 r^8 + \alpha_5 r^{10} + \alpha_6 r^{12} + \alpha_7 r^{14}$$

where r is the distance from (and is perpendicular to) the optical axis, k is the conic coefficient, $c=1/R$ where R is the radius of curvature, and $\alpha$ are coefficients given in Table 2.

In the equation above as applied to the telephoto lens unit, coefficients $\alpha_1$ and $\alpha_7$ are zero. It should be noted that the maximum value of r "max r"=Diameter/2. It should also be noted that in Table 1 (and in Tables 3 and 5 below), the distances between various elements (and/or surfaces) are marked "Lmn" (where m refers to the lens element number, n=1 refers to the element thickness and n=2 refers to the air gap to the next element) and are measured on the optical axis z, wherein the stop is at z=0. Each number is measured from the previous surface. Thus, the first distance—0.466 mm is measured from the stop to surface **102a**, the distance L11 from surface **102a** to surface **102b** (i.e. the thickness of first lens element **102**) is 0.894 mm, the air gap L12 between surfaces **102b** and **104a** is 0.020 mm, the distance L21 between surfaces **104a** and **104b** (i.e. thickness d2 of second lens element **104**) is 0.246 mm, etc. Also, L21=$d_2$ and L51=$d_5$. The lens elements in Tables 1 and 2 (as well as in Tables 3-6) are designed to provide an image on an entire ⅓" sensor having

TABLE 1

| # | Comment | Radius R [mm] | Distances [mm] | Nd/Vd | Diameter [mm] |
|---|---|---|---|---|---|
| 1 | Stop | Infinite | −0.466 | | 2.4 |
| 2 | L11 | 1.5800 | 0.894 | 1.5345/57.095 | 2.5 |
| 3 | L12 | −11.2003 | 0.020 | | 2.4 |
| 4 | L21 | 33.8670 | 0.246 | 1.63549/23.91 | 2.2 |
| 5 | L22 | 3.2281 | 0.449 | | 1.9 |
| 6 | L31 | −12.2843 | 0.290 | 1.5345/57.095 | 1.9 |
| 7 | L32 | 7.7138 | 2.020 | | 1.8 |
| 8 | L41 | −2.3755 | 0.597 | 1.63549/23.91 | 3.3 |
| 9 | L42 | −1.8801 | 0.068 | | 3.6 |
| 10 | L51 | −1.8100 | 0.293 | 1.5345/57.095 | 3.9 |
| 11 | L52 | −5.2768 | 0.617 | | 4.3 |
| 12 | Window | Infinite | 0.210 | 1.5168/64.17 | 3.0 |
| 13 | | Infinite | 0.200 | | 3.0 |

dimensions of approximately 4.7×3.52 mm. The optical diameter in all of these lens assemblies is the diameter of the second surface of the fifth lens element.

TABLE 2

| # | Conic coefficient k | $\alpha_2$ | $\alpha_3$ | $\alpha_4$ | $\alpha_5$ | $\alpha_6$ |
|---|---|---|---|---|---|---|
| 2 | −0.4668 | 7.9218E−03 | 2.3146E−02 | −3.3436E−02 | 2.3650E−02 | −9.2437E−03 |
| 3 | −9.8525 | 2.0102E−02 | 2.0647E−04 | 7.4394E−03 | −1.7529E−02 | 4.5206E−03 |
| 4 | 10.7569 | −1.9248E−03 | 8.6003E−02 | 1.1676E−02 | −4.0607E−02 | 1.3545E−02 |
| 5 | 1.4395 | 5.1029E−03 | 2.4578E−01 | −1.7734E−01 | 2.9848E−01 | −1.3320E−01 |
| 6 | 0.0000 | 2.1629E−01 | 4.0134E−02 | 1.3615E−02 | 2.5914E−03 | −1.2292E−02 |
| 7 | −9.8953 | 2.3297E−01 | 8.2917E−02 | −1.2725E−01 | 1.5691E−01 | −5.9624E−02 |
| 8 | 0.9938 | −1.3522E−02 | −7.0395E−03 | 1.4569E−02 | −1.5336E−02 | 4.3707E−03 |
| 9 | −6.8097 | −1.0654E−01 | 1.2933E−02 | 2.9548E−04 | −1.8317E−03 | 5.0111E−04 |
| 10 | −7.3161 | −1.8636E−01 | 8.3105E−02 | −1.8632E−02 | 2.4012E−03 | −1.2816E−04 |
| 11 | 0.0000 | −1.1927E−01 | 7.0245E−02 | −2.0735E−02 | 2.6418E−03 | −1.1576E−04 |

US 10,288,840 B2

| 11 | 12 |

Lens unit **100** provides a field of view (FOV) of 44 degrees, with EFL=6.90 mm, F#=2.80 and TTL of 5.904 mm. Thus and advantageously, the ratio TTL/EFL=0.855. Advantageously, the Abbe number of the first, third and fifth lens element is 57.095. Advantageously, the first air gap between lens elements **102** and **104** (the gap between surfaces **102b** and **104a**) has a thickness (0.020 mm) which is less than a tenth of thickness $d_2$ (0.246 mm). Advantageously, the Abbe number of the second and fourth lens elements is 23.91. Advantageously, an effective third air gap G (see below with reference to Table 9) between lens elements **106** and **108** (i.e. the telephoto and field lens assemblies) is greater than TTL/5. Advantageously, an effective fourth air gap (see below with reference to Table 9) between lens elements **108** and **110** is smaller than TTL/50.

