No. 22-1324

# In the
# United States Court of Appeals
# for the Federal Circuit

**APPLE INC.,**
*Appellant,*

v.

**COREPHOTONICS, LTD.,**
*Appellee.*

On Appeal from the Patent Trial and Appeal Board in
*Inter Partes* Review No. IPR2020-00877

**PATENT OWNER-APPELLEE**
**COREPHOTONICS, LTD.'S RESPONSIVE BRIEF**

Marc A. Fenster
mfenster@raklaw.com
Neil A. Rubin
nrubin@raklaw.com
James S. Tsuei
jtsuei@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Blvd.,12th Floor
Los Angeles, CA  90025
Tel: (310) 826-7474
Fax: (310) 826-6991

*Attorneys for Patent Owner-*
*Appellee Corephotonics, Ltd.*

Dated: August 24, 2022

## CLAIMS AT ISSUE
## U.S. PATENT NO. 10,288,840, CLAIMS 1, 3, AND 4

1. A mobile electronic device comprising an integrated camera, wherein the camera comprises a Wide camera unit comprising a Wide lens unit and a Telephoto camera unit comprising a Telephoto lens unit, the Telephoto lens unit and the Wide lens unit having, respectively, total track length (TTL)/effective focal length (EFL) ratios smaller and larger than 1 and defining separate Telephoto and Wide optical paths, wherein the Telephoto lens unit comprises multiple lens elements made of at least two different polymer materials having different Abbe numbers, wherein the multiple lens elements comprise a first group of at least three lens elements configured to form a telephoto lens assembly and a second group of at least two lens elements, the second group of at least two lens elements spaced apart from the first group of at least three lens elements by a predetermined effective gap equal to or larger than ⅕ of the TTL of the Telephoto lens unit, wherein the first group of at least three lens elements comprises, in order from an object plane to an image plane along an optical axis of the Telephoto lens unit, a first lens element having positive optical power and a pair of second and third lens elements having together negative optical power such that the Telephoto lens assembly provides a Telephoto optical effect of the Telephoto lens unit and such that the second and third lens elements are each made of one of the at least two different polymer materials having a different Abbe number for reducing chromatic aberrations of the Telephoto lens, wherein the second group of lens elements includes a fourth lens element and a fifth lens element made of the different polymer materials having different Abbe numbers and is configured to correct a field curvature and to compensate for residual chromatic aberrations of the Telephoto lens assembly dispersed during light passage through the effective gap between the Telephoto lens assembly and the second group of at least two lens elements, and wherein the first, third and fifth lens elements have each an Abbe number greater than 50 and the second and fourth lens elements have each an Abbe number smaller than 30

3. The mobile electronic device of claim 1, wherein the Wide and Telephoto camera units are mounted on separate printed circuit boards.

4. The mobile electronic device of claim 3, wherein the printed circuit boards are located in different spaced-apart substantially parallel planes.

**FORM 9. Certificate of Interest**

**Form 9 (p. 1)**
**July 2020**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2022-1324 |
| **Short Case Caption** | Apple Inc. v. Corephotonics, Ltd. |
| **Filing Party/Entity** | Corephotonics, Ltd. |

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/24/2022

Signature:  /s/ Neil A. Rubin

Name:  Neil A. Rubin

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
July 2020

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Corephotonics, Ltd. | | Samsung Electronics Benelux B.V. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable                  ☐   Additional pages attached

| | | |
|---|---|---|
| C. Jay Chung (formerly of Russ August & Kabat LLP) | | |
| | | |
| | | |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☐   None/Not Applicable                  ☐   Additional pages attached

| | | |
|---|---|---|
| Corephotonics, Ltd. v. Apple Inc., Case No. 3:19-cv-04809-JD (N.D. Cal.) | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable                  ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES ..........................................................ii

STATEMENT OF RELATED CASES ............................................iii

PRELIMINARY STATEMENT.....................................................1

STATEMENT OF THE ISSUES....................................................2

STATEMENT OF THE CASE ........................................................3

SUMMARY OF THE ARGUMENT..............................................17

ARGUMENT ...............................................................................19

    I.    The Board's Findings that May Does Not Teach Mounting
        Image Sensors on Separate Printed Circuit Boards Are
        Supported by Substantial Evidence .........................................19

    II.   The Board's Findings that Apple Failed to Demonstrate a
        Motivation to Combine the References in the Proposed Manner
        Are Also Supported by Substantial Evidence ..........................29

CONCLUSION.........................................................................34

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*ActiveVideo Networks, Inc. v. Verizon Commc's, Inc.,*
  694 F.3d 1312 (Fed. Cir. 2012) ...................................................... 18, 32

*Comcast Cable Commun., LLC v. Promptu Sys. Corp.,*
  838 Fed. Appx. 555 (Fed. Cir. 2021) .................................................. 27