The focal length (in mm) of each lens element in lens unit **100** is as follows: f1=2.645, f2=−5.578, f3=−8.784, f4=9.550 and f5=−5.290. The condition 1.2×|f3|>|f2|>1.5× f1 is clearly satisfied, as 1.2×8.787>5.578>1.5×2.645. f1 also fulfills the condition f1<TTL/2, as 2.645<2.952.

FIG. 3A shows a schematic illustration of an optical lens unit **200**, according to another example of the presently disclosed subject matter. FIG. 3B shows the MTF vs. focus shift of the entire optical lens system for various fields in embodiment **200**. FIG. 3C shows the distortion +Y in percent vs. field.

According to the example illustrated in FIG. 3A, lens unit **200** comprises, in order from an object side to an image side: an optional stop **201**; a telephoto lens assembly including a

In the lens unit **200**, all lens element surfaces are aspheric. Detailed optical data is given in Table 3, and the aspheric surface data is given in Table 4, wherein the markings and units are the same as in, respectively, Tables 1 and 2. The equation of the aspheric surface profiles is the same as for lens unit **100** described above.

TABLE 3

| # | Comment | Radius R [mm] | Distances [mm] | Nd/Vd | Diameter [mm] |
|---|---------|---------------|----------------|-------|----------------|
| 1 | Stop | Infinite | −0.592 | | 2.5 |
| 2 | L11 | 1.5457 | 0.898 | 1.53463/56.18 | 2.6 |
| 3 | L12 | −127.7249 | 0.129 | | 2.6 |
| 4 | L21 | 6.6065 | 0.251 | 1.91266/20.65 | 2.1 |
| 5 | L22 | 2.8090 | 0.443 | | 1.8 |
| 6 | L31 | 9.6183 | 0.293 | 1.53463/56.18 | 1.8 |
| 7 | L32 | 3.4694 | 1.766 | | 1.7 |
| 8 | L41 | −2.6432 | 0.696 | 1.632445/23.35 | 3.2 |
| 9 | L42 | −1.8663 | 0.106 | | 3.6 |
| 10 | L51 | −1.4933 | 0.330 | 1.53463/56.18 | 3.9 |
| 11 | L52 | −4.1588 | 0.649 | | 4.3 |
| 12 | Window | Infinite | 0.210 | 1.5168/64.17 | 5.4 |
| 13 | | Infinite | 0.130 | | 5.5 |

TABLE 4

| # | Conic coefficient k | $\alpha_2$ | $\alpha_3$ | $\alpha_4$ | $\alpha_5$ | $\alpha_6$ |
|---|---------------------|------------|------------|------------|------------|------------|
| 2 | 0.0000 | −2.7367E−03 | 2.8779E−04 | −4.3661E−03 | 3.0069E−03 | −1.2282E−03 |
| 3 | −10.0119 | 4.0790E−02 | −1.8379E−02 | 2.2562E−02 | −1.7706E−02 | 4.9640E−03 |
| 4 | 10.0220 | 4.6151E−02 | 5.8320E−02 | −2.0919E−02 | −1.2846E−02 | 8.8283E−03 |
| 5 | 7.2902 | 3.6028E−02 | 1.1436E−01 | −1.9022E−02 | 4.7992E−03 | −3.4079E−03 |
| 6 | 0.0000 | 1.6639E−01 | 5.6754E−02 | −1.2238E−02 | −1.8648E−02 | 1.9292E−02 |
| 7 | 8.1261 | 1.5353E−01 | 8.1427E−02 | −1.5773E−01 | 1.5303E−01 | −4.6064E−02 |
| 8 | 0.0000 | −3.2628E−02 | 1.9535E−02 | −1.6716E−02 | −2.0132E−03 | 2.0112E−03 |
| 9 | 0.0000 | 1.5173E−02 | −1.2252E−02 | 3.3611E−03 | −2.5303E−03 | 8.4038E−04 |
| 10 | −4.7688 | −1.4736E−01 | 7.6335E−02 | −2.5539E−02 | 5.5897E−03 | −5.0290E−04 |
| 11 | 0.00E+00 | −8.3741E−02 | 4.2660E−02 | −8.4866E−03 | 1.2183E−04 | 7.2785E−05 |

first plastic lens element **202** with positive refractive power having a convex object-side surface **202a** and a convex or concave image-side surface **202b**, a second plastic lens element **204** with negative refractive power, having a meniscus convex object-side surface **204a**, with an image side surface marked **204b**, and a third plastic lens element **206** with negative refractive power having a concave object-side surface **206a** with an inflection point and a concave image-side surface **206b**, and a field lens assembly including a fourth plastic lens element **208** with positive refractive power having a positive meniscus, with a concave object-side surface marked **208a** and an image-side surface marked **208b**, and a fifth plastic lens element **210** with negative refractive power having a negative meniscus, with a concave object-side surface marked **210a** and an image-side surface marked **210b**. The optical lens unit **200** further optionally includes a glass window **212** disposed between the image-side surface **210b** of fifth lens element **210** and an image plane **214**.