*Ethicon LLC v. Intuitive Surgical, Inc.,*
  No. 2020-1528, 2021 WL 3716397 (Fed. Cir. Aug. 23, 2021) ............. 28

*Granite Constr. Co. v. United States,*
  962 F.2d 998 (Fed. Cir. 1992) ...................................................... 27, 29

*Huawei Techs. Co. v. Iancu,*
  813 F. App'x 505 (Fed. Cir. 2020) ...................................................... 34

*In re Nuvasive, Inc.,*
  842 F.3d 1376 (Fed. Cir. 2016) .......................................................... 28

*Intel Corp. v. Qualcomm Inc.,*
  21 F.4th 784 (Fed. Cir. 2021) ................................................ 29, 33, 34

*TQ Delta, LLC v. CISCO Sys., Inc.,*
  942 F.3d 1352 (Fed. Cir. 2019) .......................................................... 27

*Wasica Fin. GmbH v. Contl. Automotive Sys., Inc.,*
  853 F.3d 1272 (Fed. Cir. 2017) .......................................................... 24

## STATEMENT OF RELATED CASES

This case is the only appeal from the *inter partes* review proceeding that is at issue, and this case is the only appeal that involves U.S. Patent No. 10,288,840.

The Court's decision in this appeal is likely to affect the following district court case where the '840 patent is presently asserted:

- *Corephotonics, Ltd. v. Apple Inc.*, Case No. 3:17-cv-06457-JD (N.D. Cal.)

The Court has designated this appeal a companion to the following pending appeals:

- *Corephotonics, Ltd. v. Apple Inc.*, Nos. 22-1340, 22-1341

- *Apple Inc. v. Corephotonics, Ltd.*, Nos. 22-1350, 22-1351

- *Corephotonics, Ltd. v. Apple Inc.*, Nos. 22-1455, 22-1456

The Court has also designated this appeal as related to the following pending appeal:

- *Apple Inc. v. Corephotonics, Ltd.*,
  Nos. 22-1325, 22-1327,22-1453, 22-1457

iii

# PRELIMINARY STATEMENT

The Board, in its institution decision, correctly determined that Apple's challenge to claims 3 and 4 of the '840 patent failed to even demonstrate a reasonable likelihood of prevailing. Appx274, Appx276. After a full IPR trial, which provided Apple the opportunity to present additional evidence and arguments in favor of its challenge to these claims, the Board again correctly determined that Apple had failed to demonstrate obviousness of claims 3 and 4. Appx64–65.

The two claims at issue in this appeal each require that two camera units be mounted on "separate printed circuit boards." One might expect that Apple would have presented prior art with an embodiment that showed or described more than one printed circuit board. It did not. Failing that, one might expect that Apple would argue for replacing a single printed circuit board with two separate printed circuit boards based upon some problem present in—or benefit to be gained in—the specific combination of references that it alleges would satisfy the challenged claims. Once again, it did not. Rather, Apple argues that a different embodiment in the prior art—which does not satisfy the other limitations of the

claims—would have used separate printed circuit boards, for reasons unique to that other embodiment.

Apple supports its logically challenged theory of obviousness with conclusory expert opinions that are contrary to the actual teachings of the prior art Apple relies upon. The Board correctly rejected these expert opinions and correctly interpreted the teachings of the prior art references based upon the evidence in those prior art references themselves. The Board's determinations are well supported by substantial evidence and should be affirmed.

## STATEMENT OF THE ISSUES

Apple mischaracterizes the second issue in this appeal. The question is not whether there would have been a motivation to combine the May prior art reference with Parulski, Huang, and Tang in the abstract. As Apple notes, May and Parulski have overlapping inventors, and they share a substantively identical embodiment. *Compare* Appx1335, Appx1563. But merely showing motivation for *some* combination of May with other references is not sufficient to overturn the Board's decision or salvage Apple's invalidity theory.

Rather, the actual second issue is whether, assuming that May implicitly teaches image sensors on separate printed circuit boards to address geometrical issues presented by May's *folded* lens embodiments—a theory of Apple's that the Board rejected—a person skilled in the art would have been motivated to apply such teachings to a *non-folded* lens design that did not face those geometrical issues.

Put more succinctly, the second issue is whether the Board correctly held that there was no motivation to combine purported teachings of May concerning separate printed circuit boards with the specific combination of the Parulski, Huang, and Tang references that Apple relies upon to satisfy the challenged claims.

## STATEMENT OF THE CASE

Apple's statement of the case contains important technical errors, misstates the Board's factual findings, and fails to explain the key differences between "folded" and "non-folded" lens designs that are critical to understanding the Board's conclusions as to the non-obviousness of claims 3 and 4.