Lens unit **200** provides a FOV of 43.48 degrees, with EFL=7 mm, F#=2.86 and TTL=5.90 mm. Thus, advantageously, the ratio TTL/EFL=0.843. Advantageously, the Abbe number of the first, third and fifth lens elements is 56.18. The first air gap between lens elements **202** and **204** has a thickness (0.129 mm) which is about half the thickness $d_2$ (0.251 mm). Advantageously, the Abbe number of the second lens element is 20.65 and of the fourth lens element is 23.35. Advantageously, the effective third air gap G between lens elements **206** and **208** is greater than TTL/5. Advantageously, the effective fourth air gap between lens elements **208** and **210** is smaller than TTL/50.

The focal length (in mm) of each lens element in lens unit **200** is as follows: f1=2.851, f2=−5.468, f3=−10.279, f4=7.368 and f5=−4.536. The condition 1.2×|f3|>|f2|>1.5× f1 is clearly satisfied, as 1.2×10.279>5.468>1.5×2.851. f1 also fulfills the condition f1<TTL/2, as 2.851<2.950.

FIG. 4A shows a schematic illustration of an optical lens unit **300**, according to yet a further example of the presently

APPL-1001 / Page 25 of 30
APPLE INC. v. COREPHOTONICS LTD.

US 10,288,840 B2

| 13 | 14 |

disclosed subject matter. FIG. 4B shows the MTF vs. focus shift of the entire optical lens system for various fields in embodiment **300**. FIG. **4C** shows the distortion +Y in percent vs. field.

Lens unit **300** comprises, in order from an object side to an image side, an optional stop **301**; a telephoto lens assembly including a first plastic lens element **302** with positive refractive power having a convex object-side surface **302**a and a convex or concave image-side surface **302**b, a second plastic lens element **204** with negative refractive power, having a meniscus convex object-side surface **304**a, with an image side surface marked **304**b, a third plastic lens element **306** with negative refractive power having a concave object-side surface **306**a with an inflection point and a concave image-side surface **306**b; and a field lens assembly including a fourth plastic lens element **308** with positive refractive power having a positive meniscus, with a concave object-side surface marked **308**a and an image-side surface marked **308**b, and a fifth plastic lens element **310** with negative refractive power having a negative meniscus, with a concave object-side surface marked **310**a and an image-side surface marked **310**b. Also, an optional glass window **312** may be disposed between the object-side **310**b of fifth lens element **310** and an image plane **314**.

According to the present example of lens unit **300**, all lens element surfaces are aspheric. Detailed optical data is given in Table 5, and the aspheric surface data is given in Table 6, wherein the markings and units are the same as in, respectively, Tables 1 and 2. The equation of the aspheric surface profiles is the same as for lens units **100** and **200**.

Lens unit **300** provides a FOV of 44 degrees, EFL=6.84 mm, F#=2.80 and TTL=5.904 mm. Thus, advantageously, the ratio TTL/EFL=0.863. Advantageously, the Abbe number of the first lens element is 63.1, and of the third and fifth lens elements is 57.09. The first air gap between lens elements **302** and **304** has a thickness (0.029 mm) which is about $1/10^{th}$ the thickness $d_2$ (0.254 mm). Advantageously, the Abbe number of the second and fourth lens elements is 23.91. Advantageously, the effective third air gap G between lens elements **306** and **308** is greater than TTL/5. Advantageously, the effective fourth air gap between lens elements **308** and **310** is smaller than TTL/50.

The focal length (in mm) of each lens element in embodiment **300** is as follows: f1=2.687, f2=−6.016, f3=−6.777, f4=8.026 and f5=−5.090. The condition 1.2×|f3|>|f2|>1.5× f1 is clearly satisfied, as 1.2×6.777>6.016>1.5×2.687. f1 also fulfills the condition f1<TTL/2, as 2.687<2.952.

Tables 7 and 8 provide respectively detailed optical data and aspheric surface data for a fourth embodiment of an optical lens system disclosed herein. The markings and units are the same as in, respectively, Tables 1 and 2. The equation of the aspheric surface profiles is the same as for lens systems **100**, **200** and **300**. The lens elements in Tables 7 and 8 are designed to provide an image on an entire ¼″ sensor having dimensions of approximately 3.66×2.75 mm.