**Using Lenses with Different Focal Lengths Does Not Require Sensors in Different Planes**

Citing no evidence to support its definition, Apple incorrectly equates "focal length" with "the distance between the lenses and the image sensors." Blue Br. 5. This happens to be a true statement for single-element thin lenses of the kind studied at the very beginning of an optics course, but it has little relevance for the multi-element lens designs at issue in the '840 patent and the asserted prior art.

Based on this incorrect definition, Apple then incorrectly argues that utilizing lenses with different focal lengths would lead to image sensors located in different planes. Blue Br. 5–6. Apple's apparent misunderstanding of the concept of "focal length" is surprising because both the '840 patent and Apple's expert's declaration address the relevant concepts in some detail.

The term in the '840 patent that describes a physical distance between lens elements and the image sensor is "total track length" or "TTL." Apple's expert Dr. Sasián opined that the term "TTL" should be construed as "the length of the optical axis spacing between the object-side surface of the first lens element and the image plane." Appx1203

(¶ 40). He based this opinion in part on a statement in the '840 patent specification. Appx1203 (¶ 40); Appx88 (2:15–19).

The focal length is a distinct concept. As explained in the '840 patent, the "effective focal length" (EFL) of a lens may be greater than or less than the physical TTL. Appx88–89 (2:19–21, 2:39–40, 3:28–29). The EFL is defined as the distance between the "effective principal plane" (an abstract plane where all the refraction of the refraction of the lens *appears* to have occurred) and the focal plane of the lens, and the EFL determines the magnification of the lens system. Appx88 (2:20–23, 2:32–35); *see* Appx1216–1217 (¶ 58, explaining the relationship between focal length and what angular fraction of the scene is captured by the camera).

Apple's own prior art clearly demonstrates that a camera may have lenses with different focal lengths without locating the image sensors in different planes. For example, Parulski Figure 16B shows two multi-element lenses with approximately the same length (612 and 616) and with corresponding sensors in the same plane (614 and 618):



**FIG. 16B**

Appx1335, Appx1360 (23:33–40). But the focal lengths of these two multi-element lenses differ by a factor of 2.5 (40 mm equivalent versus 100 mm equivalent). Appx1360 (23:36–40). Plainly, a desire for different focal lengths need not result in image sensors in different planes.

### The Board Did Not "Theorize" on Ways to Mount Image Sensors to Printed Circuit Boards

Apple contends that "the Board theorized [the image sensors] could be mounted to a single printed circuit board in non-planar fashion, like mounting a painting by its edge, facing the floor or the ceiling rather than the viewer." Blue Br. 12 (citing Appx52–53). But the Board's decision offers no such theory. In fact, the Board never suggests that the *image sensors* in May's folded lens embodiments (e.g., Figs. 10A–10F) would be mounted on printed circuit boards at all. Rather, it quotes Corephotonics' sur-reply, suggesting that an *image capture assembly* as a whole (which

includes the image sensors) could be mounted on a common printed circuit board. Appx52.

The Board was quite correct not to "theorize" on how the image sensors in May's folded lens embodiments might be mounted to printed circuit boards. This is because May's specification explains how the image sensors are "mounted" in these embodiments, and that explanation does not involve "mounting" sensors to printed circuit boards. Rather, May describes image sensors as being "mounted at . . . ends" of "optical relay subassembly[ies]." Appx1567–1568 (7:20–21, 7:26–28, 7:43–44, 7:50–52, 8:6–7, 8:20–21, 8:25–26, 8:36–37, 8:42–43, 8:48–50, 8:61–62, 8:67–9:1, 9:6–8, 9:12–14). The optical relay subassemblies of these embodiments are shown in Figures 16A, 16B, and 17:



FIG. 16A

FIG. 16B

FIG. 17

Appx1556, Appx1568–1569 (10:60–63, 11:4–7). In Figures 16A and 16B,

it is the "lens barrel" 6a that "support[s]" the image sensor 12. Appx1568

(10:63–65). In Figure 17, it is the "fixture" 6b that "support[s]" the image

sensor 14. Appx1569 (11:8–9). Since the sensors are "mounted at" and

"support[ed]" by the optical relay subassemblies, there is no need to speculate on them being mounted to printed circuit boards, whether by "planar" mounting, edge mounting, or otherwise.

In its discussion of its folded lens embodiments, May only refers to circuit boards in one sentence:

> "In addition, in some embodiments the sensors in the image capture assembly may be positioned next to each other ***on a common circuit board assembly***, or may be packaged in a common integrated circuit package, and the lenses in the image capture assembly may be provided in ***a common lens assembly that mounts onto the circuit board*** or the integrated circuit package."

Appx1568 (10:14–20) (emphasis added); *see* Appx44, Appx47 (Board quoting this sentence from May). There is no suggestion here of separate circuit boards for each image sensor. To the contrary, May speaks of "a common circuit board assembly" and of "the circuit board." Likewise, there is no suggestion here of mounting image sensors directly to circuit boards. Rather, it is an entire "lens assembly" that is mounted to the circuit board.