TABLE 5

| # | Comment | Radius R [mm] | Distances [mm] | Nd/Vd | Diameter [mm] |
|---|---------|---------------|----------------|-------|---------------|
| 1 | Stop | Infinite | −0.38 | | 2.4 |
| 2 | L11 | 1.5127 | 0.919 | 1.5148/63.1 | 2.5 |
| 3 | L12 | −13.3831 | 0.029 | | 2.3 |
| 4 | L21 | 8.4411 | 0.254 | 1.63549/23.91 | 2.1 |
| 5 | L22 | 2.6181 | 0.426 | | 1.8 |
| 6 | L31 | −17.9618 | 0.265 | 1.5345/57.09 | 1.8 |
| 7 | L32 | 4.5841 | 1.998 | | 1.7 |
| 8 | L41 | −2.8827 | 0.514 | 1.63549/23.91 | 3.4 |
| 9 | L42 | −1.9771 | 0.121 | | 3.7 |
| 10 | L51 | −1.8665 | 0.431 | 1.5345/57.09 | 4.0 |
| 11 | L52 | −6.3670 | 0.538 | | 4.4 |
| 12 | Window | Infinite | 0.210 | 1.5168/64.17 | 3.0 |
| 13 | | Infinite | 0.200 | | 3.0 |

TABLE 6

| # | Conic coefficient k | $\alpha_2$ | $\alpha_3$ | $\alpha_4$ | $\alpha_5$ | $\alpha_6$ |
|---|---------------------|-----------|-----------|-----------|-----------|-----------|
| 2 | −0.534 | 1.3253E−02 | 2.3699E−02 | −2.8501E−02 | 1.7853E−02 | −4.0314E−03 |
| 3 | −13.473 | 3.0077E−02 | 4.7972E−03 | 1.4475E−02 | −1.8490E−02 | 4.3565E−03 |
| 4 | −10.132 | 7.0372E−04 | 1.1328E−01 | 1.2346E−03 | −4.2655E−02 | 8.8625E−03 |
| 5 | 5.180 | −1.9210E−03 | 2.3799E−01 | −8.8055E−02 | 2.1447E−01 | −1.2702E−01 |
| 6 | 0.000 | 2.6780E−01 | 1.8129E−02 | −1.7323E−02 | 3.7372E−02 | −2.1356E−02 |
| 7 | 10.037 | 2.7660E−01 | −1.0291E−02 | −6.0955E−02 | 7.5235E−02 | −1.6521E−02 |
| 8 | 1.703 | 2.6462E−02 | −1.2633E−02 | −4.7724E−04 | −3.2762E−03 | 1.6551E−03 |
| 9 | −1.456 | 5.7704E−03 | −1.8826E−02 | 5.1593E−03 | −2.9999E−03 | 8.0685E−04 |
| 10 | −6.511 | −2.1699E−01 | 1.3692E−01 | −4.2629E−02 | 6.8371E−03 | −4.1415E−04 |
| 11 | 0.000 | −1.5120E−01 | 8.6614E−02 | −2.3324E−02 | 2.7361E−03 | −1.1236E−04 |

TABLE 7

| # | Comment | Radius R [mm] | Distances [mm] | Nd/Vd | Diameter [mm] |
|---|---------|---------------|----------------|-------|---------------|
| 1 | Stop | Infinite | −0.427 | | 2.1 |
| 2 | L11 | 1.3860 | 0.847 | 1.534809/55.66 | 2.2 |
| 3 | L12 | −8.5270 | 0.073 | | 2.1 |
| 4 | L21 | 11.1443 | 0.239 | 1.639078/23.253 | 1.9 |
| 5 | L22 | 1.8641 | 0.504 | | 1.7 |
| 6 | L31 | 19.7342 | 0.239 | 1.534809/55.66 | 1.7 |
| 7 | L32 | 3.9787 | 1.298 | | 1.7 |
| 8 | L41 | −3.3312 | 0.522 | 1.639078/23.253 | 2.8 |
| 9 | L42 | −1.7156 | 0.079 | | 3.1 |
| 10 | L51 | −1.7788 | 0.298 | 1.534809/55.66 | 3.5 |
| 11 | L52 | −12.6104 | 0.792 | | 3.7 |
| 12 | Window | Infinite | 0.210 | 1.5168/64.17 | 4.5 |
| 13 | | Infinite | 0.177 | | 4.6 |

US 10,288,840 B2

**15**

**16**

TABLE 8

| # | Conic coefficient k | α2 | α3 | α4 | α5 | α 6 |
|---|---|---|---|---|---|---|
| 2 | −0.326 | 8.776E−03 | 2.987E−02 | −6.001E−02 | 6.700E−02 | −2.849E−02 |
| 3 | −10.358 | 4.266E−02 | −2.240E−02 | 2.914E−02 | −3.025E−02 | 3.108E−03 |
| 4 | 11.447 | −3.257E−02 | 9.780E−02 | −1.143E−02 | −3.844E−02 | 1.005E−02 |
| 5 | −0.026 | −3.631E−02 | 2.928E−01 | −2.338E−01 | 3.334E−01 | −2.760E−02 |
| 6 | 0.000 | 1.578E−01 | −2.229E−02 | −4.991E−02 | 1.663E−01 | −1.298E−01 |
| 7 | 3.860 | 2.044E−01 | 5.451E−02 | −3.199E−01 | 5.619E−01 | −3.663E−01 |
| 8 | 4.094 | 3.706E−02 | −5.931E−02 | 4.662E−02 | −4.654E−02 | 1.606E−02 |
| 9 | −9.119 | −7.980E−02 | −1.376E−03 | 5.622E−03 | −6.715E−03 | 2.127E−03 |
| 10 | −12.777 | −2.695E−01 | 1.894E−01 | −5.690E−02 | 8.689E−03 | −5.269E−04 |
| 11 | 0.000 | −1.807E−01 | 1.278E−01 | −4.504E−02 | 6.593E−03 | −2.357E−04 |