To the extent that Apple argues that the image sensors must be "mounted" to printed circuit boards in a "planar" fashion in order to be

electrically connected to them, the Board correctly rejected that argument, finding that any necessary electrical connection could be provided, for example, by wires or "flex connectors." Appx54 (citing Apple's counsel at Appx491 (21:14–18)); *see* Appx1575 (23:53–54) (describing carrying "image signals" via a "flex connector").

### *Apple Mischaracterizes the Role of the Folded vs. Non-Folded Lens Distinction in the Board's Decision*

Apple suggests that the Board found a lack of motivation to combine May's purported teachings regarding folded lens embodiments because "'840 patent ostensibly concerns 'non-folded' configurations." Blue Br. 13 (citing Appx56–57). This is incorrect for two reasons. First, nothing in the '840 patent specification or claims suggests its invention would not be applicable to cameras using folded lenses. But more importantly, the point that the Board was actually making is that the proposed combination of Parulski, Tang, Huang, and May presented by Apple utilized a non-folded configuration with non-folded lenses. Appx56–57. Apple's opening brief does not dispute that point, but rather argues that teachings from May could be applied "in the non-folded context." Blue Br. 31–34.

Folded and non-folded lens designs utilize different geometries, which result in different configurations of the devices that contain them. An example of a non-folded lens is given in Figure 1 of the Huang prior art reference:



Fig. 1

Appx1369 (red annotations added). This lens includes six refractive lens elements 110, 120, 130, 140, 150, and 160 and has an associated image sensor 190. Appx1394 (9:19–34). While the lens elements bend the paths of individual light rays, the general path of light is from left to right, entering the lens from the left, passing through the six lens elements, and reaching the image sensor at the right, traveling in roughly the same direction as it was when it was when it first entered the lens. Appx315.

The Tang reference's lenses are likewise not folded:



Fig. 1A

Appx1460 (red annotations added).

An example of a *folded* lens is given in Figure 16A of the May prior art reference:



FIG. 16A

Appx1556 (red annotations added). This lens has "an optical path that is folded by a mirror prism **8**$a$," which bends the optical path by 90 degrees. Appx1568 (10:66–67). The lens has refractive lens elements, including elements adjacent to the prism and the "relay lens components **7**$a$." Appx1568 (10:63–66). The lens also has an associated image sensor 12 supported by the lens barrel 6a. Appx1568 (10:64–65). Because of the 90-degree bend in the folded optical path, the image sensor 12 is *perpendicular* to the opening the light entered through, rather than being parallel as in the more conventional non-folded arrangement.

The Parulski reference discloses an image capture assembly for use in a mobile phone camera which includes two lenses and associated image sensors. Appx11; Appx1360 (23:28–43). Parulski Figures 16A and 16B show a top view and cross-sectional view of this image capture assembly:



**FIG. 16A**

**FIG. 16B**

Appx11; Appx1335.

In the cross section of Figure 16B, element 612 is preferably a "fixed focal length wide angle lens" and element 614 is its associated sensor. Appx1360 (23:33–40). Likewise, element 616 is preferably a "fixed focal length telephoto lens" and element 616 is its associated sensor. Appx1360 (23:33–40). The lenses 612 and 616 and the associated image sensors 614 and 618 are mounted on a substrate 620.

In the Parulski device, the lenses are non-folded, and the light follows generally straight paths, without making abrupt turns due to mirrors or prisms in the optical path. In the cross section of Figure 16B, the

14

light enters through openings at the top, passes through the optical elements making up the lenses (shown as ovals in cross section), and finally reaches the image sensors at the bottom:



**FIG. 16B**

Appx1335 (red annotations added). Because the paths of the light are generally straight, the sensors are parallel to the openings that light enters through. The lenses and sensors can all be mounted on a common substrate that is opposite to the openings that light enters through and parallel to those openings and to the sensors.

While Parulski suggests using a "wide angle lens" and a "telephoto lens," it does not describe any of the detailed geometrical or material properties of these lenses, which claim 1 of the '840 patent is largely directed to. For that reason, Apple relied upon lenses from Huang and Tang to provide these detailed properties, using a lens from Huang as the

"fixed focal length telephoto lens" of Paruklski Figure 16B and using a lens from Tang as the "fixed focal length wide angle lens." Appx20–21. Notably, all of the lenses in Parulski, Huang, and Tang are non-folded lenses, so inserting the Huang and Tang lenses into Parulski did not involve any change to the geometry of the resulting device. As Apple argued for the purposes of its challenge to claim 5 (requiring mounting on "a single printed circuit board"), the combination of Parulski, Huang, and Tang would have the wide and telephoto camera units mounted on the same printed circuit board. Appx36.