The focal length (in mm) of each lens element according to this example is as follows: f1=2.298, f2=−3.503, f3=−9.368, f4=4.846 and f5=−3.910. The condition $1.2 \times |f3| > |f2| > 1.5 \times f1$ is clearly satisfied, as $1.2 \times 9.368 > 3.503 > 1.5 \times 2.298$. f1 also fulfills the condition $f1 < TTL/2$, as $2.298 < 2.64$.

Generally, with regard to the effective air gap between the adjacent lens elements, the following should be noted.

In each one of the lens units exemplified above, the first three lens elements (L1, L2 and L3) achieve essentially a telephoto effect for all fields (angles of object orientation relative to the optical axis), i.e. achieve a strong concentration (by L1) followed by partial collimation (mainly by L2 but also by L3). The fact that all fields need to have essentially the same telephoto effect leads to relatively small distances (small air gaps) between the three lens elements, e.g. especially between L1 and L2 (air gap 1). L4 and L5 are mainly field lens elements for reducing field curvature, i.e. their main effect is to cause the focal point for all fields (where the object distance is approximately infinity) to reside on the sensor plane. To achieve this, it is advantageous that for every field, the corresponding rays hit L4 and L5 at different locations, thus enabling separate adjustment for every field ("field separation").

The inventors have found that the desired fields' separation is obtainable in a lens unit design characterized by an "effective air gap" G between lenses L3 and L4 (between the telephoto and field lens assemblies, where a larger G leads to larger separation between the fields).

FIG. 5 illustrates the concept of the effective air gap between the two adjacent lens elements. First, an "air gap per field" $D_{f-n}$ is defined as the length of the n$^{th}$ field's chief ray along the respective chief ray between adjacent lens elements. Effective gap $D_{Leff}$ is then defined as the average of N air gaps per field for field angles α separated evenly between α=0 (for ray 1, air gap $D_{f-1}$) to α=α$_{max}$ (for ray N, air gap $D_{f-n}$), where ray N hits the end pixel on the image sensor diagonal. In other words, between each pair of adjacent lens elements (e.g. between L3 and L4 and between L4 and L5):

$$D_{Leff} = (\Sigma_{n=1}{}^{N} D_{f-n})/N$$

In essence, the effective air gap between adjacent lens elements reflects an average effective distance between the two surfaces bounding the air gap between the two adjacent lens elements. Exemplarily, in FIG. 5 there are N=9 chief rays (and 9 related field air gaps) and the chief rays are distributed angularly evenly between α=0 for ray 1 and α$_{max}$ for ray 9. At α$_{max}$, ray 9 hits the end pixel on the image sensor diagonal.

Table 9 shows data on TTL, $D_{Leff-3}$, $D_{Leff-4}$, and ratios between the TTL and the effective air gaps for each of lens units 100, 200 and 300 above. $D_{Leff-3}$ and $D_{Leff-4}$ were calculated using 9 chief rays, as shown in FIG. 4.

TABLE 9

| Embodiment | TTL | $D_{Leff-3}$ = G | $D_{Leff-4}$ | $D_{Leff-3}$/TTL | $D_{Leff-4}$/TTL |
|---|---|---|---|---|---|
| 100 | 5.903 | 1.880 | 0.086 | 0.319 | 0.015 |
| 200 | 5.901 | 1.719 | 0.071 | 0.291 | 0.012 |
| 300 | 5.904 | 1.925 | 0.094 | 0.326 | 0.016 |
| 400 | 5.279 | 1.263 | 0.080 | 0.246 | 0.015 |

Using $D_{Leff-3}$=G instead of the commonly used distance along the optical axis between L3 and L4 ensures better operation (for the purpose of reduction of field curvature) of lens elements L4 and L5 for all the fields. As seen in Table 9, good field separation may exemplarily be achieved if $D_{Leff-3}$=G>TTL/5.

A compact optical design requires that the diameter of L5 be as small as possible while providing the required performance. Since the lens and camera footprint is determined by L5 diameter, a small effective air gap, $D_{Leff-4}$, between lens L4 and L5 is advantageous in that it allows a small diameter of lens L5 without degrading the optical performance Effective air gap $D_{Leff-4}$ is a better indicator of the L5 diameter than the commonly used air gap along the optical axis between L4 and L5. An adequately small L5 diameter may exemplarily be achieved if the effective air gap between the field lenses L4 and L5 is $D_{Leff-4}$<TTL/50.

It should be noted that an effective air gap $D_{Leff}$ can be calculated in principle using any combination of two or more chief rays (for example ray 1 and ray 9 in FIG. 4). However, the "quality" of $D_{Leff}$ calculation improves while considering an increased number of chief rays.