Viewed from the front of the camera, the non-folded lens results in a simple geometry, with the image sensors 614 and 618 located behind the lens openings:



**FIG. 16A**

Appx1335. Because the optical path of the folded lens is bent by 90 degrees, the geometry of the folded lens device viewed from the front is different:



**FIG. 10E**

Appx1552, Appx1567 (7:10–12). While the circular openings to the three lenses in this figure are all located close to one another, the sensors 12a, 12b, and 12c are all displaced to the sides of the lens openings, in different directions and different distances. Appx1567 (8:31–54). A common printed circuit board can be placed behind the lenses of this folded design, opposite the lens openings, but because of the different orientations of the image sensors in this folded-lens design, the image sensors would be perpendicular to such a printed circuit board.

## SUMMARY OF THE ARGUMENT

1.   The Board correctly found that May does not teach mounting image sensors on separate printed circuit boards. There is no depiction of printed circuit boards in the folded-lens embodiments Apple relies upon, and the only description of printed circuit boards that relates to these

17

embodiments describes "a common circuit board assembly" and refers to "the circuit board." The only evidence that even suggests there are multiple printed circuit boards in these embodiments is the conclusory opinion of Apple's expert that a POSITA "would understand" or "would have recognized" that those multiple printed circuit boards are there.

Such flimsy expert testimony cannot support a determination of obviousness, and the Board rightly rejected it. Instead, the Board carefully examined the prior reference itself and based on this evidence correctly determined it did not teach mounting image sensors on separate printed circuit boards.

2.    The Board also correctly found that there was no adequate motivation presented to modify the prior art in the way proposed by Apple. Apple's purported motivation to combine rests on generic testimony concerning "modularity," "flexibility," and "cost" that did not show how the proposed modification would actually improve the device in any of these respects. The Board properly rejected this generic and conclusory testimony. *See ActiveVideo Networks, Inc. v. Verizon Commc's, Inc.*, 694 F.3d 1312, 1327–28 (Fed. Cir. 2012). After reviewing both Apple's expert testimony and the teachings in the prior art itself, the Board correctly found

that the evidence failed to show that these purported generic benefits of multiple printed circuit boards over a common printed circuit board were real or that they would have motivated a POSITA to make the proposed modifications to the art.

## ARGUMENT

### I. The Board's Findings that May Does Not Teach Mounting Image Sensors on Separate Printed Circuit Boards Are Supported by Substantial Evidence

The Board correctly found that May does not teach mounting image sensors on separate printed circuit boards. Appx51–53. Apple has not pointed to *any* express disclosure in May—or in any other prior art—of using more than one printed circuit board. In particular, Apple's opening brief does not identify any figure in May that shows multiple printed circuit boards. Apple does point to a figure in May that shows a single "common green circuit board" with two image sensors mounted on it. Blue Br. 18. But for the alleged teaching of multiple printed circuit boards, Apple must take a figure from May and draw in the purported printed circuit boards as red-dashed annotations:



FIG. 10E

Blue Br. 21 (based upon Appx1552).

As Apple's opening brief makes clear, the theory that May (implic-itly) teaches multiple printed circuit boards rests entirely on the testi-mony of Apple's expert Dr. Sasián. Blue Br. 16–26. The Board expressly considered all of Dr. Sasián's testimony on this matter. Appx52. The Board expressly—and correctly—found that Dr. Sasián's testimony was "not persuasive that May teaches or suggests placing different lens units on separate printed circuit boards" and that the evidence Dr. Sasián cited does not support his position. Appx52.

Dr. Sasián's testimony plainly is unpersuasive, and indeed contrary to the other evidence in this IPR. Apple's opening brief cites to para-graphs 44, 66–67, 74, and 77 of Dr. Sasián's initial declaration and to

paragraph 13, 15, 18, 21–22, 24–27, and 30 of Dr. Sasián's second declaration supporting Apple's reply before the Board. Nowhere in any of these opinions does Dr. Sasián offer non-conclusory opinions, supported by reasoning or evidence that the May embodiments contain multiple printed circuit boards, as suggested in Apple's annotations to May Figure 10E shown above.

Paragraph 66 of his initial declaration presents the substance of Dr. Sasián's opinion: "In these embodiments, a POSITA would understand that each camera of the image capture assembly includes a sensor (i.e., 12a, 12b, 14, 16) mounted on a different printed circuit board." Appx1269–1270. But as support for this opinion he cites only to figures that do not depict printed circuit boards and to numbered paragraphs of the May specification (evidently referencing the May printed publication which was not in evidence in the IPR) that say nothing about using different printed circuit boards. Appx1270. The opinion in paragraph 66 is supported by nothing beyond Dr. Sasián's own say-so.