The miniature telephoto lens units described above with reference to FIGS. 1C and 2 to 5 are designed with a TTL shorter than EFL. Accordingly, due to shorter TTL, such lens units have a smaller field of view, as compared to standard mobile phone lens units. Therefore, it would be particularly useful to use such a telephoto lens unit as a Tele sub-camera lens unit in a dual aperture zoom camera. Such a dual aperture zoom camera is described in the above-mentioned WO14199338 of the same assignee as the present application.

As mentioned above, a problem associated with the use of conventional Wide and Tele lens modules in a camera is associated with the different lengths/heights of the lenses which can cause shadowing and light blocking effects. According to the presently disclosed subject matter it is suggested to eliminate or at least significantly reduce these shadowing and light blocking effects by replacing the conventional Tele lens module by the miniature telephoto lens unit described above in the dual aperture camera.

APPL-1001 / Page 27 of 30
APPLE INC. v. COREPHOTONICS LTD.

US 10,288,840 B2

17

18

Thus, according to the presently disclosed subject matter, the problem discussed above posed by a difference in the TTL/EFL ratios of the conventional Tele and Wide lenses may be solved through use of a standard lens for the Wide camera ($TTL_W/EFL_W$>1.1, typically 1.3) and of a special Telephoto lens design for the Tele camera ($TTL_T/EFL_T$<1, e.g. 0.87), where the telephoto lens unit is configured as described above, providing the miniature telephoto lens unit.

Using the above described miniature telephoto lens unit enables to reduce the $TTL_T$ (according to one non-limiting example down to 7×0.87=6.09 mm) leading to a camera height of less than 7 mm (which is an acceptable height for a smartphone or any other mobile electronic device). The height difference between the telephoto lens unit and the Wide lens unit is also reduced to approximately 1.65 mm, thus reducing shadowing and light blocking problems.

According to some examples of a dual-aperture camera disclosed herein, the ratio "e"=$EFL_T/EFL_W$, is in the range 1.3-2.0. In some embodiments, the ratio $TTL_T/TTL_W$<0.8e. In some embodiments, $TTL_T/TTL_W$ is in the range 1.0-1.25. According to some examples disclosed herein, $EFL_W$ may be in the range 2.5-6 mm and $EFL_T$ may be in the range 5-12 mm.

Referring now to the figures, FIG. 6A shows schematically in perspective cross section an example of a dual-aperture zoom camera device 600. Camera device 600 includes two camera unit 602 and 604. It should be understood that the two camera units may be associated with common or separate detectors (pixel matrix and their associated read out circuits). Thus, the two camera units are actually different in their optics, i.e. in the imaging channels defined by the wide and telephoto lens units. Each camera unit may be mounted on a separate PCB (respectively 605a and 605b) including the read out circuit, and includes a lens unit (respectively 606 and 608), and an image sensor including a pixel matrix (respectively 614 and 616), and an actuator (respectively 610 and 612) associated with a focusing mechanism. In this embodiment, the two PCBs lie in the same plane. It should be understood that in the embodiment where the readout circuits of the two imaging channels are in the same plane, a common PCB can be used, as will be described further below. The two camera units are connected by a case 618. For example, camera 602 includes a Wide lens unit and camera 604 includes a Telephoto lens unit, the $TTL_T$ of the lens unit defining the respective camera height H. For example, the Wide and Telephoto lens units provide respectively main and auxiliary optical/imaging paths, enabling to use the main image for interpreting the auxiliary image data.

FIG. 6B shows schematically, in perspective cross, another example of a dual-aperture zoom camera 600' utilizing the principles of the invention. Camera 600' is generally similar to the above-described camera 600, and the common components are shown in the figure in a self-explanatory manner and thus are not indicated by reference numbers. As in camera 600, in the camera 600', the camera unit 602 (e.g. a Wide lens camera) and camera unit 604 (e.g. a Telephoto lens camera) are mounted on separate PCBs (respectively 605a and 605b). However, in contrast with camera 600, in camera 600' the two PCBs lie in different planes. This enables the object side principal planes of the Wide and Telephoto lens units to be close one to the other, thus reducing the dependency of magnification factor in the two units on the object distance.

For example, camera dimensions for the cameras shown in FIGS. 6A and 6B may be as follows: a length L of the camera (in the Y direction) may vary between 13-25 mm, a width W of the camera (in the X direction) may vary between 6-12 mm, and a height H of the camera (in the Z direction, perpendicular to the X-Y plane) may vary between 4-12 mm. More specifically, considering a smartphone camera example disclosed herein, L=18 mm, W=8.5 mm and H=7 mm.

FIG. 7 shows schematically, in perspective cross section, yet another example of a dual-aperture zoom camera 700. Camera 700 is similar to cameras 600 and 600' in that it includes two camera units 702 and 704 with respective lens units 706 and 708, respective actuators 710 and 712 and respective image sensors 714 and 716. However, in camera 700, the two camera units 702 and 704 are mounted on a single (common) PCB 705. The mounting on a single PCB and the minimizing of a distance "d" between the two camera units minimizes and may even completely avoid camera movement (e.g. associated with mishaps such as drop impact). In general, the dimensions of camera 700 may be in the same range as those of cameras 600 and 600'. However, for the same sensors and optics, the footprint W×L and the weight of camera 700 are smaller than that of cameras 600 and 600'. Mishaps such as drop impact may cause a relative movement between the two cameras after system calibration, changing the pixel matching between the Tele and Wide images and thus preventing fast reliable fusion of the Tele and Wide images. Therefore, such effects should preferably be eliminated.