Paragraph 67 adds a discussion of May's non-folded embodiment in Figures 24A-24B and of the substantively identical embodiment in Parulski's figures 16A–16. Appx1270. But as Dr. Sasián's own testimony

makes clear, these embodiments have multiple lenses and sensors on a *single* printed circuit board. Appx1270. There is nothing in the teachings regarding these embodiments to suggest sensors mounted to multiple different printed circuit boards. Appx1270. As for paragraph 74, there Dr. Sasián cites evidence from May that directly contradicts his opinion. In the language he quotes, May states that the sensors are "on a ***common circuit board*** assembly." Appx1272 (¶ 74) (emphasis added); Appx1568 (10:14–16). That sentence from May goes on to state that there may be a common lens assembly that "mounts onto ***the circuit board***." Appx1568 (10:17–20) (emphasis added).

Dr. Sasián's reply declaration again offers nothing but his say-so that May teaches multiple printed circuit boards. For example, paragraph 13 states that "[a] POSITA would have also recognized that May's other optical assemblies would also include image sensors mounted on a PCB," citing his prior declaration for support. Appx2474 (¶ 13). Paragraph 15 shows that if one assumes Dr. Sasián's position that the sensors are mounted to different printed circuit boards, those boards would be different planes, and paragraphs 18, 21, and 24 simply repeat his conclusion, without citing to any support aside from his own earlier declaration.

Appx2475, Appx2477, Appx2479, Appx2480. Paragraph 22 does cite to evidence, but that evidence is a prior art reference (Ryu) showing just a single image sensor mounted on a single printed circuit board. Appx2479 (¶ 22). Ryu does not show the use of multiple printed circuit boards, and it certainly does not show that May—an unrelated prior art reference— teaches the use of multiple printed circuit boards.

There is one citation to May in Dr. Sasián's reply declaration that might appear on its face to support Dr. Sasián's position, namely a citation to May Figure 17, which Dr. Sasián describes as "also showing image sensor 14 mounted on a PCB." Appx2474 (¶ 13). But this description too rests on no more that Dr. Sasián's say-so. He does not say what in Figure 17 is the purported PCB, and nothing in the patent's description of Figure 17 mentions a PCB. Appx1569 (11:4–15). The Board expressly rejected the argument that May's Figure 17 shows a printed circuit board, noting that Apple "does not explain how and why any component of the figure would have been understood to teach or suggest a printed circuit board." Appx54. Moreover, Apple failed to argue that Figure 17 shows a printed circuit board in its original petition or in its opening brief before this

Court. Accordingly any such argument is waived. *See* Appx379–380 (noting citation to Figure 17 in reply was untimely). *Wasica Fin. GmbH v. Contl. Automotive Sys., Inc.*, 853 F.3d 1272, 1286 (Fed. Cir. 2017) (rejecting reply arguments based upon new passages in the prior art reference).

The Board correctly rejected Apple's expert's conclusory opinion. But Apple accuses the Board of improperly substituting Apple's unsupported theories with unsupported theories of its own. As explained above, however, the Board did not adopt a "non-planar mounting theory" with the image sensor mounted to a printed circuit board in a "non-planar" manner. *See supra* at 6–10. Nothing in May says that the image sensors of the folded-lens embodiments are "mounted" to printed circuit boards, and the Board's decision does not suggest that the image sensors would be mounted to printed circuit boards. What the Board's decision does say is that the image sensors could be ***connected*** in a non-planar fashion to the printed circuit board, via wires or flex connectors. Appx54. In other words, the image sensors could be connected to the printed circuit board without being mounted to it.

As for how many printed circuit boards there are in the May folded lens embodiments and where they are located, May's specification clearly

suggests there is only one printed circuit board. Appx1568 (10:14–20) (referring to "a ***common circuit board*** assembly" and to "***the circuit board***" (emphasis added)). It further states that a "common lens assembly" containing all of the lenses can be mounted on this one circuit board. Appx1568 (10:14–20) As to where that board with all of the lenses mounted on it would be located, Apple's brief seems to assume that it would have to be located along the sides of the image capture assembly and then proceeds to vividly show that would be a geometrical impossibility:



FIG. 10E

Blue Br. 19. But the Board recognized that May's image capture assemblies are three-dimensional objects. In addition to sides, they have a front and a back. Placing the printed circuit board in front of the lenses in Figure 10E would be problematic, as it would block the light from entering

the camera. But, as the Board recognized, the printed circuit board could be placed at the back of the image capture assembly, opposite the openings to the lenses, and in that way the lenses could all be mounted on that single printed circuit board. Appx52.