As described above, the high-quality imaging is also associated with the implementation of standard optical image stabilization (OIS) in such a dual-aperture zoom camera. Standard OIS compensates for camera tilt ("CT"), i.e., image blur, by a parallel-to-the image sensor (exemplarily in the X-Y plane) lens movement ("LMV"). The amount of LMV (in millimeters) needed to counter a given camera tilt depends on the camera lens EFL, according to the relation:

$$LMV=CT*EFL,$$

where "CT" is in radians and EFL is in mm.

Since the Wide and telephoto lens units have significantly different EFLs, both lenses cannot move together and achieve optimal tilt compensation for both of the respective camera units. More specifically, since the tilt is the same for both camera units, a movement that will compensate for the tilt for the Wide camera unit will be insufficient to compensate for the tilt for the Telephoto camera unit, and vice versa. Using separate OIS actuators for the two camera units respectively can achieve simultaneous tilt compensation for both of them, but the entire system would be complex and costly, which is undesirable for portable electronic devices.

In this connection, reference is made to FIG. 8 which shows an example of a dual-aperture zoom camera 800 (similar to the above-described camera 700) that includes two camera units 802 and 804 mounted either on a single PCB 805 (as shown in this example) or on separate PCBs. Each camera unit includes a lens unit (respectively 806 and 808), an actuator (respectively 810 and 812) and an image sensor (respectively 814 and 816). The two actuators are rigidly mounted on a rigid base 818 that is flexibly connected to the PCB (or PCBs) through flexible elements 820. Base 818 is movable by an OIS mechanism (not shown) controlled by an OIS controller 902 (shown in FIG. 9). The OIS controller 902 is coupled to, and receives camera tilt information from a tilt sensor (e.g. a gyroscope) 904 (FIG. 9). More details of an example of an OIS procedure as disclosed herein are given below with reference to FIG. 9. The two camera units are separated by a small distance "d",

APPL-1001 / Page 28 of 30
APPLE INC. v. COREPHOTONICS LTD.

US 10,288,840 B2

19

20

e.g. 1 mm. This small distance between camera units also reduces the perspective effect enabling smoother zoom transition between the camera units.

As indicated above, the two image sensors **814** and **816** may be mounted on separate PCBs that are rigidly connected, thereby enabling adaptation of an OIS mechanism to other system configurations, for example those described above with reference to FIGS. **6**A and **6**B.

In some embodiments, and optionally, a magnetic shield plate may be used, e.g. as described in co-owned U.S. patent application Ser. No. 14/365,718 titled "Magnetic shielding between voice coil motors in a dual-aperture camera", which is incorporated herein by reference in its entirety. Such a magnetic shield plate may be inserted in the gap (with width d) between the Wide and Tele camera units.

In general, the dimensions of camera **800** may be in the same range as those of cameras **600**, **600'** and **700**.

Reference is made to FIG. **9**, which exemplifies the camera operation, utilizing a tilt sensor **904** which dynamically measures the camera tilt (which is the same for both the Wide and Tele camera units). As shown, an OIS controller **902** (electronic circuit including hardware/software components) is provided, which is coupled to the actuators of both camera units (e.g. through base **818**), and receives a CT input from the tilt sensor **904** and a user-defined zoom factor, and controls the lens movement of the two camera units to compensate for the tilt. The LMV is for example in the X-Y plane. The OIS controller **902** is configured to provide a LMV equal to CT*EFL$_{ZF}$, where "EFL$_{ZF}$" is chosen according to the user-defined zoom factor, ZF. According to one example of an OIS procedure, when ZF=1, LMV is determined by the Wide camera unit's EFL$_W$ (i.e. EFL$_{ZF}$=EFL$_W$ and LMV=CT*EFL$_W$). Further, when ZF>e (i.e. ZF>EFL$_T$/EFL$_W$), LMV is determined by the telephoto camera unit's EFL$_T$ (i.e. EFL$_{ZF}$=EFL$_T$ and LMV=CT*EFL$_T$). Further yet, for a ZF between 1 and e, the EFL$_{ZF}$ may shift gradually from EFL$_W$ to EFL$_T$ according to EFL$_{ZF}$=ZF*EFL$_W$.

Thus, the present invention provides a novel approach for configuring a camera device suitable for use in portable electronic devices, in particular smart phones. The present invention solves various problems associated with the requirements for physical parameters of such devices (weight, size), high image quality and zooming effects.