The Board's understanding of how May's printed circuit board is located in the folded-lens embodiments is fully consistent with—and supported by—what May actually says about the printed circuit board in these embodiments. It is also consistent with where the printed circuit board is located in the only embodiment of May that actually shows a printed circuit board:



FIG. 24A

Appx1563 (Fig. 24A) (as annotated at Blue Br. 18). Just as the Board understood to be the case for May's folded embodiments, this non-folded embodiment has a common circuit board (highlighted green by Apple) located at the back of the camera, opposite the openings to the lenses.

Apple appears to argue that it should prevail because it presented expert testimony and Corephotonics did not respond with an expert of its own. Blue Br. 25. But as Apple had to acknowledge, the Board "may reject even uncontroverted expert testimony when it is intrinsically unpersuasive." *Granite Constr. Co. v. United States*, 962 F.2d 998, 1006 (Fed. Cir. 1992). Indeed, this Court has held that "conclusory expert testimony is inadequate to support an obviousness determination on substantial evidence review." *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1359 (Fed. Cir. 2019). Testimony inadequate to *support* an obviousness determination from the Board certainly cannot be sufficient to *reverse* a determination of non-obviousness. Moreover, a determination by the Board that a challenger failed provide evidence sufficient to carry its burden can itself meet the substantial evidence standard. *Comcast Cable Commun., LLC v. Promptu Sys. Corp.*, 838 Fed. Appx. 555, 557 (Fed. Cir. 2021) ("Substantial evidence supports the Board's finding that Comcast failed to show a motivation to combine . . . .")

But here the Board did more than simply point to a lack of adequate evidence offered by Apple. The Board carefully analyzed the testimony of Dr. Sasián *and* the specifications and figures of the May and Parulski

prior art. Appx51–55. Based upon this evidence, the Board presented a reasoned analysis, concluding that May's actual teachings were different from what Dr. Sasián's testimony suggested. Appx51–55. Accordingly, the May and Parulski references themselves constitute substantial evidence to support the Board's factual findings.

The cases cited by Apple are distinguishable. In *Nuvasive*, the issue was that the Board itself failed to identify a motivation to modify the art in support of its obviousness determination. *In re Nuvasive, Inc.*, 842 F.3d 1376, 1384–85 (Fed. Cir. 2016) ("the PTAB failed to articulate a *reason why* the PHOSITA would have been motivated to modify [the art]"). In *Ethicon*, the petitioner's expert provided a reasoned explanation for how the modification would prevent a specific type of accident during use of a medical device, and the Board failed to address that testimony at all. *Ethicon LLC v. Intuitive Surgical, Inc.*, No. 2020-1528, 2021 WL 3716397, at *7 (Fed. Cir. Aug. 23, 2021) (unpublished). Here, Dr. Sasián offered no such reasoned support for his opinions on printed circuit boards, and the Board fully addressed such opinions as he did offer.

In *Granite*, a civil engineer with extensive experience in the design of concrete dams performed a numerical calculation of the safety factor

provided by a specific dam feature, and supported his opinions with factual observations concerning the environment and performance of the dam at issue. *Granite*, 962 F.2d at 1005–06. In *Intel*, the expert presented detailed technical explanations both of *how* and of *why* the person skilled in the art would have modified the prior art circuits. *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 798 (Fed. Cir. 2021). Under those circumstances, the Board's critiques that the expert's opinions were conclusory or impermissibly "generic" were not supported by substantial evidence. *Id.* at 799. Dr. Sasián's testimony lacked any of the detail or factual support of the testimony in *Granite* or *Intel*, and the Board's conclusions that differed from Dr. Sasián's are well-supported by the evidence.

## II.  The Board's Findings that Apple Failed to Demonstrate a Motivation to Combine the References in the Proposed Manner Are Also Supported by Substantial Evidence

This Court need only reach the question of a motivation to combine if finds in Apple's favor on issue 1 and reverses the factual findings of the Board as to whether May teaches mounting image sensors on separate printed circuit boards. As explained above, the Board's finding are well-supported by substantial evidence, indeed by the only credible evidence, and they should be sustained. However, to the extent that the Court

reaches the question of motivation to combine, this issue provides an independent reason that the Board's determinations of non-obviousness should be sustained.

The question here is not whether there would have been a motivation to combine the teachings of May with Parulski, Huang, and Tang in some general sense. Rather, the question is whether a person skilled in the art would have been motivated by purported implicit teachings of May concerning folded-lens cameras with multiple printed circuit boards to modify the non-folded-lens combination of Parulski, Huang, and Tang, replacing its single, common printed circuit board with separate printed circuit boards for the wide and telephoto camera units. The Board correctly found that Apple had failed to carry its burden of showing a motivation for this modification. Appx55–60.