The invention claimed is:

**1**. A mobile electronic device comprising an integrated camera, wherein the camera comprises a Wide camera unit comprising a Wide lens unit and a Telephoto camera unit comprising a Telephoto lens unit, the Telephoto lens unit and the Wide lens unit having, respectively, total track length (TTL)/effective focal length (EFL) ratios smaller and larger than 1 and defining separate Telephoto and Wide optical paths, wherein the Telephoto lens unit comprises multiple lens elements made of at least two different polymer materials having different Abbe numbers, wherein the multiple lens elements comprise a first group of at least three lens elements configured to form a telephoto lens assembly and a second group of at least two lens elements, the second group of at least two lens elements spaced apart from the first group of at least three lens elements by a predetermined effective gap equal to or larger than ⅓ of the TTL of the Telephoto lens unit, wherein the first group of at least three lens elements comprises, in order from an object plane to an image plane along an optical axis of the Telephoto lens unit, a first lens element having positive optical power and a pair of second and third lens elements having together negative optical power such that the Telephoto lens assembly provides a Telephoto optical effect of the Telephoto lens unit

and such that the second and third lens elements are each made of one of the at least two different polymer materials having a different Abbe number for reducing chromatic aberrations of the Telephoto lens, wherein the second group of lens elements includes a fourth lens element and a fifth lens element made of the different polymer materials having different Abbe numbers and is configured to correct a field curvature and to compensate for residual chromatic aberrations of the Telephoto lens assembly dispersed during light passage through the effective gap between the Telephoto lens assembly and the second group of at least two lens elements, and wherein the first, third and fifth lens elements have each an Abbe number greater than 50 and the second and fourth lens elements have each an Abbe number smaller than 30.

**2**. The mobile electronic device of claim **1**, wherein light receiving outer surfaces of the Wide and Telephoto lens units are located substantially in the same plane, thereby reducing shadowing and light blocking effects therebetween.

**3**. The mobile electronic device of claim **1**, wherein the Wide and Telephoto camera units are mounted on separate printed circuit boards.

**4**. The mobile electronic device of claim **3**, wherein the printed circuit boards are located in different spaced-apart substantially parallel planes.

**5**. The mobile electronic device of claim **1**, wherein the Wide and Telephoto camera units are mounted directly on a single printed circuit board.

**6**. The mobile electronic device of claim **1**, wherein the Wide and Telephoto camera units are spaced from one another a distance d of about 1 mm.

**7**. The mobile electronic device of claim **1**, wherein the Telephoto lens unit has a TTL less than 6.5 mm.

**8**. The mobile electronic device of claim **1**, wherein the lens elements of the second group of lens elements are spaced from one another an effective air gap smaller than ⅒₅₀ of the TTL of the Telephoto lens unit.

**9**. The mobile electronic device of claim **1**, wherein the Telephoto lens unit has a TTL smaller than 5.5 mm, an EFL larger than 5.9 mm, and an optical diameter smaller than 4 mm, enabling to provide an image on an entire area of a ¼" to ⅓" image sensor.

**10**. The mobile electronic device of claim **1**, wherein the Telephoto lens unit has a TTL smaller than 6.2 mm, an EFL larger than 6.8 mm, and an optical diameter smaller than 5 mm, enabling to provide an image on an entire area of a ¼" to ⅓" image sensor.

**11**. The mobile electronic device of claim **1**, wherein Telephoto lens unit TTL/EFL ratio is smaller than 0.9.

**12**. The mobile electronic device of claim **1**, wherein the Telephoto lens unit TTL is less than 5.5 mm.

**13**. The mobile electronic device of claim **1**, wherein the Telephoto lens unit EFL is greater than 5.9 mm.

**14**. The mobile electronic device of claim **1**, wherein the Telephoto lens unit EFL is greater than 6.8 mm.

**15**. The mobile electronic device of claim **1**, wherein the Telephoto camera unit includes an image sensor and wherein an image captured by the Telephoto camera unit has a field of view that is no larger than 44 degrees.

**16**. The mobile electronic device of claim **11**, wherein the Telephoto lens unit EFL is greater than 5.9 mm.

**17**. The mobile electronic device of claim **11**, wherein the Telephoto lens unit EFL is greater than 6.8 mm.

**18**. The mobile electronic device of claim **1**, wherein the Telephoto lens unit has an F# smaller than 3.2 and a TTL smaller than 6.2 mm.

US 10,288,840 B2

21

**19**. The mobile electronic device of claim **1**, wherein the first lens element of the Telephoto lens unit has a focal length f**1** smaller than TTL/2.

**20**. The mobile electronic device of claim **1**, wherein the first, second and third lens elements have respective focal lengths f**1**, f**2** and f**3**, and wherein the respective focal lengths satisfy the condition 1.2|f**3**|>|f**2**|>1.5f**1** and wherein the Telephoto lens unit has an F# smaller than 3.2, wherein the Telephoto lens unit TTL is smaller than 6.2 mm.

**21**. The mobile electronic device of claim **1**, wherein the Telephoto camera unit includes an image sensor with an image sensor size ¼" or ⅓".

**22**. The mobile electronic device of claim **18**, wherein the first lens element of the Telephoto lens unit has a focal length f**1** smaller than TTL/2.

\* \* \* \* \*

## CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because this brief contains 6177 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ James Anglin Flynn*
James Anglin Flynn
*Counsel for Appellant*