None of the evidence cited by Apple outside of Dr. Sasián's testimony (and the '840 patent) even mentions using multiple printed circuit boards, let alone identifies any benefits that using multiple printed circuit boards would have over using one printed circuit board. Rather the wispy logic of Apple's modification goes as follows: First, the non-folded embodiments of Parulski, May, and Ryu have image sensors planarly

30

mounted on (single) printed circuit boards. Second, the folded embodiments of May have image sensors arranged in a way that they cannot all be planarly mounted on a single printed circuit board. Third, in order to nonetheless planarly mount each image sensor in these folded embodiments on printed circuit board, the person skilled in the art would mount the image sensors on multiple circuit boards. Fourth, because using multiple printed circuit boards solves a purported problem in these folded-lens embodiments, the person skilled in the art would also be motivated to use multiple printed circuit boards in non-folded devices that do not face that purported problem.

Even if you accept the third step in this logic—which the Board correctly did not—the fourth step does not follow. The fact that one design faces a problem that can be solved by a particular modification does not provide a motivation to make that modification to other designs that do not face that problem. Apple's logic is akin to arguing that because periscopes are useful in submarines when they are under water, a person skilled in the art of boat design would be motivated to also add periscopes to sailboats and oil tankers, which one hopes do not routinely submerge.

31

Setting aside the flawed logic of Apple's position, the evidence it relies on is also fatally weak. For motivation to combine, Apple's position again rests on the conclusory testimony of its expert. Dr. Sasián's testimony cites entirely generic "motivations" of "modularity," "ease of repair," "flexibility," and "cost," without providing any evidence or meaningful explanation of why these benefits would result from replacing one printed circuit board with two. Appx2480–2482 (¶¶ 25–27).

The Board examined the testimony of Dr. Sasián, as well as the specifications of May and Parulski, and found no evidence that actually suggested replacing one printed circuit board with two would improve (rather than diminish) modularity or flexibility, or that it would reduce cost. Appx58–61. The bare assertions of Dr. Sasián—unexplained and unsupported—of improvements in modularity, flexibility, repair, or cost are not sufficient to support a motivation to replace one printed circuit board with two, as Apple proposes.

As the Board held, Dr. Sasián's opinions about modularity and cost are akin to the generic testimony on motivation to combine based upon modularity and cost that were rejected in *ActiveVideo*. 694 F.3d 1312, 1327–28 (Fed. Cir. 2012). How does increasing the number of parts in a

product (replacing one printed circuit board with two and adding corresponding connectors) *reduce* cost or make repairs *easier*? Dr. Sasián simply makes this rather surprising assertion, without offering evidence or explanation that demonstrates it is true. Appx2482 (¶ 27). How does mounting lenses and sensors to multiple printed circuit boards rather than one improve "modularity" or "flexibility" in a way that would motivate a person skilled in the art to make this change? How is aligning lenses in the same plane determinantal? How does mounting lenses to different printed circuit boards make it easier to use lens assemblies from different sources? Again Dr. Sasián makes these assertions without evidence or explanation. Appx2481 (¶ 26).

The opinions supporting motivation to combine in this case fall well short of the opinions in Apple's caselaw that this Court has found to be legally sufficient. In *Intel*, the prior art "expressly highlight[ed] power consumption as a consideration" and "expressly contemplate[d] the idea of turning off unused circuits." *Intel*, 21 F.4th at 798. Intel's expert described a specific way to turn off a specific circuit, showing that doing so would save power and—as the patentee's own expert acknowledged—not

change the output of the device. *Id.* Dr. Sasián's opinions fail to demonstrate benefits or motivations in this way. In *Huawei*, the expert demonstrated a precise and concrete benefit to the proposed change—namely reducing the number of bits to be transmitted in a radio signal—and showed that improving efficiency by reducing the number of bits to be transmitted was one of the "fundamental design principles" in the field. *Huawei Techs. Co. v. Iancu*, 813 F. App'x 505, 510 (Fed. Cir. 2020). Dr. Sasián's opinions fail to demonstrate any such concrete benefits. The Board correctly rejected them.

## CONCLUSION

Corephotonics respectfully requests that the Court affirm the Board's conclusion that claims 3 and 4 of the '840 are not unpatentable, because both of the factual determinations of the Board challenged by Apple are supported by substantial evidence and because either factual determination is sufficient, on its own, to support the Board's conclusion.

Dated: August 24, 2022                Respectfully submitted,

*/s/ Neil A. Rubin*
Marc A. Fenster
mfenster@raklaw.com
Neil A. Rubin
nrubin@raklaw.com
James S. Tsuei
jtsuei@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA  90025
Telephone: 310-826-7474

Attorneys for Patent Owner-Appellee,
COREPHOTONICS, LTD.

# CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limita-

tion of the Federal Rules of Appellate Procedure and Federal Circuit

Rules because the filing has been prepared using a proportionally-spaced

typeface and includes 5677 words.


Dated: August 24, 2022           */s/ Neil A. Rubin*
                                 Neil A. Rubin